UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:16-cv-21008-CIV-MORENO/LOUIS

JEFFREY MELTON, EZEKIEL MORRIS,
TOMMY JOHNSON, JUAN VALDES, and
MANVILLE SMITH, Individually and on
behalf of all others similarly situated,

       Plaintiffs,

v.

CENTURY INTERNATIONAL ARMS
CORP.; CENTURY ARMS, INC.; CENTURY
ARMS OF VERMONT, INC.; and CENTURY
INTERNATIONAL ARMS OF VERMONT,
INC.,

       Defendants.

CLASS ACTION

## DEFENDANTS' MOTION TO PRECLUDE PLAINTIFFS' EXPERT DAVID BYRON AND INCORPORATED MEMORANDUM IN SUPPORT

**PISCIOTTI MALSCH**
30 Columbia Turnpike, Suite 205
Florham Park, New Jersey 07932
Telephone:  (973) 245-8100
Facsimile:  (973) 245-8101

*Attorneys for Defendants*

Defendants Century International Arms, Corp., Century Arms, Inc., Century Arms of Vermont, Inc., and Century International Arms of Vermont, Inc. (collectively, "Century" or "Defendant"), pursuant to Rule 702 of the Federal Rules of Evidence, hereby file this Motion to Preclude Plaintiffs' Expert David Byron.

## PRELIMINARY STATEMENT

To support their class certification motion, Plaintiffs disclosed David Byron as their jack-of-all-trades expert who will offer opinions on the design of the AK-style rifles, identifying a uniform class defect, experiences of Century's customers, the reasons for Century's manufacturing decisions, the adequacy of Century's assembly procedures, the sufficiency of the warnings in the manual, and the calculation of classwide damages. Although Mr. Byron is a self-proclaimed expert in the "firearms industry," Mr. Byron has largely been employed manufacturing polymer components for firearms (stocks and grips) and has no experience with designing or manufacturing firearms. Moreover, even if he did have the requisite experience, the facts demonstrate that Mr. Byron has no legitimate methodology to support his intended opinions. In this regard, Mr. Byron's intended opinions are exactly why Rule 702 and <u>Daubert</u> exist.

## BACKGROUND FACTS

### I. Century Sells Original AK-Style Rifles or AK-Style Rifles Manufactured From Original Parts

Century is an importer and manufacturer of firearms. One of the products it imports, manufactures, and sells are AK-style rifles. The AK-47 design originated in Russia in the 1940s. Variations of the original design have been manufactured in numerous countries around the world, including Europe. Century imports original-configuration AK-style firearms and then (1) resells them as-is; (2) modifies them to comply with federal law; or (3) disassembles them, destroys the barrel and receiver, and then reassembles the rifle utilizing a U.S.-made barrel and receiver, but with otherwise original parts. How Century handles a particular firearm is based upon how the rifles are classified under the law: "low capacity" (group one); "high capacity" (group two); or

2

"assault weapons" (group three). Century attempts to utilize as many original parts as possible because many gun enthusiasts and collectors seek to procure authentic AK-style rifles.[1]

## II. Plaintiffs Disclosed David Byron as an Expert to Support Their Class Certification Motion and Damages Model

Plaintiffs filed a class action complaint against Defendants alleging that AK-style rifles manufactured by Century contain a uniform defect. (Dkt. No. 1., Plt. Compl.) On February 1, 2018, Plaintiffs filed their Motion for Class Certification. (Dkt. No. 74.) In support of the motion, Plaintiffs disclosed David Byron as a liability and damages expert, and annexed a copy of his expert declaration and CV. (Dkt. No. 83.) In his declaration, the scope of his work and opinions were detailed:

> I have been retained by Plaintiffs' counsel to inspect and analyze the CLASS WEAPONS, particularly as it relates to the CLASS DEFECT. I have also been asked to determine whether damages can be calculated on a classwide basis. I make this declaration based upon my **personal knowledge, skill, experience, and education**.

(Id. ¶ 1 (emphasis added).)

## III. Mr. Byron's Opinions

### A. Mr. Byron's Definition of the "Class Defect" and "Class Definition"

Mr. Byron opined that the "class defect" is "[c]ontinuing to rotate the safety selector above the safety stop position will fire or dry-fire the weapon." (Id. ¶ 1, n. 2.) According to Mr. Byron, the "class defect" is caused by the use of the original safety lever, which has a "wide tab-like" structure at the base of the safety catch, when manufacturing the rifles. (Id. ¶ 13.) Mr. Byron is of the opinion that any AK-style rifle that utilized the original safety lever will exhibit the class

---

[1] Please note that this first paragraph is meant to be a short synopsis of the relevant background facts regarding the type of firearm at issue in this case. For a more detailed explanation, and specific citations to the record, please see Factual Background Section II to Defendants' Opposition to Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law.

3

defect and discharge if the safety lever rises above the safety stop position. (Ibid.) According to Mr. Byron, the "class weapons" include thirty-six models of AK-style firearms. (Id. ¶ 1, n. 1.)[2]

**B. Mr. Byron's Opinions.**

Mr. Byron's opinions, which are set forth in the section of his Declaration entitled "Observations and Opinions," are as follows:

1. Since all class weapons contain the original safety lever, all class weapons are capable of unintentionally discharging.
2. Century uses the original safety lever because "it is the easiest and cheapest option."
3. Century's assembly, testing, and inspection procedures are inadequate.
4. The dust cover on an AK-style rifle is not a necessary component and does not prevent the safety lever from over-rotating.
5. The warnings in Century's manuals are inadequate.
6. Damages can be calculated on a classwide basis.

(Id. ¶¶ 9-57.) As will be demonstrated below, Mr. Byron lacks the qualifications and/or methodology to support any of these opinions.

## STANDARD

### I. Evaluating Expert Testimony in Conjunction With a Motion for Class Certification is Warranted

In seeking class certification, the plaintiff bears the burden of establishing of the elements of Rule 23 of the Federal Rules of Civil Procedure by a preponderance of the evidence. See Aranaz v. Catalyst Pharm. Partners Inc., 302 F.R.D. 657, 662-663 (S.D. Fla. 2014). In assessing whether this burden is met, a court must conduct a "rigorous analysis" of the evidence a plaintiff puts forth. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-51 (2010); Gilchrist v. Bolger, 733 F.2d 1551, 1555 (11th Cir. 1984). In so doing, "[t]he district court must resolve all conflicts in the evidence

---

[2] WASR: M70AB2; RPK; DRAGUNOV; AMD65; M70B1; M72; GP 1972; 1975 AK Bullpup; Golani; 2007 Champion Pistol; Galil; Draco Pistol; PLS54C; M70B1; M70B2; M76; AK74; Tantal; C39v2; AES10B; 1960AK; AKMS; GP1975; Saiga; PAPM85; PAPM92; M70; M74; N-PAP; GPAK 74; MAK-22; PAPM90; MAADI; MAK-90; and AK63D.

4

necessary to make the requisite determinations under Rule 23." Lee-Bolton v. Koppers Inc., 319 F.R.D. 346, 381 (N.D. Fla. 2017) (internal citations omitted).

In undertaking its rigorous analysis, "a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." Sher v. Raytheon Co., 419 Fed. Appx. 887, 890 (11th Cir. 2011) (quoting Am. Honda Motor Co., Inc., 600 F.3d 813 (7th Cir. 2010)). This is particularly necessary when the expert's testimony is necessary to prove the elements for class certification. Id. at 890-91. "District courts in the Eleventh Circuit must perform a 'full Daubert' analysis 'when an expert's testimony is critical to class certification.'" Lee-Bolton, 319 F.R.D at 370 (citing Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin'l Corp., 762 F.3d 1248, 158, n. 7 (11th Cir. 2014)); see also Williams v. Wells Fargo Bank, N.A., 280 F.R.D. 665, 671 (S.D. Fla. 2012). Even when a full Daubert analysis of all aspects of an expert's opinion is not performed, Daubert standards are applied to those elements of the expert proofs that are necessary for class certification. Legg v. Voice Media Group, Inc., 2014 U.S. Dist. LEXIS 61322, *1122 (S.D. Fla. 2014).

## II.   Expert Admissibility Standard

Rule 702 of the Federal Rules of Evidence states, in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trial of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The party offering the expert testimony bears the burden of laying the proper foundation and that party must demonstrate admissibility by a preponderance of the evidence. Rink v. Cheminova, Inc., 400 F.3d 1286, 1291-92 (11th Cir. 2005). To determine whether expert testimony or any report prepared by an expert may be admitted, a court must engage in a three-part inquiry, which includes whether: (1) the expert is qualified to testify competently regarding

5

the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998) (citing Daubert v. Merrell Dow Pharms, Inc., 509 U.S. 579 (1993)). The Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004). While these prongs are necessarily intertwined, the court must individually analyze each concept. Ibid.

When determining reliability, "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. Frazier, 387 F.3d at 1261-62. To make this determination, a court must examine: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." Ibid. "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." Id. at 1262. Therefore, the reliability factors are not exclusive, and alternative questions may be more probative in the context of determining reliability based upon the opinions being proffered. Id. at 1258.

The "helpfulness" prong addresses whether the testimony "concern[s] matters that are beyond the understanding of the average lay person." Edwards v. Shanley, 580 Fed. Appx. 816, 823 (11th Cir. 2014). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific' or whose factual basis is not adequately explained." Ibid. (quoting Cook ex rel. Estate of Tessler v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1111 (11th Cir. 2005)). To be appropriate, there must be a "fit" between the offered testimony and the facts of the case. McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004). Indeed, "there is no fit where a large analytical leap must be made between the facts and the opinion." Ibid.

6

## **ARGUMENT**

As will be briefly demonstrated, Mr. Byron should be precluded from testifying in his matter because none of his opinions meet the aforementioned standards.

**I.   Mr. Byron Should Be Precluded From Offering Opinions About the Uniform Defect and the Capability of All Class Firearms to Unintentionally Discharge.**

First, Mr. Byron is not qualified to offer opinions related to the design aspects of AK-style firearms. As recounted in more detail above, although continuously referring to his "experience in the field" of firearms, Mr. Byron's deposition testimony revealed the hollowness of this statement. Mr. Byron holds no advanced degrees and is not an engineer.[3] Although Mr. Byron worked as a gunsmith forty years ago, his primary experience "in the field" related to manufacturing polymer firearm components (such as grips and stocks). (Ex. A, Byron Dep. at 40:7-18, 47:8-25, 66:17 – 67:9, 68:24 – 69:4; see also id. at 70:18-22 (noting that he cannot think of any other firearm related product he designed or manufactured); Ex. B, Dep. Exhibits 1-6.)[4] He has never manufactured or designed a complete firearm for retail sale nor has he ever designed or manufactured internal firearm parts (such as safeties or trigger groups). (Id. at 48:3-14.) He has never worked for a major manufacturer of firearms and has not been involved in the assembly of firearms. (Id. at 208:5-12.)

In terms of his familiarity with AK-style firearms, he admitted that he saw very few AK-style rifles (less than a dozen) while working as a gunsmith forty years ago and never inspected a Century AK-style firearm prior to this case. (Id. at 43:14-24, 44:8-11.) He has never personally imported AK-style firearms or surplus parts for AK-style firearms. (Id. at 206:18-20.) He has never assembled AK-style firearms for sale. (Id. at 206:21-23.) He has never owned an AK-style firearm, and the last time he would have actually fired such a rifle would have been over forty

---

[3] Mr. Byron's highest level of education is high school. Although he attended the University of Florida for your years for electronical engineering, he did not graduate. (Ex. A, Byron Dep. at 10:1 – 11:9.) He opted not to earn his degree because "in my field, nobody was finding work." (Id. at 10:11-13.) Instead, he pursued a career in gunsmithing and gemology. (Id. at 11:21 – 12:7.)
[4] Mr. Byron has never designed and manufactured any firearm for sale. (Id. at 59:16 – 63:2.)

years ago. (Id. at 114:15 – 115:4.) Prior to this case, the last time he remembers holding an AK-style firearm was in the 1990s, although he believes that he may have held or looked at an AK-style firearm at a gun show approximately three years ago. (Id. at 116:9 – 117:7.) Mr. Byron has never authored any authoritative texts or any publications related to AK-style firearms. (Id. at 89:19 – 90:8.) As demonstrated, Mr. Byron simply lacks the requisite experience (both generally and specifically) to opine about the design or manufacturing of the product in this case.

Second, even if qualified, Mr. Byron has no verifiable methodology for his asserted opinions (that every class firearm will discharge if the safety lever is allowed to over-rotate). In order to formulate this conclusion, he inspected a total of *seven* AK-style firearms:

> Q. You've inspected a total of seven AK-47s for purposes of this opinion, correct?
> A. That's correct.

(Id. at 162:4-6; 152:6-19.) Mr. Byron inspected no other firearm to prepare his opinions in this case. (Id. at 153:8-14.) He made no comparisons between the design of the class firearms and the design of any other AK-style firearms by any other manufacturer. (Id. at 153:24 – 154:3, 210:23 – 211:2, 219:20-25.) Despite only inspecting *seven* firearms, he offers the opinion that this condition can present itself in *thirty-six* different models, totalling over *1,250,000* firearms. (Id. at 162:4-10.) [5]

Even if inspecting seven firearms was a sufficient methodology to validate his opinions, Mr. Byron has no objective evidence to support his opinions. Although Mr. Byron examined the seven rifles, he took no measurements and made no calculations regarding the forces/tension needed to rotate the safety lever. (Id. at 163:23 – 164:4, 165:20 – 166:1.) He made no calculations despite admitting that the force required was different from firearm-to-firearm and that he could have made such measurements. (Id. at 164:17-25, 165:6-19, 166:13-23.) Indeed, Mr. Byron made no calculations and did not record anything that would enable anyone to compare one AK-style

---

[5] It should also be mentioned that there is a wealth of evidence showing that Mr. Byron is just plain wrong in his opinion that every class firearm will discharge if the safety lever is allowed to over-rotate. (See Opp. to Mot. for Class Cert., at p. 4-5.) This fact underscores the lack of reliable methodology offered by Mr. Byron.

8

firearm to another. (Id. at 166:20-23.) He explained that he did not do such calculations or make any written notes about his evaluations because he was not instructed by counsel to do so. (Id. at 167:3-10.) Additionally, although he noted "some variance" between the dust covers he inspected, he made no calculation regarding the "variance," even though he admitted he could have done so. (Id. at 175:12-25.) Further, Mr. Byron's declaration includes CAD-style drawings purporting to depict the mechanisms of the firearms, but at his deposition, he admitted that he did not even create those drawings – he merely found them on the internet and does not know who created them. (Id. at 179:1 – 180:24.)

Instead of providing any objectively verifiable support for his opinions, Mr. Byron explained that "I used my personal experience." (Id. at 18-19.) In this regard, Mr. Byron created a video in which he purposefully manipulated the safety lever with enough "force, along with the velocity, to override the second notch and the dust cover," but he never attempted to measure the amount of force required to manipulate the lever in such a manner:

> Q. And did you calculate the amount of force – the amount of force that you just described to me?
> A. No. I didn't. I can, if needed.
>
> Q. Okay. But, you haven't?
> A. But no, I didn't, because remember, I didn't take force measurements because I didn't think it was necessary. **I could feel it.**

(Id. at 191:1 – 191:13 (emphasis added).) Mr. Byron admitted that while he could have obtained measurements or other data to support his opinions, he opted not to in lieu of simply relying on his personal feelings. (Ibid.)

He never even spoke to the plaintiffs about their experiences with their firearms. (Id. at 128:1-17.) In his report, Mr. Byron opines that "[o]wners of these weapons have suffered unintentional discharges by over-rotating the safety when attempting to engage the safety," but he admitted at deposition that he had absolutely no support for this statement:

> Q. Well, I guess my question is that – is that you say here, "**Owners of these weapons have suffered unintentional discharges by over-rotating the**

9

>  > **safety when attempting to engage the safety."** Have any of the class plaintiffs experienced that?
> 
> A. I don't know that they've actually discharged the weapon.

(Id. at 225:1-8 (emphasis added).) He has no personal knowledge of this ever happening to any class plaintiff or customer. (Ibid.) Despite his lack of personal knowledge or evidence to support this opinion, however, Mr. Byron stated that the lack of evidence "doesn't mean it didn't happen." (Id. at 225:19-20.)

Mr. Byron has no stated methodology for his opinions. Indeed, the real bases for Mr. Byron's opinions are his unverifiable beliefs and say-so:

> Q. But I'm talking, specifically, about AK-47s. And did you do anything to determine why customers want to buy Century AK-47s? For example, did you poll customers? Did you go to interview anyone? Did you do anything along those lines to help validate what you're saying in your report?
> A. **I'm fairly confident in what I say about the firearms market.**
>
> Q. Uh-huh.
> A. And I – **I understand the pulse of the market.**
>
> Q. Okay.
> A. I don't need to go out and talk to several customers and hope I have a large enough sample to validate my opinion.
>
> Q. Okay.
> A. **I am fairly competent in my opinion.**

(Id. at 209:22 – 210:10 (emphasis added).) Other times, he would justify his opinions by generally referring to his "experience in the firearms industry," even though his experience has no bearing on the opinion being preferred:

> Q. What do you base that – your opinion on why people buy Century AK-47s?
> A. **My experience in the firearms industry.**

(Id. at 203:20-25 (emphasis added); see also id. at 209:11-17.) Mr. Byron never points to what specific "experience" supports his opinions, which is because – as demonstrated above – he does not have the requisite experience.

10

Mr. Byron's class definition and uniform defect opinions are not based on a scientific process and he offers no explanation to explain how his inspection of seven total firearms was sufficient to allow him to reliably opine that the purported defective condition exists in over 1,250,000 firearms. Indeed, such a conclusory statement without factual support is such "a large analytical leap" warranting preclusion. McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004). Based on the well-established case law, and Mr. Byron's own testimony, he lacks the qualifications and methodology to offer opinions regarding a uniform class defect in this matter, and "noting in either Daubert or the Federal Rules of Evidence requires a district court to admit evidence that is connected to existing data only by the *ipse dixit* of the expert." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 157 (1999) (quoting General Elec. Co. v. Joiner, 422 U.S. 136, 146 (1997)).

## II. Mr. Byron Should Be Precluded From Offering the Opinion That Century Utilizes Original Safety Levers Because "It is the Easiest and Cheapest Option"

In his declaration, Mr. Byron claims that "Century uses the full-auto safety because it is the easiest and cheapest option." (Dkt. No. 83, ¶¶ 30-31.) In addition to the lack of experience already noted above, Mr. Byron has no experience that would allow him to offer such an opinion. He has never worked for a major manufacturer of firearms and has not been involved in the assembly of firearms. (Id. at 208:5-12.) He has never personally imported or exported AK47s or surplus parts for AK-style firearms. (Id. at 206:18-20.) He has never assembled AK-47s for sale. (Id. at 206:21-23.) Aside from the glaring lack of qualifications, as evidence by his own report, Mr. Byron did absolutely nothing to support this statement. He does not cite to or rely on any pricing information, witness testimony, or other documentary evidence to show that Century utilized the original safety lever because it was the cheapest option. (See Dkt. No. 83, ¶¶ 30-31.) The reason for this is obvious – because there is no such evidence. Instead, he cites to one anonymous comment from a "firearms blog." (Id. ¶ 31, n. 10.) When pressed to provide any evidence to support this contention during his deposition, Mr. Byron could not. (Ex. A, Byron Dep. at 202:10-19.) He claimed that he had conducted a lot of internet research and had "a plethora

11

of websites" where this issue was discussed, but he neither referenced them in his declaration nor identified them. (Id. at 205:1-8, 205:23 – 206:2.) At his deposition, the only specific evidence Mr. Byron could cite to was his "general business knowledge of the firearms industry." (Id. at 205:14-22.) Frankly, such a conclusory statement unsupported by any evidence is precisely the reason why Rule 702 exists.[6]

### III. Mr. Byron Should Be Precluded From Offering Any Opinions About Century's Assembly or Inspection Procedures.

In his declaration, Mr. Byron criticizes Century's assembly and inspection procedures as inadequate. (Dkt. No. 83, ¶¶ 38-39.) However, Mr. Byron cites to no specific evidence to support this conclusion – again, it is an opinion based solely on his "experience." At his deposition, he admitted that he had no base of knowledge to reliably offer an opinion on this topic as he has never created assembly instructions for a full firearm, has never worked at a manufacturer of firearms, and has never worked on an assembly line. (Ex. A, Byron Dep. at 208:5-12, 215:8-11, 215:14-17, 216:7-9.) Likewise, he has never drafted assembly instructions or inspection instructions for an AK-style firearm. (Id. at 215:14-17, 216:7-9.) He has also never been involved in importing AK-style firearms or surplus parts for AK-style firearms. (Id. at 206:18-20.) Clearly, the only basis offered for this opinion – Mr. Byron's "experience" – is insufficient to satisfy the standards under Daubert.

### IV. Mr. Byron Should Be Precluded From Offering Any Opinions About the Purpose of the Dust Cover.

Mr. Byron also intends to opine that the dust cover is "not a necessary component" and "does not prevent the safety lever from over-rotating." (Dkt. No. 83, ¶¶ 40-42.) For all of the reasons specified in Argument Section I, *supra*, Mr. Byron should not be permitted to offer such testimony. Additionally, Mr. Byron's deposition testimony reveals the insufficient foundation he has for such an opinion. Although being critical of the material out of which the dust cover is

---

[6] Moreover, this opinion does not even take into account Byron's own admission that there are firearms collectors and enthusiasts who want the most original parts on an AK-style rifle. (Ex. A, Byron Dep. at 202:13-19.)

constructed, Mr. Byron admitted that he took no measurements and never compared the material at issue to the material used by other companies in the industry. (Ex. A, Byron Dep. at 219:2-6.) He never looked at the design or material thickness of any other dust cover. (Id. at 219:7-10.)

Again, when asked to provide a basis for his opinions, Mr. Byron was unable to offer anything other than "his experience":

> Q. So, are you – are you critical of the material used to make – to make these original parts, the safety lever and the dust cover?
> A. No. What I'm critical of is the fact that somebody's trying to rely on the dust cover to be part of the safety system.
>
> Q. Okay. And that's based on your experience in the firearms field?
> A. Based on my manufacturing **experience** and **experience** in the firearms field, yes.
>
> Q. But, I think we talked about it earlier, you haven't – prior to this case, you hadn't inspected an AK-47 in quite some time, correct?
> A. That's correct. It's been a while.

(Id. at 217:8-21.) As already explained, Mr. Byron's "manufacturing experience" concerned polymer component parts (such as stocks and grips) and his amorphous citation to his "experience in the firearms field" also provides no support for this opinion.[7] Therefore, Mr. Byron should not be permitted to offer this opinion at trial.

---

[7] It is also worth noting that Mr. Byron's opinions regarding the dust cover are inherently contradictory. In his declaration, he claims that the dust cover "is not a necessary component of the firearm," which leads one to believe that a consumer should be able to utilize the firearm without the dust cover. At his deposition, however, he explained that he merely meant that the rifle would still be operational without the dust cover in place:

> Q. And that's what you mean by "it's not a necessary component." The rifle will still operate without the dust cover?
> A. That's correct.

(Id. at 228:18-21.) This is akin to saying that a seat belt is not a necessary component of a car because the car will still operate without it. Further, when asked whether it would be reasonable for a consumer to ever utilize an AK-style firearm without a dust cover on, Mr. Byron answered that a consumer should only remove the dust cover when cleaning or field-stripping the firearm and the dust cover should never be removed while the firearm is loaded. (Id. at 228:22 – 229:10, 229:20-24.)

### V. Mr. Byron Should Be Precluded from Offering Any Opinions About the Adequacy of Century's Manuals.

In his Declaration, Mr. Byron provides no work experience or education regarding warnings or human factors analysis. Indeed, as was confirmed at his deposition, Mr. Byron lacks any experience in this area. Mr. Byron has no degree in communications (Id. at 21:5-7); has never drafted a user manual for firearms (Id. at 107:9-17, 110:12-18); has never drafted any warnings for a firearm (Id. at 108:10-21); has never drafted a manual or warnings for AK-style rifles (id. at 110:19-22); and has taken no courses in human factors (Id. at 238:14-18). Mr. Byron has never testified as an expert with respect to the sufficiency of a warning in a firearms manual. (Id. at 235:23-25.) In addition to his lack of qualifications, Mr. Byron did nothing to establish a basis for his purported criticisms of the manual. He did not review manuals from other manufacturers or rely on any treatise or other authoritative publication to support his opinions. Again, Mr. Byron merely wants the jury – and the Court – to accept his opinions regarding warnings based on nothing more than his own say-so.

### VI. Mr. Byron Should Be Precluded From Offering Opinions About Classwide Damages.

In the last paragraphs of his declaration, Mr. Byron purports to offer an opinion regarding damages in this case. In this regard, he intends to offer opinions about the costs to replace an original safety lever with an aftermarket safety lever and about the market value of the class firearms at the time of purchase. He simply has no basis for either opinion. Preliminarily, Mr. Byron is not qualified to provide such testimony. He admittedly has no degrees in accounting or economics. (Ex. A, Byron Dep. at 22:6-11.) There is nothing in his CV or his background that demonstrates that he has the knowledge or experience to support such an opinion. Indeed, he admitted – after dodging the question multiple times – that he has never provided such a damages opinion before. (Id. at 140:5-14.)

Mr. Byron also failed to provide any objective support for his opinions. In terms of the replacement costs for aftermarket safety levers, Mr. Byron calculated this amount ($143.44 to $365.74) by "googling." Mr. Byron testified that he conducted internet research regarding the

prices for replacement safety selectors and then conducted internet research regarding the rates for gunsmiths. (Id. at 241:1 – 243:15.) He then crafted a cost range without any specific methodology. (Id. at 243:17 – 244:20 (noting that he utilized no standard method to establish his calculations).) In this regard, Mr. Byron kept no record of the websites he visited, the various prices his located, or the information upon which his calculations were formed. He did not record where the gunsmiths were located. He made no phone calls to consumers, retail shops, or wholesalers. (Id. at 242:124 – 243:7.) Instead, he conducted internet research for prices for gunsmiths and replacement parts, and then "I threw out the sites that were too low and the sites *I felt* were too high" and "then tried to use the sites that *I felt* were reasonable for a high and a low." (Id. at 244:10-20 (emphasis added).) When asked to explain his methodology, he explained as follows:

>     Q.    And how did you make that determination of what was considered to be too high and too low?
>     A.    **Experience.**

(Id. at 244:21-23 (emphasis added).) He also explained that relied upon his "personal experience" as a gunsmith to form these opinions (id. at 242:2-6), but he admitted that he had not worked as a gunsmith in *over forty years*. Just like with all of his other opinions, a blanket reference to "experience" is not sufficient to permit this opinion to reach a jury.

In terms of Mr. Byron's other opinion – that "damages are calculable on a classwide basis based on the premium gun owners pay for a safe weapon" – Mr. Byron offers no monetary figure and made no effort to calculate the "premium paid." (Dkt. No. 83, ¶ 57.) When repeatedly asked for a basis for his opinion, he was unable to provide any tangible evidence. (Ex. A, Byron Dep. at 246:14 – 247:13.) Indeed, Mr. Byron admitted that he never compared Century's pricing of firearms to other AK-47 manufacturers. (Id. at 247:11-13.) Instead, he cites to the "eleven firearm price guides that I have written" as support. (Ibid.) In the 1970s and 1980s, Mr. Byron wrote price guides for valuing firearms. (Ex. A, Byron Dep. at 90:18-25.) The price guides included the factors that affect the market value of firearms, including when they are purchased, the trends at

15

the time, the condition, and the location of sale. (Id. at 93:17 – 97:5.) In his books, Mr. Byron also identified the historic nature of firearms as being a factor greatly affecting the market price. (Id. at 101:1-25.) In his declaration, Mr. Byron does not reference *any* of the factors listed in his own book when discussing the purported "premium" paid by the class plaintiffs upon purchasing the firearms. (See Dkt. No. 83, ¶ 57.) Instead, Mr. Byron states that "[a]lthough there are several variables that affect gun prices, safety is a constant factor in pricing." (Ibid.) As Mr. Byron admitted, however, "safety" was not one of the many factors he included in his pricing guides for assessing the market value of firearms. (Ex. A, Byron Dep. at 260:7-18.) In other words, Mr. Byron cites his price guides as support for his damages calculation, but a review of the guides demonstrates that they do not actually support his opinion. Thus, he did not even follow the methodology set forth in his own pricing guides. In other words, Mr. Byron has no legitimate basis for his blanket claim that "damages are calculable on a classwide basis based on the premium gun owners pay for a safe weapon."

## CONCLUSION

Based on the foregoing arguments and authorities, Mr. Byron should be precluded from testifying at trial.

## LOCAL RULE 7.1(A)(3) CERTIFICATION

The undersigned counsel for Defendants has conferred with Plaintiffs' counsel who has advised that they intend to oppose the relief requested herein.

Dated: Florham Park, New Jersey
       March 23, 2018

[SIGNATURE ON SUBSEQUENT PAGE]

Respectfully submitted,

**s/Ryan L. Erdreich**
Ryan L. Erdreich, Esq. (Florida Bar No.: 65712)
rerdreich@pmlegalfirm.com
Anthony M. Pisciotti, Esq. (pro hac vice)
apisciotti@pmlegalfirm.com
Danny C. Lallis, Esq. (pro hac vice)
dlallis@pmlegalfirm.com
Jeffrey M. Malsch
jmalsch@pmlegalfirm.com
PISCIOTTI MALSCH
30 Columbia Turnpike, Suite 205
Florham Park, New Jersey 07932
Telephone: (973) 245-8100
Facsimile: (973) 245-8101

## CERTIFICATE OF SERVICE

I hereby certify that, on March 23, 2018, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system and a copy of the foregoing was served by the CM/ECF system upon all counsel and parties of record on the Service List below.

**s/Ryan L. Erdreich**
Ryan L. Erdreich, Esq. (Florida Bar No.: 65712)
rerdreich@pmlegalfirm.com

## SERVICE LIST

Angelo Martino, Jr., Esq.
amjrpamail@aol.com
amjrpal@hotmail.com
ANGELO MARTINO, JR., P.A.
645 S.E. 5th Terrace
Ft. Lauderdale, Florida 33301
Telephone: (954) 765-0537
Facsimile: (954) 765-0545
*Attorneys for Plaintiffs*


Steve W. Berman, Esq. (pro hac vice)
steve@hbsslaw.com
Jerrod C. Patterson (pro hac vice)
jerrodp@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
*Attorneys for Plaintiffs*