**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  1:16-cv-21008-CIV-MORENO/LOUIS**

JEFFREY MELTON, EZEKIEL MORRIS,
TOMMY JOHNSON, JUAN VALDES, and
MANVILLE SMITH, Individually and on
behalf of all others similarly situated,

          Plaintiffs,

    v.

CENTURY INTERNATIONAL ARMS,
CORP.; CENTURY ARMS, INC.; CENTURY
ARMS OF VERMONT, INC.; and CENTURY
INTERNATIONAL ARMS OF VERMONT,
INC.,

          Defendants.

CLASS ACTION

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED**
**MEMORANDUM OF LAW IN SUPPORT**

**PISCIOTTI MALSCH**
30 Columbia Turnpike, Suite 205
Florham Park, New Jersey 07932
Telephone:    (973) 245-8100
Facsimile:    (973) 245-8101

*Attorneys for Defendants*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ iii

**BACKGROUND AND MATERIAL FACTS** ...................................................................1

   I.    **Material Facts** .....................................................................................................1

         A.    **Century Imports and Resells Surplus Firearms** .................................1

         B.    **Century's Importation and Resale Process** .........................................1

         C.    **The Redundant Safety System of the AK-Style Firearm** ................................................................................................3

         D.    **The Alleged "Defect" Can Only Occur Under Two Circumstances:   When the Parts are Damaged or When the Dust Cover is Removed** ............................................3

         E.    **The Named Plaintiffs' Rifles Were Not in the Same Condition as When They Left Century** ...............................4

         F.    **Plaintiffs' Purchases and Experiences With the AK-Style Firearms** ....................................................................4

               1.   Arizona Plaintiff: Melton ..........................................................4

               2.   Illinois Plaintiff: Morris ...........................................................5

               3.   Florida Plaintiffs: Valdes, Smith, and Johnson.......................5

         G.    **Plaintiffs Have Not Established a Viable Claim for Damages** ..............................................................................6

   II.   **Relevant Procedural History** .........................................................................7

         A.    **The Original *Erickson* Lawsuit** ........................................................7

         B.    **Motion to Dismiss** ...............................................................................7

         C.    **Motion for Class Certification** ..........................................................7

         D.    **Motion to Preclude Plaintiff's Expert** ..............................................7

**STANDARD** ...................................................................................................................8

**ARGUMENT** ..................................................................................................................8

   I.    **If Plaintiffs' Sole Expert is Precluded, Plaintiffs' Lawsuit Should be Entirely Dismissed** ....................................................8

   II.   **There is No Evidence of a Substantial Safety Risk or That All AK-Style Firearms Will Experience an Unintended Discharge** ..................................................................................9

   III.  **There is No Evidence of a Universal Latent Defect** ...................................11

IV.  **All Plaintiffs' Claims Fail Because They Have Not Established a Viable Claim for Damages** ................................................................ 12

V.   **Summary Judgment is Warranted on Plaintiffs' Consumer Fraud Claims** ................................................................ 15

   A.  **Non-Resident Plaintiffs (Melton and Morris) Cannot Bring a Claim Under the FDUTPA** ................................................................ 15

   B.  **There Was No Deceptive or Unfair Act by Century** ................................................................ 16

   C.  **Plaintiffs Failed to Present Evidence of Proximate Cause** ................................................................ 17

VI.  **Summary Judgment is Warranted on Plaintiffs' Unjust Enrichment Claims** ................................................................ 17

   A.  **Since Plaintiffs Bring a Claim Under the FDUTPA, There is No Basis for an Unjust Enrichment Claim** ................................................................ 17

   B.  **Plaintiffs Morris and Smith Purchased Their Firearms Secondhand** ................................................................ 18

   C.  **Plaintiffs Have Presented No Evidence That They Conferred Any Benefit on Defendant** ................................................................ 18

   D.  **The Circumstances of the Purchasers Were Not Inequitable** ................................................................ 19

VII. **The Claims of Plaintiffs Melton, Morris, and Smith Should Be Dismissed** ................................................................ 19

   A.  **Plaintiff Melton's Claims are Time-Barred** ................................................................ 19

   B.  **Plaintiffs Morris and Smith Purchased Class Firearms After Already Knowing About the Purported Latent Defect** ................................................................ 20

VIII. **The Individual Claims of Melton (Arizona) and Morris (Illinois) Should Also Be Dismissed** ................................................................ 20

**CONCLUSION** ................................................................ 20

## TABLE OF AUTHORITIES

### CASES

Aaron Data Sys. v. GLD Int'l, Inc.,
  2018 U.S. Dist. LEXIS 49523 (S.D. Fla. March 23, 2018) .........................................16

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986)..................................................................................................8

Carriullo v. Gen. Motors,
  2016 U.S. App. LEXIS 8962 (11th Cir. 2016) ...........................................................12

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986)..................................................................................................8

Comcast Corp. v. Behrend,
  569 U.S. 27 (2013)....................................................................................................12

Cooper v. Old Williamsburg Candle Corp.,
  653 F. Supp. 2d 1220 (M.D. Fla. 2009) ......................................................................9

Cramer v. Ford Motor Co.,
  2011 WL 247232 (Fla. Cir. Ct. June 9, 2011) .............................................................9

David v. Am. Suzuki Motor Corp.,
  629 F. Supp. 2d 1309 (S.D. Fla. 2009) ......................................................................18

Dawson v. Withycombe,
  163 P.3d 1034 (Ariz. Ct. App. 2007) .........................................................................20

Democratic Republic of the Congo v. Air Capital Group, LLC,
  614 Fed. App'x 460 (11th Cir. 2015) ........................................................................13

Fla. Power Corp. v. City of Winter Park,
  887 So. 2d 1237 (Fla 2004).......................................................................................19

Gastaldi v. Sunvest Resort Cmtys, L.C.,
  709 F. Supp. 2d 1299 (S.D. Fla. 2010) ......................................................................15

Hap v. Toll Jupiter Ltd. P'ship,
  2009 US. Dist. LEXIS 5866 (S.D. Fla. Jan. 27, 2009) ...............................................16

Harrison v. Leviton Mfg. Co.,
  2006 U.S. Dist. LEXIS 76334 (N.D. Okla. Oct. 19, 2006) ..........................................9

Hutson v. Rexall Sundown, Inc.,
  837 So.2d 1090 (Fla. Dist. Ct. App. 2003) ...............................................................15

In re Chi. Flood Litig.,
   680 N.E.2d 265 (Ill. 1997) ....................................................................................20

In re Motions to Certify Classes Against Court Reporting Firms for Charges
   Relating to Word Indices, 715 F. Supp. 2d 1265 (S.D. Fla. 2010) .............................17

In re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig.,
   880 F. Supp. 2d 801 (E.D. Ohio 2012) ....................................................................13

In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales
   Practices, Prod. Liab. Litig., 754 F. Supp. 2d 1145, 1166-67 (C.D. Cal.
   2010) .....................................................................................................................13

In re Trayslol Prods. Liab. Litig.,
   2013 U.S. Dist. LEXIS 49139 (S.D. Fla. Apr. 2, 2013) ...........................................18

Johnson & Johnson Consumer Cos.,
   124 F. Supp. 3d 1283 (S.D. Fla 2015) ....................................................................14

Justice v. Rheem Mfg. Co.,
   318 F.R.D. 687 (S.D. Fla. 2016) ......................................................................17, 19

Kia Motors Am. Corp. v. Butler,
   985 So.2d 1133 (Fla. Ct. App. 2008) .....................................................................13

Lassen v. Nissan N. Am., Inc.,
   211 F. Supp. 3d 1267 (C.D. Cal. 2016) .........................................................9, 10, 11

Lujan v. Defenders of Wildlife,
   504 U.S. 555 (1992) ................................................................................................8

Makaryan v. Volkswagen Grp. Of Am., Inc.,
   2017 U.S. Dist. LEXIS 216312 (C.D. Cal. Oct. 13, 2017)...................................11, 12

Matthews v. Am. Honda Motor Co.,
   2012 U.S. Dist. LEXIS 90802 (S.D. Fla. June 6, 2012) ...........................................18

Montgomery v. New Piper Aircraft, Inc.,
   209 F.R.D. 221 (S.D. Fla. 2002)............................................................................17

Moore v. GNC Holdings, Inc.,
   2014 U.S. Dist. LEXIS 199393 (S.D. Fla. March 18, 2014) ....................................19

Newman v. RCN Telecom Servs.,
   238 F.R.D. 57 (S.D.N.Y. 2006) .............................................................................20

O'Bryan v. Ford Motor Co.,
   18 F. Supp. 3d 1361 (S.D. Fla. 2014) ......................................................................8

O'Shea v. Littleton,
   414 U.S. 488 (1974) ........................................................................................................10

PNR, Inc. v. Beacon Prop. Mgmt., Inc.,
   842 So. 2d 773 (Fla. 2003) ............................................................................................16

Prohias v. Pfizer, Inc.,
   490 F. Supp. 2d 1228 (S.D. Fla. 2007) .........................................................................18

Rollins, Inc. v. Butland,
   951 So. 2d 860 (Fla. Ct. App. 2006) ........................................................................13, 15

Rollins, Inc. v. Heller,
   454 So. 2d 580 (Fla. Ct. App. 1984) ............................................................................12

Sanchez-Knutson v. Ford,
   310 F.R.D. 529 (S.D. Fla. 2015) .............................................................................13, 14

Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec.
   Corp., 694 P.2d 198 (Ariz. 1984) .................................................................................20

Stein v. Marquis Yachts, LLC,
   2015 U.S. Dist. LEXIS 35088 (S.D. Fla. Mar. 20, 2015) ........................................15, 16

Taragan v. Nissan N. Am., Inc.,
   2013 U.S. Dist. LEXIS 87148 (N.D. Cal. June 30, 2013) ..............................................9

Thermoset Corp. v. Bldg. Materials Corp. of Am.,
   2015 WL 11197750 (S.D. Fla. Apr. 9, 2015) .................................................................9

United Techs Corp. v. Mazer,
   556 F.3d 1260 (11th Cir. 2009) ....................................................................................18

Varner v. Dometic Corp.,
   2017 U.S. Dist. LEXIS 187308 (S.D. Fla. July 27, 2017) ...............................11, 13. 14

Washington v. LaSalle Bank Nat. Ass'n,
   817 F. Supp. 2d 1345 (S.D. Fla. 2011) .........................................................................16

Zlotnick v. Premier Sales Grp., Inc.,
   480 F.3d 1281 (11th Cir. 2007) ....................................................................................16

**STATUTES**

18 U.S.C. § 922 ................................................................................................................ 2

Ariz. Rev. Stat. § 12-542 ................................................................................................. 19

Ariz. Rev. Stat. § 12-543 ................................................................................................. 19

Fla. Stat. § 95.031 .......................................................................................................... 15

Fla. Stat. § 501.204 ........................................................................................................ 19

**RULES**

Fed. R. Civ. P. 56 ............................................................................................................ 8

Defendants Century International Arms Corp., Century Arms, Inc., Century Arms of Vermont, Inc., and Century International Arms of Vermont, Inc. (collectively, "Century" or "Defendant"), hereby file this motion for summary judgment in accordance with Rule 56 of the Federal Rules of Civil Procedure ("Rule") and respectfully seek dismissal of Plaintiffs' lawsuit.

## BACKGROUND AND MATERIAL FACTS

### I.   <u>MATERIAL FACTS</u>

#### A.  <u>Century Imports and Resells Surplus Firearms</u>

Century is an importer and manufacturer of firearms with offices in Florida and Vermont. (Statement of Material Facts ("SOMF"), ¶ 1.)  Although maintaining offices in both states, manufacturing, procuring, importing, exporting, developing, storage, and shipping of firearms occurs at Century's facilities in Vermont.  (<u>Id.</u> ¶ 2.)  While Century manufactures some firearms domestically, the major part of its business is importing and reselling original (or surplus) firearms. (<u>Id.</u> ¶ 3.)  One of the types of firearms it procures, imports, and resells is AK-style firearms.  (<u>Id.</u> ¶¶ 3-4.)  To this end, Century will purchase surplus firearms from various foreign locations (such as foreign governments, police, or manufacturers) with the intent to import them and re-sell in the United States.  (<u>Id.</u> ¶ 5.)  Century's business model advertises and promotes their firearms as being made from surplus parts and containing as many original parts as permissible under the law.  (<u>Id.</u> ¶¶ 6, 8.)  Plaintiffs' own liability expert, as well as Plaintiff Morris, testified that collectors and enthusiasts seek out AK-style firearms with the most original parts.  (<u>Id.</u> ¶¶ 9, 42.)  The manual specifically states that the firearms are reassembled from surplus parts.  (<u>Ibid.</u>)  Many gun enthusiasts and collectors purchase original AK-style firearms as collectibles.  (<u>Id.</u> ¶ 7.)  Thus, in addition to attracting customers who want the rifles for sporting purposes, Century's AK-style firearms also attract gun collectors, hobbyists, and enthusiasts.  (<u>Ibid.</u>)

#### B.  <u>Century's Importation and Resale Process</u>

Although Century imports and sells many more models and configurations of AK-style firearms, Plaintiffs' class definition includes 36 different models, which have over 100 different configurations:  WASR: M70AB2; RPK; DRAGUNOV; AMD65; M70B1; M72; GP 1972; 1975 AK Bullpup; Golani; 2007 Champion Pistol; Galil; Draco Pistol; PLS54C; M70B1; M70B2; M76; AK74; Tantal; C39v2; AES10B; 1960AK; AKMS; GP1975; Saiga; PAPM85; PAPM92; M70; M74; N-PAP; GPAK 74; MAK-22; PAPM90; MAADI; MAK-90; and AK63D.  (<u>Id.</u> ¶ 10.)

Depending on how the foreign firearms are configured, these surplus AK-style rifles can either be:  (1) imported and sold without change; (2) imported and modified to comply with federal

importation law; or (3) imported into a bonded facility, fully disassembled, and sold as part kits or reassembled into a complete firearm with a U.S.-made barrel, receiver, and parts to comply with 18 U.S.C. § 922(r).  (SOMF, ¶ 11.)  In the first category, there are certain AK-style rifles and pistols that federal law allows to be imported and sold without change.  (Id. ¶ 12.)  In terms of the class firearms, they will include the following:  DRAGUNOV, 2007 Champion, Draco, PLS54C, PAPM85, PAPM92, PAPM90, MAADI, MAK-90, WASR, NPAP and MAK-22.  (Ibid.)

The second category of AK-style firearms are modified to conform to regulations allowing for re-sale in the United States as federal law prohibits both directly importing certain rifles into the United States and/or fully reassembling the rifles.  (Id. ¶ 13.)  The third category of AK-style firearms cannot be sold in the United States in their original configuration because they are considered "machine guns" under federal law.  (Id. ¶ 14.)  These firearms are imported into Century's bonded facility and disassembled; the receiver and barrel are destroyed; and the remaining parts are re-assembled with a new barrel and receiver to make "an authentic reproduction for the U.S. market."  (Ibid.)  When AK-style firearms are reassembled from the original surplus parts, federal law mandates that the final product contain no more than ten of the imported parts listed in Section 922(r).[1]  (Id. ¶ 16.)  The safety lever is not one of the parts listed in Section 922(r).  (Ibid.)

Since Century's AK-style firearms are reassembled from surplus parts, the decision regarding which original parts will be utilized in conformity with Section 922(r) is not uniform and is decided on a firearm-by-firearm basis.  (Id. ¶ 17.)  Since the firearms are surplus firearms, the condition of the parts of the firearm will vary.   (Ibid.)  Nonetheless, in accordance with its business model, Century strives to utilize as many original parts as permissible under the law, which means that the original safety lever will be utilized when the firearm is reassembled after importation.  (Id. ¶ 18.)

The rifles are inspected during the assembly process as well as after assembly is completed. (Id. ¶ 20.)  Part of the final inspection includes a function check and a safety check, which ensures that the safety lever and the dust cover are installed properly and that the safety devices are properly functioning.  (Id. ¶ 20-21.)

---

[1] 18 U.S.C. § 922(r) pertains to building or modifying imported semi-automatic rifles, and the statute directs that a semi-automatic rifle built from foreign parts can use no more than ten of the following foreign parts:  (1) frames, receivers, receiver castings, forgings, or stampings; (2) barrels; (3) barrel extensions; (4) mounting blocks; (5) muzzle attachments; (6) bolts; (7) bolt carriers; (8) operating rods; (9) gas pistons; (10) trigger housings; (11) triggers; (12) hammers; (13) sears; (14) disconnectors; (15) butt stocks; (16) pistol grips; (17) forearms, hand guards; (18) magazine bodies; (19) followers; or (20) floor plates.

### C. **The Redundant Safety System of the AK-Style Firearm**

The AK-style firearm, which was designed in the 1940s in Russia and subsequently manufactured all over the world, contains a redundant safety system. (Id. ¶ 23.) AK-style firearms have a two-position safety lever that can be manually pushed down to fire and up for safe:

 

| Fire | Safe |

(Id. ¶ 24.) The safety lever is designed to be tight to the side of the receiver with resistance when it is pushed from safe to fire or vice-versa. (Ibid.) The safety lever also has a protruding notch, which corresponds to an indent on the receiver to "click" into the "safe" or "fire" position. (Ibid.)

The upper portion of the receiver, referred to as the "dust cover," is a secondary safety. (Id. ¶ 25.) In addition to preventing dust and debris from entering the inner-workings of the firearm, the dust cover serves as an additional stop for the safety lever as it prevents the lever from rotating beyond the "safe" position on the firearm. (Ibid.) All of these parts of the AK-style firearm work together and interact to prevent the safety lever from over-rotating beyond the "safe" position. (Id. ¶ 26.)

The dust cover is an integral component part of the rifle, and it is undisputed that rifles should never be utilized, or loaded, with the dust cover removed. (Id. ¶ 27.) Additionally, the manual specifically warns customers about disassembling the firearm while loaded. (Ibid.) Plaintiffs' sole liability expert (David Byron) concurs, as he explained that the only two times when a customer should remove the dust cover is to clean the rifle or when field-stripping it, and that the rifle should never be loaded when doing so. (Id. ¶ 28.)

### D. **The Alleged "Defect" Can Only Occur Under Two Circumstances: When the Parts are Damaged or When the Dust Cover is Removed**

In this case, Plaintiffs allege that if the safety lever (or selector) rotates above the safety stop position and above the dust cover, the firearm can discharge without a trigger pull. (Id. ¶ 29.) As discussed above, however, the design of the AK-style firearm prevents the safety lever from ever rotating above the safety stop position. (Id. ¶ 30.) In fact, Plaintiffs' liability expert admitted that, as designed, the safety lever should not be able to rotate above the safety stop position or the dust cover to cause a discharge. (Id. ¶ 31.)

Nonetheless, Plaintiffs' liability expert opines that the safety lever may be able to rotate far enough to cause a discharge when (1) the dust cover is removed from the firearm or (2) the safety lever, dust cover, or the receiver is damaged, bent, or out of tolerance.  (Id. ¶ 32.)  Indeed, Defendants' experts agree that the only way for the safety lever to rotate above the safety stop position would be in such instances.  (Id. ¶ 33.)  Defendants' experts examined and tested almost 100 AK-style firearms (that are part of this class), and the examination revealed that with the dust cover on, none of the safety levers could rotate above the safety stop position.  (Id. ¶ 34.)

During the prior thirty years, Century has sold over 1.25 million of the AK-style firearms identified in this purported class, yet there has only been one unverified *claim* of an unintentional discharge due to the safety lever of the firearm rotating with the dust cover on and no injuries have ever been reported.  (Id. ¶ 35.)  In other words, this purported safety issue has resulted in *zero* injuries and *0.0008%* of the firearms sold in the last thirty years have even resulted in a claim related to an unintended discharge.  (Ibid.)  In fact, Century has been selling AK-style weapons since the early 1980s, which means that the total number of AK-style rifles sold by Century with this type of safety lever is in excess of 1.25 million.[2]  (Id. ¶ 36.)

### E. The Named Plaintiffs' Rifles Were Not in the Same Condition as When They Left Century

A post-lawsuit inspection of Plaintiffs' firearms revealed that they were not in the same condition as when they left Century's facility.  (Id. ¶ 37.)  For example, Plaintiff Melton's safety selector was loose fitting and deformed due to abuse and the internal fire controls of the Johnson and Smith rifles had been partially disassembled and reassembled incorrectly.  (Id. ¶ 38.)  In fact, when Plaintiffs' expert was forced to inspect AK-style firearms other than the ones owned by the named plaintiffs,[3] the safety lever would not rotate above the dust cover because the rifles had the correct tolerances and had not been abused.  (Id. ¶ 39.)[4]

### F. Plaintiffs' Purchases and Experiences With the AK-Style Firearms

#### 1. Arizona Plaintiff:  Melton

On September 20, 2010, Mr. Melton purchased a 1975 AK-47 bullpup from J&G Sales,

---

[2] Further, Century is not the only manufacturer/importer of AK-style rifles that utilize surplus parts, including original safety levers.  (Ibid.)  Therefore, the total number of AK-style rifles from all manufacturers in the United States with the alleged "defective" safety levers is even greater.

[3] In forming his opinions, Plaintiffs' sole liability expert only inspected the firearms owned by the class plaintiffs. Defendants' liability expert inspected the class firearms as well as 100 other AK-style firearms that are alleged to be part of the class.  Their inspection revealed that the safety lever could not rotate above the dust cover in the manner alleged by Plaintiffs and their expert.

[4] Unable to provide an explanation for this, Plaintiff's liability expert speculated that these weapons must have been "altered" prior to his inspection.  (SOMF, ¶ 39.)

Inc., a firearms retailer in Prescott Arizona for about $500.00. (SOMF ¶ 40.) Mr. Melton had no prior knowledge of Century, had not reviewed any Century literature, and had not seen Century's website. (Id. ¶ 41-42.) He had received a sales flyer created by J&G, which had advertised the firearm at a reduced price. (Id. ¶ 42.) Mr. Melton never experienced any problems with the rifle, but after reviewing a YouTube video, he "disassembled" the rifle, including removal of the dust cover, and then manipulated the safety lever until it tripped the sear. (Id. ¶ 44.) Mr. Melton stated that he did not know what his damages were. (Id. ¶ 46.)

### 2. Illinois Plaintiff:  Morris

On April 10, 2015, Mr. Morris purchased an O-PAP for $350.000, and after the class action was commenced, Plaintiff purchased a Century model AES10B. (SOMF ¶ 48.) Both firearms were purchased secondhand. (Ibid.) Mr. Morris is an experienced firearms collector and enthusiast, and runs his own YouTube channel. (Id. ¶ 47.) He did not read any literature, websites, or advertisements prior to purchasing either firearm. (Id. ¶ 49.) On both occasions, he happened to see the firearms while perusing inventory in a store. He explained that he purchased the O-PAP because he had "wanted a Serbian M-70 and that one quite literally happened to fall into my lap." (Id. ¶¶ 50-51.) He bought the AES10B because he had been looking for this model firearm and happened to locate one the day he visited the retailer. (Id. ¶ 52.) Mr. Morris testified that he was looking forward to the case being over because "I miss my gun." (Id. ¶ 53.)

### 3. Florida Plaintiffs:  Valdes, Smith, and Johnson

On February 1, 2016, Mr. Smith purchased his C39 secondhand from his father for an undisclosed sum (and his father had previously purchased it from a friend). (Id. ¶ 54.) Mr. Smith explained that he had become aware of the class action lawsuit originally filed by Mr. Erickson *prior* to purchasing the firearm from his father. (Id. ¶ 55.) Mr. Smith did not read any literature, advertising, or visit Century's website prior to the purchase. (Id. ¶¶ 56-57.) Mr. Smith never had any functional problems with the rifle. (Id. ¶ 57.)

On December 26, 2013, Mr. Valdes purchased a Century AK-47 for $904.73. (Id. ¶ 58.) He never received or reviewed the manual, and he never reviewed any advertisements, websites or anything else. (Id. ¶¶ 59-60.) He purchased the firearm because he wanted to start collecting firearms and he happened to see this one in the store. (Id. ¶ 61.) Mr. Valdes never had any issues with the firearm under normal operation. (Id. ¶ 62.) In contravention of the warnings, however, Mr. Valdes "opened up the top" of the firearm while it was still loaded in order to look at an internal spring (and while he was in his house). (Id. ¶ 63.) Upon rotating the safety lever in this condition, the firearm discharged into a wall. (Ibid.) Mr. Valdes admitted that it was improper to

disassemble a loaded firearm.  (Id. ¶ 64.)

On October 31, 2013, Mr. Johnson purchased a Century NPAP rifle for $699.  (Id. ¶ 66.) He never read any manual, never visited Century's website, and "never read anything."  (Id. ¶ 67.) He purchased the firearm because he considers himself a "prepper," and was looking for a rifle with a 1.5 millimeter trunnion.  (Id. ¶ 68-69.)  He explained that Century's rifle was the cheapest one he located.  (Ibid.)  Mr. Johnson accessorized the rifle, including changing the dust cover.  (Id. ¶ 70.)  At some point later, with the rifle unloaded, he pulled the safety lever above the dust cover. (Id. ¶ 71.)  However, he continued to use the rifle, shooting upwards of 400 rounds.  (Ibid.)  He stated that he was unaware as to how he has been damaged by his purchase.  (Id. ¶ 73.)

### G.  Plaintiffs Have Not Established a Viable Claim for Damages

Plaintiffs have not disclosed an expert economist and have not set forth any analysis comparing the market value of the rifles in the condition in which they were received compared to the market value of the rifles in the condition that they allegedly should have been received.  (Id. ¶¶ 74-76, 82.)  Instead, Plaintiffs rely on their liability expert, Mr. Byron, to establish their damages claim.  (Id. ¶¶ 75-78)  Mr. Byron contends that the plaintiffs' damages can be calculated by the amount it costs to replace the current safety lever with an aftermarket safety lever.  (Id. ¶ 77.)  Mr. Byron concluded that it would cost approximately $143.44 to $365.74 to repair the firearms, install a replacement part, and ship the firearms:  "The total individual damages, consisting of the cost of a replacement 'semi-auto' safety, gunsmith installation, and shipping and return, would range from about $143.44 to $365.74 depending on safety selected, installation difficulty, and shipping."  (Id. ¶¶ 78-79.)  It is undisputed that the upper limit of Mr. Byron's repair and replacement cost calculation is more than the amount Plaintiff Morris actually paid for his rifle ($350.00).  (Ibid.)

Mr. Byron testified that he formulated this calculation by conducting "internet research" regarding the prices for replacement parts and then the rates for gunsmiths.  (Id. ¶ 80.)  Without any methodology, he calculated this range.  (Ibid.)  Mr. Byron provided no record of the websites he visited, the various prices he located, or the information on which his calculations were formed. Defendant's retained economist, Dr. McCormick, was highly critical of Mr. Byron's damages calculations because they "bear[] no connection to the concept of economic harm."  (Id. ¶ 81-83.) The retail costs of the various models vary greatly (between $350 and $1,129.00), and it is undisputed that the retail prices of firearms are contingent on a number of factors, including the date of the purchase, the condition of the firearm, the model firearm, and the location of sale.  (Id. ¶¶ 84-85.)  Additionally, the political climate is also a major factor affecting the market price of firearms, including the firearms at issue.  Indeed, Plaintiff Morris testified that the market value of

6

firearms is highly affected by the political climate.  (Ibid.)  It is undisputed that Plaintiffs' damages assessment takes none of these factors into account and merely offers a straight arithmetic damages model that deducts the "repair and replace" costs from the price paid by each plaintiff.  (Ibid.)

## II.   RELEVANT PROCEDURAL HISTORY

### A.   **The Original *Erickson* Lawsuit**

On January 19, 2016, J. Steven Erickson (a lawyer from Missouri) commenced a class action against Century in the Southern District of Florida.  (Dkt. No. 4-1.)  Counsel for Mr. Erickson then advertised the lawsuit on his website and in news publications.  Two months later (March 18, 2016), the Erickson lawsuit was voluntarily dismissed.  (Dkt. No. 4-2.)  On the same day, this identical class action lawsuit was commenced without Mr. Erickson as a named plaintiff.  (Dkt. No. 1, Plt. Compl.)  In his place were three Florida residents (Johnson, Valdes, and Smith); one Illinois resident (Morris); and one Tennessee resident who had purchased his firearm in Arizona (Melton).  (Id. at p. 1.)

### B.   **Motion to Dismiss**

Plaintiffs originally brought a ten count complaint, but Defendant filed a motion to dismiss. The motion was granted in part and denied in part.[5]  Plaintiffs' causes of action under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") and for unjust enrichment were permitted to proceed.  Plaintiffs' claims for injunctive relief, breach of implied warranty, and under the Magnuson-Moss Warranty Act were entirely dismissed.  Plaintiffs' negligence and strict liability claims were dismissed as to all plaintiffs but for Melton (Arizona).  Plaintiffs' claims for fraudulent inducement, failure to warn, and fraudulent concealment were also dismissed as to all plaintiffs but for Melton (Arizona) and Morris (Illinois).  (See generally Dkt. No. 20.)

### C.   **Motion for Class Certification**

Plaintiffs filed a motion for class certification, which has been fully briefed, and they seek to have (1) a nationwide class certified for their FDUTPA and unjust enrichment claims or (2) state classes under the consumer protection laws of Arizona, Florida, and Illinois.  (Dkt. No. 72.)

### D.   **Motion to Preclude Plaintiffs' Expert**

Defendant filed a motion to preclude Plaintiffs' jack-of-all-trades expert, David Byron, from offering any opinions in this case.  (Dkt. No. 89.)  Century argued that Mr. Byron lacked the qualifications to offer liability opinions or to offer damages opinions.  Additionally, Mr. Byron failed to provide any verifiable methodology for his liability opinions or his damages opinions.  In

---

[5] The Court also conducted a choice of law analysis as to all of the various plaintiffs.

fact, Mr. Byron admitted to only inspecting seven firearms prior to rendering his opinion; provided no measurements or calculations; and repeatedly referred to his "experience" as a basis for his opinions despite having no relevant experience.  In terms of his damages calculations, Mr. Byron calculated the cost to repair and replace the safety lever on the rifles, which consisted of doing internet searches for part costs, gunsmith rates, and shipping costs.  Mr. Byron kept no record of the various websites he visited and provided no explanation for his ultimate calculation for the repair-and-replacement costs.  For these reasons, among others, Defendant contends that Mr. Byron should not be permitted to offer any testimony at the time of trial.[6]

## STANDARD

Under Rule 56(a), the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is warranted "where, after adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial."  O'Bryan v. Ford Motor Co., 18 F. Supp. 3d 1361, 1366 (S.D. Fla. 2014) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).  "[I]n such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 322-23.  In fact, "[t]he mere existence of a scintilla of evidence in support of the [plaintiff's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [plaintiff]."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Further, at the summary judgment stage, a plaintiff can no longer rely on "mere allegations," but "must 'set forth' by affidavit or other evidence 'specific facts'" that support the existence of standing.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  Finally, in a purported class action, "[i]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."  O'Shea v. Littleton, 414 U.S. 488, 494 (1974).

## ARGUMENT

**I.    IF PLAINTIFFS' SOLE EXPERT IS PRECLUDED, PLAINTIFFS' LAWSUIT SHOULD BE ENTIRELY DISMISSED.**

At the heart of Plaintiffs' allegations is a latent defect in the design of the safety lever on

---

[6] This is merely a synopsis of the arguments set forth in Defendant's motion to preclude Mr. Byron.  (Dkt. No. 89.)  Defendant specifically incorporates by reference the facts, testimony, and legal authorities raised therein.

AK-style rifles that can cause the rifle to fire without a trigger pull.  (See Dkt. No. 1, ¶¶ 13, 26, 60, 113, 114.)  In order to prove a product defect, a plaintiff must offer expert opinion that the product is indeed defective."  Cooper v. Old Williamsburg Candle Corp., 653 F. Supp. 2d 1220, 1225 (M.D. Fla. 2009); Cramer v. Ford Motor Co., 2011 WL 247232 (Fla. Cir. Ct. June 9, 2011).  Where a plaintiff fails to offer any expert testimony on this issue, the claims must be dismissed.  Cramer, 2011 WL 247232 at *4.  Thus, if the motion to preclude Plaintiffs' sole liability expert is granted, then Defendant respectfully contends that summary judgment on all claims is warranted.  See, e.g., Thermoset Corp. v. Bldg. Materials Corp. of Am., 2015 WL 11197750 at *5 (S.D. Fla. Apr. 9, 2015) (granting summary judgment on FDUTPA claims where the plaintiff did not have expert testimony and therefore "its proof on the existence of a defect fails as insufficient").

## II.   THERE IS NO EVIDENCE OF A SUBSTANTIAL SAFETY RISK OR THAT ALL AK-STYLE FIREARMS WILL EXPERIENCE AN UNINTENDED DISCHARGE.

As articulated, Plaintiffs allege that a latent defect in the class firearms can discharge without a trigger pull under two scenarios:  (1) when an integral component part of the firearm (the dust cover) is removed or (2) when the safety lever, dust cover, and/or receiver are damaged or bent.  As a result, Plaintiffs argue that they are at a "substantial and unreasonable risk of personal injury and death."  (Dkt. No. 1, Plt. Compl., ¶¶ 113, 114, 119.)  Undermining this claim is the fact that from 1.25 million firearms AK-style rifles sold by Century in the last thirty years, there has been only one claim of an unintentional discharge due to the safety lever of the firearm with the dust cover on and no injuries have ever been reported.  Thus, 0.0008% of firearms sold had an *unverified claim* of an unintended discharge and 0.00% of the firearms sold have caused any injury related to an alleged problem with the safety lever.[7]  (SOMF ¶ 35.)  Indeed, none of the Plaintiffs have experienced a discharge of the rifle with the rifle fully assembled (i.e., the dust cover on).

Further, it is well-settled that when plaintiffs limit themselves to a claim for economic damages, they cannot base standing on their "concern" about future personal injury.  See Lassen v. Nissan N. Am., Inc., 211 F. Supp. 3d 1267, 1279 (C.D. Cal. 2016); Harrison v. Leviton Mfg. Co., 2006 U.S. Dist. LEXIS 76334, at *7 (N.D. Okla. Oct. 19, 2006) (explaining that plaintiffs limiting their claims to economic damages cannot base standing on risk of injury).  Additionally, Plaintiffs' concerns about future harm amount only to speculative risk of injury since discovery has revealed that none of the plaintiffs sustained an unintentional discharge with the rifle correctly

---

[7] As also noted in the Statement of Material Facts, Century, and other competitors, have been selling these style firearms since the early 1980s, which means that the total number of AK-style firearms sold with this type of safety lever is much higher, which further evidences the lack of an imminent safety risk.

assembled.  Lassen, 211 F. Supp. 3d at 1279; Taragan v. Nissan N. Am., Inc., 2013 U.S. Dist. LEXIS 87148, at *4 (N.D. Cal. June 30, 2013) (holding that a risk that vehicles equipped with a keyless fob system will roll away if the operator fails to place the transmission in park after shutting of the engine was "theoretical" and none of the plaintiffs actually experienced such an incident). Further, Plaintiffs cannot create standing by alleging that other, unidentified non-parties have been or will be injured.  Taragan, 2013 U.S. Dist. LEXIS 87148 at *4.

At the motion to dismiss stage, the Court recognized that there are "cases in which claims were dismissed for lack of standing where plaintiffs sought damages for costs of remedying safety hazards." (Dkt. No. 20.)  Nonetheless, the Court found that Plaintiffs' allegations were sufficiently pleaded to permit the case to proceed to discovery.  Now, however, upon completion of discovery, it is apparent that the plaintiffs have not suffered an injury in fact, which is an invasion of a judicially cognizable interest that is (a) concrete and particularized and (b) actual or imminent. Lujan, 504 U.S. at 560.  The facts demonstrate that there is no evidence of a substantial safety risk whatsoever.  Given this, summary judgment for Defendant is warranted.

Moreover, this case is an example of plaintiffs trying to shoehorn a product liability claim into a consumer fraud case.  Case law demonstrates that "product liability law and consumer fraud law serve different purposes," and that "products liability standards do not readily transfer to the consumer fraud context."  Lassen v. Nissan N. Am., Inc., 211 F. Supp. 3d 1267, 1285 (C.D. Cal. 2016).  The purpose of products liability law is to encourage manufacturers to optimize the safety of their products, but, "[b]y contrast, the purpose of consumer fraud law is to prevent sellers from deceiving consumers about their products and services."  Id. at 1286.  It has been explained that:

> Insofar as consumer fraud law requires sellers to disclose defects that raise safety concerns, that is because safety-related defects are considered sufficiently *material* to trigger a duty to disclose in order to avoid deceiving a consumer, not because consumer fraud is directly concerned with consumer safety.  Consumer safety is therefore incidental to consumer fraud law's paramount concern of preventing deception.  Thus, where the basis of an alleged consumer fraud claim is that the seller failed to disclose a safety defect, and where the gravamen of the defect is that the product does not malfunction but lacks certain additional safety features, the claim starts to become less about deception and more about consumer safety, which is not the immediate concern of consumer fraud.

Id. at 1296-87.  It is for this reason that a consumer fraud claim based on an allegation that the product could be made safer is improper and "would obliterate the distinction between consumer fraud claims and failure-to-warn products liability claims because, in effect, a seller could be held liable for mere economic loss for failure to disclose hazards of a product, even where the failure to disclose resulted in neither physical injury nor property damage."  Id. at 1287.  "The design

defect standards developed in the products liability context do not readily map to the consumer fraud context.  Whether a product is defectively designed and therefore triggers a duty to disclose for purposes of consumer fraud actions cannot be coextensive with the retrospective, open-ended design defect tests of products liability."  Id. at 1288.

Here, Plaintiffs are attempting to blur the distinction between a product liability and a consumer fraud claim.  Plaintiffs do not contend that the firearms are not properly functioning. Instead, they contend that the products at issue should have had an additional safety device that prevents the over-rotation of the safety lever when a component part of the rifle is removed or when parts of the rifle are damaged or dented.  Considerations of equity and logic demonstrate that Plaintiffs should not be allowed to pursue a consumer fraud claim under such circumstances.

## III.   THERE IS NO EVIDENCE OF A UNIVERSAL LATENT DEFECT

Plaintiffs' "defect" theory is grounded in two alternatives:  the firearm will discharge without a trigger pull when (1) the dust cover is removed allowing the safety lever to over-rotate or (2) damage to the safety lever, dust cover, or receiver will allow the safety lever to over-rotate. As all experts have noted in this case, as designed and manufactured, the redundant safety system of the class firearms prevents the safety lever from ever over-rotating beyond the safety stop position.  (SOMF ¶¶ 30-31.)  Thus, there is no defect in the rifles.

Additionally, Plaintiffs were obligated to present evidence that the alleged problem manifested itself at the point of sale.  Varner v. Dometic Corp., 2017 U.S. Dist. LEXIS 187308, at *8 (S.D. Fla. July 27, 2017).  No such showing has been made.  Indeed, Plaintiffs' theory of defect relies upon two situations: intentional removal of the dust cover or damage to the implicated parts of the rifle.  In other words, according to Plaintiffs' own theory of alleged defect, the conditions necessary for the defect to present itself relate to actions that occur after the point of sale.

Further, Plaintiffs' claim that the defective condition can present itself upon manipulating the safety lever with the dust cover removed is not a viable liability theory because there is no evidence that this situation was part of the "basis of the bargain."  Specifically, there are no facts showing that Century made any representations or suggestions that a consumer should operate its firearms without the dust cover on or specifically that the safety mechanisms would continue to function normally if the consumer removed the dust cover.  See Makaryan v. Volkswagen Grp. Of Am., Inc., 2017 U.S. Dist. LEXIS 216312, at *14-15 (C.D. Cal. Oct. 13, 2017) ("Plaintiff does not allege that Defendant made any representation or suggestion that a driver should drive without a seat belt or specifically that the start/stop system would continue to function normally if the driver removed his seat belt.").  In fact, it is undisputed that the dust cover should never be removed

unless the gun is being cleaned or field stripped, and Century expressly warns against having a firearm loaded in such a condition.  (SOMF ¶¶ 27-28.)  The fact that a firearm may become unsafe if a consumer removes a component part does not constitute a cognizable injury under the law. Makaryan, 2017 U.S. Dist. LEXIS 216312 at *15 (collecting cases and explaining that because "her vehicle may become unsafe if Plaintiff removes her seatbelt while operating it does not constitute a cognizable injury").

Finally, Plaintiffs' own expert admits that, as designed, the safety lever should not be able to rotate above the safety stop position or the dust cover to cause a discharge.  (SOMF ¶ 31.) Plaintiffs' theory of defect relies upon there being damage to the dust cover, the safety lever, or the receiver that would cause these component parts to be out-of-specification, permitting the safety lever to be able to bypass the dust cover while on.  Again, this does not present a cognizable theory of defect.  As Defendants' experts found, Plaintiffs' firearms were not in the same condition as when they left the factory.  (SOMF ¶¶ 37-39.)  Moreover, Century specifically warns its customers that these products are made from surplus and used parts and that the customers should have it periodically inspected by a gunsmith "for worn or damaged parts."  (Id. ¶ 8.)  Simply, there is no latent defect in the firearms, which means that Plaintiffs' lawsuit should be dismissed as a matter of law.

## IV.   ALL PLAINTIFFS' CLAIMS FAIL BECAUSE THEY HAVE NOT ESTABLISHED A VIABLE CLAIM FOR DAMAGES

Plaintiffs seek damages related to a "basis of the bargain" theory.  (See Dkt. No. 72 at p. 16-17.)  A plaintiff's damages model must be consistent with its liability case.  Comcast Corp. v. Behrend, 569 U.S. 27 (2013) ("[A]ny model supporting a plaintiff's damages case must be consistent with its liability case . . . .").  Under the FDUTPA, a plaintiff is only entitled to "actual damages."  Fla. Stat. § 501.211(2).  The standard for determining actual damages recoverable under FDUTPA is well-defined in the case law:

> [T]he measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties. . . .  A notable exception to the rule may exist when the product is rendered valueless as a result of the defect-then the purchase price is the appropriate measure of actual damages.

Rollins, Inc. v. Heller, 454 So. 2d 580, 585 (Fla. Ct. App. 1984); see also Carriullo v. Gen. Motors, 2016 U.S. App. LEXIS 8962, at *9 (11th Cir. 2016).  Plaintiff has the burden to provide evidence of loss of market value:  "In short, plaintiffs must marshal evidence to prove the gap in value

between what was promised and what was delivered, unless the defendant palmed off a product that was truly worthless. In the latter situation, a plaintiff may recoup the full price he paid for the valueless good or service." Democratic Republic of the Congo v. Air Capital Group, LLC, 614 Fed. App'x 460, 472 (11th Cir. 2015). For purposes of recovery under FDUTPA, "actual damages" do not include consequential damages. Rollins, Inc. v. Butland, 951 So. 2d 860, 869 (Fla. Ct. App. 2006). Therefore, "actual damages" do not include repair, replacement, or resale costs. Kia Motors Am. Corp. v. Butler, 985 So.2d 1133, 1140 (Fla. Ct. App. 2008). Finally, a general allegation that a plaintiff did not receive the "benefit of the bargain" or paid a premium is insufficient. In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, Prod. Liab. Litig., 754 F. Supp. 2d 1145, 1166-67 (C.D. Cal. 2010).

Importantly, the Southern District of Florida has rejected "backdoor" attempts to recover repair or replacement costs under a "basis of the bargain" theory. Varner v. Dometic, 2017 U.S. Dist. LEXIS 187308, at *23-24 (S.D. Fla. 2017) (rejecting plaintiff's argument that the benefit of the bargain was "the cost to replace the defective cooling units with a non-defective cooling unit"); Sanchez-Knutson v. Ford, 310 F.R.D. 529, 538 (S.D. Fla. 2015) (rejecting Plaintiff's "straight arithmetic damages model" that was "contrary to law as an attempt to recover vehicle repair costs"); see also In re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig., 880 F. Supp. 2d 801, 838 (E.D. Ohio 2012) (applying Florida law and holding that a plaintiff cannot recover under the FDUTPA the cost of repairing and replacing the allegedly defective coolant tubes in his vehicle).

For example, in Sanchez-Knutson, the plaintiff alleged that her car's HVAC system had a latent safety defect that allowed exhaust odor to enter the passenger compartment of the vehicle, and the plaintiff proposed the following damages model for her FDUTPA claim:

> Plaintiff's straight arithmetic damages model will simply deduct from the purchase or lease price of the car the cost of Ford's multiple repairs. This model is premised on the legal theory that the class members have paid too much – either in purchase price or in lease payments – for a car that is uniquely susceptible to carbon monoxide contamination. Thus, at a minimum, the sales and lease price should be deducted by the cost-to-repair . . . . **Plaintiff contends that [she] is not attempting to recover repair costs, but, instead, [is] setting forth a theory to calculate actual damages, which are recoverable under FDUTPA, through a proxy for the amount of overpayment, *i.e.*, what amount of money would have theoretically made Plaintiff whole at the time of purchase or lease of a vehicle with the allegedly dangerous or defective condition.**

310 F.R.D. at 538 (emphasis added). This claim for damages was rejected as the Southern District of Florida found that "Plaintiff's straight arithmetic damages model is contrary to law as an attempt to recover vehicle repair costs, which are unrecoverable under FDUTPA." Ibid.

Similarly, in Varner, the plaintiff alleged that refrigerator units in RVs contained a latent safety defect that posed significant risk of fires. 2017 U.S. Dist. LEXIS 187308 at *25. In response to a summary judgment motion contending that the plaintiff failed to set forth evidence to support a damages claim to support an FDUTPA or unjust enrichment claim, the plaintiffs argued that

> [T]hey have provided evidence that damages amount **to the cost to restore Plaintiffs the benefit of their bargain, that is, the cost to replace defective cooling units with a non-defective cooling unit. The Plaintiffs cite to the expert report of Jonathan Curnitz. Curnitz's report, however, simply calculates "the average installment cost of a non-defective cooling unit."**

Id. at *25-26 (emphasis added). The Southern District of Florida rejected this claim for damages because the plaintiffs' alleged repair and replacement costs did not establish that "they had overpaid for the refrigerators or that their refrigerators lost value as a result of the alleged defect." Id. at *26.

Here, Plaintiffs have provided no evidence demonstrating the difference in market value between the rifles in the condition as purchased and the rifles in the condition as they should have been delivered. Instead, Plaintiffs are impermissibly attempting to seek "repair and replacement costs" under the guise of a "basis of the bargain" theory. Plaintiffs' expert Mr. Byron's damages theory is based upon the purported costs to replace the current safety lever with an aftermarket safety lever (including costs of the part, shipping fees, and gunsmith time). (SOMF, ¶¶ 53-54.) This opinion, even if admissible, does not establish "actual damages" under the FDUTPA or otherwise establish "basis of the bargain" damages. Varner, 2017 U.S. Dist. LEXIS 187308 at *23-24; Sanchez-Knutson, 310 F.R.D. at 538. Indeed, Defendant's expert economist, Dr. McCormick, explained that Mr. Byron's damages calculations "bear[] no connection to the concept of economic harm." (SOMF ¶ 58.) In fact, the illogicality of Plaintiffs' damages model can be shown by the fact that, in some instances, the purported replacement costs will exceed the cost of the rifle. (SOMF ¶ 56.) Plaintiffs have put forth no evidence that the firearms at issue have dropped in value due to the alleged defective condition, and Plaintiffs have otherwise failed to come forth with evidence establishing basis of the bargain or price premium damages, which is what they have alleged and need to prove in order to have cognizable legal claims in this case. See Johnson & Johnson Consumer Cos., 124 F. Supp. 3d 1283, 1290 (S.D. Fla 2015). As noted above, Plaintiffs have the burden to provide evidence establishing a cognizable claim for damages in this

case. Simply, they have not done so, and Plaintiffs' lawsuit should be entirely dismissed accordingly.[8]

## V.    SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' CONSUMER FRAUD CLAIMS

Under the FDUTPA, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fla. Stat. § 501.204(1).  There are three elements to an FDUTPA claim:  (1) a deceptive or unfair practice, (2) causation, and (3) actual damages.  Rollins, Inc., 951 So.2d at 869.  In addition to Plaintiffs' failure to present evidence of actual damages (see Argument Section IV, supra), Plaintiffs cannot satisfy the other elements of an FDUTPA claim.

### A.    Non-Resident Plaintiffs (Melton and Morris) Cannot Bring a Claim Under the FDUTPA

In moving to dismiss, Defendant argued that the non-resident plaintiffs (Melton and Morris) could not bring a claim under the FDUTPA.  (Dkt. No. 20 at p. 14-16.)  In permitting these claims to proceed to discovery, the Court found:

> Here, Melton's and Morris's injuries occurred where the rifles were purchased – outside of Florida.  Following the reasoning in Hutson[ v. Rexall Sundown, Inc., 837 So.2d 1090 (Fla. Dist. Ct. App. 2003)] and Stein[ v. Marquis Yachts, LLC, 2015 U.S. Dist. LEXIS 35088 (S.D. Fla. Mar. 20, 2015)], this could preclude Melton and Morris from bringing a claim under the Florida Deceptive and Unfair Trade Practices Act.  However, Plaintiffs have alleged many facts connecting Florida to Century's alleged misconduct giving rise to the claim.  For example, the Complaint states that Century designed, manufactured, marketed, and distributed the rifles in Florida; that Century willfully, knowingly and/or recklessly committed acts in Florida for the purposes of concealing safety defects; that all Century entities are citizens of Florida; and that Century misrepresented facts in its manuals and on its website, both in Florida.

(Id. at p. 15-16.)  It was also noted that "the Court likely will readdress the issue after further fact development."  (Id. at p. 16.)  While these allegations may have been sufficient at the pleadings stage, now that discovery has been completed, it is without question that the FDUTPA cannot apply to any out-of-state plaintiff in this case.

---

[8] Even if Plaintiffs' damages model was appropriate, which it is not, Defendants have moved to preclude Mr. Byron from offering such an opinion because he failed to explain his methodology for his "replacement cost" calculations. (See Dkt. No. 89.)  Moreover, it is well-settled that the relevant inquiry is the difference in market value at the time of delivery of the product.  See, e.g., Gastaldi v. Sunvest Resort Cmtys, L.C., 709 F. Supp. 2d 1299, 1306 (S.D. Fla. 2010) (explaining that the plaintiff's expert provided no methodology explaining how he concludes that the purchase price two years before delivery is the same as the market value at the time of delivery).  But, Mr. Byron made no attempt to evaluate the market value at the time of sale.  Additionally, outside factors affecting market value – such as time of sale, location, and political climate – were never even considered by Mr. Byron.  Ibid. (explaining that the failure to account for the decline in the real-estate market when assessing damages creates a "real possibility of a forbidden windfall").

Initially, the facts show that all designing, procurement, manufacturing, importing, inspecting, development, storage, and shipping of firearms (and manuals) occurs at Century's facilities in Vermont. (SOMF ¶ 2.) No firearms are imported, manufactured, assembled, or shipped to or from Florida. (Ibid.) Additionally, not all of the Century entities are Florida corporations; in fact, Century's importation and manufacturing operation is located exclusively in Vermont. (Ibid.) Moreover, Mr. Melton did not review any Century advertising at any point in time; rather, he received a "sales flyer" from "J&G Sales in Prescott, Arizona." (SOMF ¶¶ 40-44.) Similarly, none of the other plaintiffs reviewed any Century literature or advertisements at any point. (Id. ¶¶ 47-50.) As the Court previously found, "Melton's and Morris's injuries occurred where the rifles were purchased – outside of Florida." (Dkt. No. 20 at p. 15.) Therefore, there is no basis to apply the FDUTPA to the out-of-state plaintiffs in this case. See, e.g., Stein, 2015 U.S. Dist. LEXIS 35088 at *17 (explaining that since the claims arise out of the sale of goods and that sale occurred in a different state, "the FDUTPA does not apply"). Indeed, recent case law from the Southern District of Florida has explained that the "FDUTPA does not apply to actions that occurred outside of Florida." Aaron Data Sys. v. GLD Int'l, Inc., 2018 U.S. Dist. LEXIS 49523, at * 25 (S.D. Fla. March 23, 2018).

### B. There Was No Deceptive or Unfair Act By Century

"FDUTPA can be violated in two ways: (1) a per se violation premised on the violation of another law proscribing unfair or deceptive practice or (2) adopting an unfair or deceptive practice." Hap v. Toll Jupiter Ltd. P'ship, 2009 US. Dist. LEXIS 5866, at *9 (S.D. Fla. Jan. 27, 2009). "The Florida Supreme Court has noted that 'deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." Zlotnick v. Premier Sales Grp., Inc., 480 F.3d 1281, 1284 (11th Cir. 2007) (quoting PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So. 2d 773, 777 (Fla. 2003)). "[A] deceptive practice is one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Washington v. LaSalle Bank Nat. Ass'n, 817 F. Supp. 2d 1345, 1350 (S.D. Fla. 2011).

Here, there is no evidence – or even an allegation – that Defendant misrepresented or otherwise had a business practice that was likely to mislead the reasonable consumer. Instead, Plaintiffs' allegation is that the firearms contained a latent defect and Defendant omitted telling Plaintiffs about it. This allegation, however, is insufficient to demonstrate an unfair practice within the meaning of the FDUTPA. As the facts demonstrate, Century imported original, foreign-made

AK-style firearms, which were reassembled utilizing surplus parts.  Century's literature all clearly state that the products are imported and assembled from surplus and used parts.  (SOMF ¶ 6.) Moreover, Century specifically advises its customers to have the rifles periodically examined by gunsmiths for "worn or damaged parts."  (Id. ¶ 8.)  In other words, Plaintiffs obtained exactly what was bargained for, and Defendant did not commit an unfair or deceptive act.

> ### C.  **Plaintiffs Failed to Present Evidence of Proximate Cause**

Under the applicable law, to be actionable, any purported deceptive act must be "likely to mislead a consumer acting reasonably in the same circumstances."  In re Motions to Certify Classes Against Court Reporting Firms for Charges Relating to Word Indices, 715 F. Supp. 2d 1265, 1282 (S.D. Fla. 2010).  Along this same vein, when reasonable consumers "would be unlikely to be exposed to a disclosure of an alleged defect, there will be no causation as a matter of law.  Justice v. Rheem Mfg. Co., 318 F.R.D. 687, 697 (S.D. Fla. 2016).  In other words, without exposure to materials in which a defendant should have or could have disclosed the allegedly omitted information, a plaintiff cannot prove an FDUTPA claim.  See Montgomery v. New Piper Aircraft, Inc., 209 F.R.D. 221, 229 (S.D. Fla. 2002) (explaining that a plaintiff must demonstrate that each member was "exposed to the Defendants' advertising and marketing materials alleged to constitute a deceptive trade practice"); Justice, 318 F.R.D. at 697 (finding no causation because "many consumers do not review central AC system product brochures or the websites of AC manufacturers, and thus would be unlikely to be exposed to a disclosure of an alleged defect").

In this case, none of the plaintiffs reviewed any materials emanating from Century prior to or at the time of purchasing their rifles.  (SOMF ¶¶ 40-73.)  Melton reviewed a "sales flyer" from a third-party; not from Century.  (Id. ¶ 42.)  In other words, a reasonable consumer would not have been exposed to any disclosure of any purported defect.  Justice, 318 F.R.D. at 697.  Plaintiffs were obligated to come forth with evidence establishing a causal link between Defendant's alleged conduct and their damages claim (loss of benefit of the bargain), but the record is entirely devoid of any such causal connection.

## VI.   SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' UNJUST ENRICHMENT CLAIMS

> ### A.  **Since Plaintiffs Bring a Claim Under the FDUTPA, There is No Basis for an Unjust Enrichment Claim.**

Under Florida law, when a plaintiff's claim for unjust enrichment is based on the same operative facts that give rise to a consumer fraud claim, then an unjust enrichment claim is not legally viable.  See Prohias v. Pfizer, Inc., 490 F. Supp. 2d 1228, 1236-37 (S.D. Fla. 2007) ("[I]n their unjust enrichment claim, the plaintiffs seek recovery for the exact same wrongful conduct as

in their consumer fraud act claim. . . . [I]f the plaintiffs have been damaged by such scheme, then the plaintiffs have a remedy at law as properly pled under the consumer fraud acts . . . .”); Matthews v. Am. Honda Motor Co., 2012 U.S. Dist. LEXIS 90802, at *4 (S.D. Fla. June 6, 2012) (“It is well-established under Florida law that unjust enrichment is an equitable remedy that is available only when the plaintiff lacks an adequate remedy at law.  Here, because Matthews' unjust enrichment claim is predicated on the same wrongful conduct as her FDUTPA claim, she does not lack an adequate legal remedy.”); see also In re Trayslol Prods. Liab. Litig., 2013 U.S. Dist. LEXIS 49139, at *63 (S.D. Fla. Apr. 2, 2013) (granting summary judgment on an unjust enrichment claim because it is derivative of other legal claims); David v. Am. Suzuki Motor Corp., 629 F. Supp. 2d 1309, 1323 (S.D. Fla. 2009) (holding that no claim for unjust enrichment exists when the claim is based on an alleged defect in the frame of a motorcycle because that is the same basis for the plaintiff's other legal claims).  Here, as established during discovery, Plaintiff's consumer fraud claims and unjust enrichment claims arise from the same alleged conduct of Defendant.  Accordingly, Plaintiffs cannot maintain an unjust enrichment claim as a matter of law.

## B.  Plaintiffs Morris and Smith Purchased Their Firearms Secondhand

It is undisputed that Plaintiffs Morris and Smith purchased their firearms secondhand. (SOMF ¶¶ 48, 54.)  Therefore, neither Plaintiff conferred a benefit on Defendant, which means their claims for unjust enrichment are not viable.  United Techs Corp. v. Mazer, 556 F.3d 1260, 1270 (11th Cir. 2009) (the first element of unjust enrichment is “a benefit conferred upon a defendant by the plaintiff”).

## C.  Plaintiffs Have Presented No Evidence That They Conferred Any Benefit on Defendant

As previously demonstrated, Plaintiffs purchased firearms manufactured from surplus parts that were imported by Defendant.  Defendant expressly stated, in their manual and advertisements, that these firearms were as close to original as possible and had been imported.   Plaintiff has offered no evidence that they overpaid for the items as described or that any benefit was conferred, directly or indirectly, on Defendant.  On the contrary, based on the deposition testimony of the plaintiffs and the undisputed facts, it is apparent that Plaintiffs received exactly what they sought. Moreover, Plaintiffs have not come forth with any evidence demonstrating – in any tangible way – the “benefit” that they conferred on Century upon purchasing these firearms.  Absent such evidence, Plaintiffs' unjust enrichment claim fails as a matter of law.

## D.  The Circumstances of the Purchases Were Not Inequitable

Plaintiffs also failed to establish the third prong of an unjust enrichment claim; namely,

that the circumstances are such that it would be inequitable for the defendant to retain any benefit. Fla. Power Corp. v. City of Winter Park, 887 So. 2d 1237, 1241 n. 4 (Fla 2004).  For example, in Moore v. GNC Holdings, Inc., 2014 U.S. Dist. LEXIS 199393 (S.D. Fla. March 18, 2014), the plaintiffs brought an unjust enrichment claim against a manufacturer of a creatine supplement because the product failed to contain a warning or disclaimer advising consumers to drink adequate amounts of water to avoid side effects despite other manufacturers containing such warnings.  Id. at *5-6.  The Southern District of Florida held that the plaintiffs failed to meet this third prong of an unjust enrichment claim because, "[e]ven if plaintiffs were deceived into purchasing the product, they paid only the market value of the product in its actual state.  In other words, they paid a normal sum for creatine monohydrate without a hydration warning, and in exchange, they received and retained creatine monohydrate without a hydration warning.  It would not be inequitable for Defendant to retain the money received from Plaintiffs' purchase of the product." Id. at *14.

Similar to Moore, in this case, there is no evidence that Plaintiffs received anything other than what was offered:  a firearm manufactured from foreign surplus parts.  Plaintiffs here paid market value for the rifles in their actual state – no more, no less.  There is no evidence in the record to establish otherwise.  Therefore, in addition to all of the other reasons articulated above, Plaintiffs claim for unjust enrichment should be dismissed.

**VII.   THE CLAIMS OF PLAINTIFFS MELTON, MORRIS, AND SMITH SHOULD BE DISMISSED**

### A.   Plaintiff Melton's Claims are Time-Barred

The statute of limitations for a claim under the FDUTPA or for unjust enrichment is four years.  Fla. Stat. § 95.031(1); see also Justice v. Rheem Mfg. Co., 2014 U.S. Dist. LEXIS 179128, at *18 (S.D. Fla. Aug. 22, 2014) ("FDUTPA claims are subject to a four-year statute of limitations, which accrues on the date of the sale of the subject product.").  The other claims sounding under Arizona law (negligence, strict liability, and fraud) have two and three-year statutes of limitations. See Ariz. Rev. Stat. §§ 12-542, 12-543(3).  Plaintiff Melton purchased his firearm on September 20, 2010¸ but this lawsuit was not commenced until March 18, 2016.  Therefore, Plaintiff Melton's claims are time-barred.[9]

### B.   Plaintiffs Smith and Morris Purchased Class Firearms After Already Knowing About the Purported Latent Defect

---

[9] It is also worth noting that if this case is certified as a class, the four-year statute of limitations would apply and preclude the claims of any customer who purchased a class firearm prior to March 13, 2012 (four years prior to the filing of this lawsuit).

Plaintiffs Smith and Morris both testified to buying class firearms *after* they already knew of the alleged defective condition.  (SOMF ¶¶ 48, 55.)  Accordingly, these two plaintiffs should not be permitted to maintain a lawsuit against Defendant.  See, e.g., Newman v. RCN Telecom Servs., 238 F.R.D. 57, 78 (S.D.N.Y. 2006) (barring recovery of any plaintiff who "having experienced slower than advertised service, continued to pay for and use [defendant's] high speed internet service.").

## VIII.    THE INDIVIDUAL CLAIMS OF MELTON (ARIZONA) AND MORRIS (ILLINOIS) SHOULD ALSO BE DISMISSED

Under Illinois and Arizona law, to establish a claim based on fraudulent misrepresentation or inducement, a plaintiff must, among other things, submit evidence that his damages were caused by the defendant's intentional conduct and reliance.  See In re Chi. Flood Litig., 680 N.E.2d 265, 275 (Ill. 1997); Dawson v. Withycombe, 163 P.3d 1034, 1044, 1048 (Ariz. Ct. App. 2007).  As established by the factual record and the arguments set forth above, Plaintiffs have neither established a causal connection between any intentional conduct of Defendant and their claimed damages in this case nor have they established reliance.

Further, while Arizona law does not automatically foreclose product liability and negligence causes of action when only economic loss is suffered, the Court must look to the facts of each individual case to determine whether tort principles or contract principles are applicable. See Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp., 694 P.2d 198, 210 (Ariz. 1984).  Using the three factor analysis (nature of the alleged defect, the manner in which the loss occurred, and the type of loss or damage that resulted), it is apparent that principles of tort law should not apply here.  Indeed, Plaintiffs' claim for damages is related to the basis of the bargain.  Moreover, this is not a property damage case and there is no allegation that the alleged defect caused property damage or other economic damage (such as a defect causing millions of dollars in damage like in Salt River).  Finally, as the evidence articulated above proves, Plaintiffs have failed to even demonstrate a defective condition.  Considering all of the facts at hand, there is no basis for Plaintiff Morris's individual tort claims under Arizona law.

## CONCLUSION

Based on the undisputed facts and the cited legal authorities, Plaintiffs' lawsuit should be dismissed, and Defendant respectfully requests that summary judgment be granted in its favor.

[SIGNATURE ON FOLLOWING PAGE]

Dated: Florham Park, New Jersey
        October 26, 2018

Respectfully submitted,

**s/Ryan L. Erdreich_____**
Ryan L. Erdreich, Esq. (Florida Bar No.: 65712)
rerdreich@pmlegalfirm.com
Anthony M. Pisciotti, Esq. (pro hac vice)
apisciotti@pmlegalfirm.com
Danny C. Lallis, Esq. (pro hac vice)
dlallis@pmlegalfirm.com
Jeffrey M. Malsch
jmalsch@pmlegalfirm.com
PISCIOTTI MALSCH
30 Columbia Turnpike, Suite 205
Florham Park, New Jersey 07932
Telephone:  (973) 245-8100
Facsimile:   (973) 245-8101

## CERTIFICATE OF SERVICE

I hereby certify that, on October 26, 2018, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system and a copy of the foregoing was served by the CM/ECF system upon all counsel and parties of record on the Service List below.

**s/Ryan L. Erdreich**
Ryan L. Erdreich, Esq. (Florida Bar No.: 65712)
rerdreich@pmlegalfirm.com

### SERVICE LIST

Angelo Martino, Jr., Esq.
amjrpamail@aol.com
amjrpal@hotmail.com
ANGELO MARTINO, JR., P.A.
645 S.E. 5th Terrace
Ft. Lauderdale, Florida 33301
Telephone: (954) 765-0537
Facsimile: (954) 765-0545
*Attorneys for Plaintiffs*

Steve W. Berman, Esq. (pro hac vice)
steve@hbsslaw.com
Jerrod C. Patterson (pro hac vice)
jerrodp@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
*Attorneys for Plaintiffs*