UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:16-cv-21008-CIV-MORENO/LOUIS

JEFFREY MELTON, EZEKIEL MORRIS,
TOMMY ALLEN JOHNSON, JUAN
VALDES, and MANVILLE SMITH,
Individually and on behalf of all others
similarly situated,

                                        Plaintiffs,

                v.

CENTURY INTERNATIONAL ARMS,
CORP., CENTURY ARMS, INC.,
CENTURY ARMS OF VERMONT, INC.,
and CENTURY INTERNATIONAL ARMS
OF VERMONT, INC.,

                                        Defendants.

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND INCORPORATED MEMORANDUM OF LAW IN SUPPPORT**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    REMAINING CLAIMS...........................................................................................2

III.   STATEMENT OF MATERIAL FACTS.................................................................2

IV.   ARGUMENT ..........................................................................................................8

      A.    Legal standard ...........................................................................................8

      B.    Plaintiffs have standing to assert their claims..........................................9

            1.     Plaintiffs were injured at the point of sale by overpaying for their weapons.........................................................................................9

      C.    Plaintiffs have proven their FDUTPA claim. .........................................11

            1.     Plaintiffs have proven "actual damages" under FDUTPA. .......11

            2.     Florida law applies to non-Florida residents.............................12

            3.     Century fraudulently sold the weapons without disclosure of the defect...................................................................................14

            4.     Century's conduct misled a reasonable consumer. ....................16

      D.    Plaintiffs are entitled to unjust enrichment restitution. ..........................17

            1.     Plaintiffs can pursue unjust enrichment as an alternative.........17

            2.     Plaintiffs agree that Smith and Morris cannot obtain unjust enrichment restitution. ..............................................................17

            3.     Plaintiffs established that Defendants received a benefit from remaining Plaintiffs.................................................................17

            4.     Defendants should not profit from their fraudulent conduct. ....18

      E.    Plaintiff Melton's claims are timely. ......................................................19

      F.    Plaintiffs Smith and Morris did not believe they were purchasing a defective weapon. ..................................................................................19

      G.    Melton and Morris' fraud claims are valid. ............................................19

      H.    Defendants do not move for summary judgment on three counts. ..........20

010623-11 1076931 V1

V.      CONCLUSION....................................................................................................20

010623-11 1076931 V1

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970)........................................................................................8

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................................8

*Anson v. Am. Motors Corp.*,
  155 Ariz. 420 (Ariz. Ct. App. 1987)..............................................................19

*Blake v. Am. Airlines, Inc.*,
  90 F. Supp. 2d 1265 (S.D. Fla. 2000) (Moreno, J.) .......................................8

*TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC*,
  945 F. Supp. 2d 1331 (M.D. Fla. 2013).........................................................14

*Carriuolo v. Gen. Motors co.*,
  823 F.3d 977 (11th Cir. 2016) .......................................................................16

*Clark v. Coats & Clark, Inc.*,
  929 F.2d 604 (11th Cir. 1991) ......................................................................8, 9

*Collins v. Beazer Homes USA, Inc.*,
  334 F. Supp. 2d 1365 (N.D. Ga. 2004) ...........................................................9

*Davis v. Main Street Family Pharmacy, LLC*,
  2016 WL 9051172 (May 19, 2016) ...........................................................11, 16

*Davis v. Powertel, Inc.*,
  776 So.2d 971 (Fla. Dist. Ct. App. 2000) ......................................................16

*James D. Hinson Elec. Contracting Co., Inc. v. BellSouth Telecomm., Inc.*,
  796 F. Supp. 2d 1341 (M.D. Fla. 2011).........................................................17

*Kendall v. Cobb Cty.*,
  14 F. Supp. 2d 1342 (N.D. Ga. 1998) .............................................................9

*Latimer v. Roaring Toyz, Inc.*,
  601 F.3d 1224 (11th Cir. 2010) .......................................................................9

*Licul v. Volkswagen Grp.*,
  2013 WL 6328734 (S.D. Fla. Dec. 5, 2013) ..................................................17

*In re LightSquared Inc.*,
    511 B.R. 253 (Bankr. S.D.N.Y. 2014) .....................................................................18

*Melton v. Century Arms, Inc.*,
    243 F. Supp. 3d 1290 (S.D. Fla. 2017) ........................................................... *passim*

*Moore v. GNC Holdings, Inc.*,
    2014 WL 12644919 (S.D. Fla. Mar. 18, 2014) .....................................................18

*Patterson & Wilder Constr. Co., Inc. v. United States*,
    226 F.3d 1269 (11th Cir. 2000) ..............................................................................9

*Poe v. Sears, Roebuck & Co., Inc.*,
    1 F. Supp. 2d 1472 (N.D. Ga. 1998) ......................................................................9

*Sports Imaging of Ariz., L.L.C. v. 1993 CKC Tr.*,
    2008 WL 4448063 (Ariz. Ct. App. Sept. 30, 2008) ..............................................17

*State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*,
    427 F. App'x 714 (11th Cir. 2011) ........................................................................17

*Stein v. Marquis Yachts, LLC*,
    2015 WL 1288146 (S.D. Fla. Mar. 20, 2015) .......................................................12

*In re: Takata Airbag Prods. Liab. Litig.*,
    2016 WL 6072406 (S.D. Fla. Oct. 14, 2016) (Moreno, J.) ....................................14

*Wise v. Hartford Life & Accident Ins. Co.*,
    360 F. Supp. 2d 1310 (N.D. Ga. 2005) ...................................................................9

010623-11 1076931 V1

## I.    INTRODUCTION

Century imports, manufactures, and sells inherently dangerous assault rifles, and Century has an obligation to make these dangerous weapons as safe as possible.  Even Century's corporate representative admitted that it has an obligation to manufacture and sell safe weapons.[1] Century has agreed that it would "never sell a weapon that was unsafe," and—acknowledging that weapons are inherently dangerous—Century makes them as safe as possible.  *Id.* ¶ 102.  Century's representative further pledged that Century would take reasonable steps to make sure its weapons were safe, and would "never sell unsafe weapons simply because it was cheaper to do so."

Plaintiffs bring this class action lawsuit because Century has failed to live up to its own standards.  The class weapons[2] Century sells are *needlessly* dangerous because, when the safety selector is rotated above the dust cover, the weapons will fire without a trigger pull.  *Id.* ¶ 104. Century has known about this defect since 2008, and has not taken any meaningful steps to prevent it.  *Id.* ¶ 105.  In fact, it has taken steps to conceal it.  In 2008, when it learned about the defect, it amended some of its manuals to tell gun owners to take their weapons to a gunsmith if the safety selector can rotate over the dust cover.  *Id.* ¶ 189.  It conspicuously omitted the fact that rotating the safety selector above the dust cover will fire the weapon— which even Century's corporate representative admitted was "important" information for the customer to know.  *Id.*

Century has not met its burden of demonstrating that there are no genuine issues of material fact.  Indeed, there are numerous factual disputes about virtually every aspect of this case, including the existence of the defect itself, Century's duty to disclose the defect, whether Century's "warning" to customers about the defect was sufficient (or alternately whether it disguised the defect), whether the guns are worth less because of the defect, whether gun owners who want authentic weapons also want dangerous weapons, and whether it is reasonably foreseeable that gun owners might dent and displace the dust cover on weapons made of thin sheet metal.  Defendants' motion for summary

---

[1] Plaintiffs' Statement of Material Facts ("PS") ¶ 101 (filed herewith).

[2] The class weapons are as follows: Century AK-47 model pattern firearm imported or manufactured by Century, limited to the following model platforms: WASR; M70AB2; RPK; DRAGUNOV; AMD65; C39v1 (excluding C39v2); M72; GP 1972; 1975 AK Bullpup; Golani; 2007 Champion Pistol; Galil; Draco Pistol; PLS54C; M70B1; M70B2; M76; AK74; Tantal; AES10B; 1960AK; AKMS; GP 1975; Saiga (excluding shotguns); PAPM85; PAPM92; M70; M74; N-PAP; GPAK 74; MAK-22; PAPM90; MAADI; MAK-90; and AK63D.

judgment[3] asks the Court to accept their view of the case, which relies on a misstatement of the defect and the evidence itself.  Defendants' motion should be denied.

## II.      REMAINING CLAIMS

Plaintiffs' claims that survived Defendants' motion to dismiss are:

- **Count 1** (Violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")—All plaintiffs).

- **Count 2** (Negligence—Plaintiff Melton only).

- **Count 3** (Strict Liability In Tort—Plaintiff Melton Only).

- **Count 6** (Fraudulent Inducement and/or Suppression—Plaintiffs Melton and Morris Only).

- **Count 7** (Negligent Failure To Disclose, Failure To Warn, Concealment, and Misrepresentation—Plaintiffs Melton and Morris Only).

- **Count 8** (Fraudulent Concealment and Intentional Failure To Warn—Plaintiffs Melton and Morris Only).

- **Count 9** (Wrongful and/or Unjust Enrichment—All Plaintiffs).

Defendants' Motion is primarily organized on various factual assertions, and not one a claim-by-claim basis.  To systematically evaluate whether Defendants are entitled to summary judgment on any counts, each of the surviving counts is discussed below.

## III.      STATEMENT OF MATERIAL FACTS

Century imports and sells AK-style firearms.[4]  Century is required under U.S. law to convert these firearms from fully automatic to semi-automatic.  *Id.* ¶¶ 14, 16.[5]  Century is also required to modify the weapons to comply with U.S. regulations regarding foreign-sourced components.  *Id.* ¶ 16.  These regulations—known as the "922r regulations" after the U.S. statute that prohibits their importation[6]—require that no more than 10 parts in an assault rifle can be sourced from a foreign manufacturer.  SOMF ¶ 16.  The safety selector is not one of the 922r

---

[3] *See* Defs' Mot. Summ. J. & Inc. Memo. of Law in Supp., D.E. 161 ("Mot.").

[4] L.R. 56.1 Stmt. of Material Facts in Supp. Defs.' Mot. Summ. J. ("SOMF") ¶¶ 3–4 (D.E. 161-1).

[5] Some of the Class Weapons are sold by Century "as-is."  *See id.*

[6] *See* 18 U.S.C. 922(r).  Despite this nomenclature, the list of foreign parts is actually provided at 27 C.F.R. § 178.39(c).

components, which means that Century does not get credit for complying with the 922r regulations by using a U.S.-made safety selector. *Id.*

In an effort to save on costs, Century uses the original safety selectors attached to the rifles or from other gun kits, or buys surplus safety selectors from overseas vendors.[7] But the fully automatic safety selectors are not designed or intended to be used in semi-automatic rifles because the tab of the safety selector is too wide and causes the gun to fire if the safety selector is raised above the dust cover.[8] Plaintiffs have all experienced the same defect in this case.[9] As Plaintiff Melton vividly describes it, "if you raise the safety, the gun will fire. You can actually use the safety as a trigger." *Id.* ¶ 112.

Century knew about the problem since at least 2008,[10] and that there was a way to substantially reduce the risk of accidental discharges. Century designed a safety selector for its U.S.-made AK-47s that fixed the defect. *Id.* ¶ 114. Raising the safety selector above the dust cover in these U.S. models will not fire the weapon. *Id.* ¶ 115. Century never adopted this readily available fix for the Class Defect. *Id.* ¶ 116.

The main thrust of Century's defense throughout this litigation is to define away the defect by arguing that, if the gun misfires, it is because the customer "abused" the weapon or the gun is "damaged." Mot. 4, 11. This argument is not only flatly inconsistent with the evidence (as detailed below), it conveniently avoids confronting the real issue: the gun is defective because it can be fired without a trigger pull using the safety selector. Nothing in its voluminous briefing, including its Motion, squarely confronts this central point.[11]

---

[7] *See* Decl. David Byron in Supp. Pls.' Mot. Class Cert. ("Byron Decl.") ¶ 31.

[8] *Id.* ¶ 13.

[9] *See* PS ¶ 108 (Johnson Dep.) ("[t]he safety selector switch exceeds the dust cover causing accidental discharge"); *id.* ¶ 109 (Smith Dep.) (his gun had same defect as on web videos, which had "someone demonstrating the safety tripping the disconnect and causing the hammer to fall" and "[t]he safety will still rise above the notch with the dust cover on"); *id.* ¶ 110 (Morris Dep.) (safety selector can rise above dust cover, causing an accidental discharge); *id.* ¶ 111 (Valdes Dep.) (safety selector can rise up and fire the weapon).

[10] *See id.* ¶ 113.

[11] For example, Defendants contend that "Plaintiffs' 'defect' theory is grounded in two alternatives: the firearm will discharge without a trigger pull when (1) the dust cover is removed allowing the safety lever to over-rotate or (2) damage to the safety lever, dust cover, or receiver will allow the safety lever to over-rotate." Mot. 11. This misstates Plaintiffs' defect theory, as Plaintiffs have made clear.

- 3 -

First, Defendants deny there is a defect because, they contend, the dust cover works as a "secondary safety," which prevents the defect from occurring. Mot. 11–12. There are several reasons why this assertion is false. The dust cover does not prevent the safety selector from raising above the dust cover, as illustrated and explained by Plaintiffs' expert David Byron. PS ¶ 117. The dust cover is thin, flimsy, and prone to getting dented or disfigured. PS ¶ 118. A Century representative testified that the dust cover can become bent or dented simply from dropping the weapon. *Id.* ¶ 119. The safety inspection manual warns the inspectors that "[m]any of the AK63D dust covers do not fit properly and have to be modified." *Id.* ¶ 120. As Mr. Byron noted, disfigurement of dust covers was so common that the Soviet army issued a tools kits to straighten the dust cover. *Id.* ¶ 121. And the dust cover itself is not an essential part of the Class Weapons; there are several scenarios under which the owner will fire the weapons without the dust covers, either by necessity or design. *Id.* ¶ 122. Plaintiff Tommy Johnson testified that the safety selector exceeds the dust cover "effortlessly" and with "minimal force." As he explained, "It's not like I'm forcing it. I have other AKs, other AK Variants to where it comes up and it stops at the dust cover. This, it will come up." *Id.* ¶ 123. Plaintiff Melton testified that his safety selector inadvertently slid above the dust cover with a round in the chamber when his glove got stuck between the safety selector and the receiver, although the gun did not fire. *Id.* ¶ 124.

Defendants also assert that, to the extent the Plaintiffs' firearms exhibit the defect, they did not leave Century's warehouse in a defective condition. Mot. 4. But there is literally no evidence of the condition of the weapons when they left the factory (and Century cites no evidence in support); in fact, the evidence shows that the defect occurs when the weapons are new. Plaintiff Tommy Johnson purchased his weapon on October 31, 2013. The very next day, he went shooting and discovered the defect. As he testified, "[a]fter I finished the last meg 20 rounds downrange, I cleared the weapon and pulled the safety selector up, exceeded the dust cover by a quarter of an inch, and the trigger fired." *Id.* ¶ 200.

Century also contends that the defect only occurs when the gun owners intentionally abuse their weapons. Yet Century readily admits that it is both predictable[12] and foreseeable[13]

---

[12] *See* PS ¶ 125 (Watkins Decl.) ("Safety selector damage often occurs when a firearm owner attempts to alter the force required to rotate the selector by bending the safety selector's arm away from the receiver. . . . Unfortunately, owners bend the safety selector's arm too far and

that the class weapons will become dented and bent over time.  AK-47s are known as combat-ready assault rifles used in armed conflict for decades.  *Id.* ¶ 127.  Century is not selling a fragile tea set.  It is disingenuous for Century to claim now that dropping a rifle, for example, is both foreseeable and yet is an "abuse" of the weapon.  It is particularly disingenuous for Century to assert that there is no defect based on a dust cover that it knows will inevitably fail.  Century's own manuals proclaim that, "[w]ith proper care and handling, [the class weapon] will give you long, reliable service."  *Id.* ¶ 196.  If Century represents that the weapons are built for long service, it cannot now assert that the class weapons only need to function as advertised when they leave the factory.

Defendants claim that "Plaintiffs' own expert admits that, as designed, the safety lever should not be able to rotate above the safety stop position or the dust cover to cause a discharge." Mot. 12.  That's not what he said, and it is worthwhile to quote the entire testimony that Defendants cite to provide the full context (PS ¶ 128):

> Q.   Now, I guess my question for you is is if --if the -- as designed, the safety lever on these class AK-47s, if everything is working as designed, shouldn't the safety lever ever move past the dust cover?
>
> MR. PATTERSON:  Object to form.
>
> THE WITNESS:  In a perfect world where everything is brand new, in theory, it should.
>
> BY MR. LALLIS: Q.   Okay.  Right.  So if the tension's correct, and the notches are correct, and the dust cover has the tab, and the safety lever has the appropriate tab as well, that should prevent it from going above the safe position?
>
> MR. PATTERSON:  Object to form.
>
> THE WITNESS:  In theory.  The reason I say "in theory" is, in manufacturing and in use, that dust cover is deformable.  It can move.  It can rattle.  It can fall off.

Century's position is that the weapons function as intended right when they leave the factory.  In addition to being factually incorrect (as Plaintiff Johnson's experience shows), it is also legally wrong.  When a customer purchases a car, she does not buy it with the expectation

---

cause the safety selector to no longer mate properly with the dust cover, allowing the safety arm to be rotated above the 'Safe' position and defeat the purpose of the safety selector.").

[13] *Id.* ¶ 126.

that it will work only for the drive home; she reasonably expects that it will continue to perform at the same level for years to come.  That is part of the benefit of the bargain she obtained at the point of sale. Similarly, class weapon owners do not purchase the weapons with the expectation that they will perform as advertised for the first week; they reasonably expect that the weapons will remain safe and defect-free for years after purchase.

Defendants also assert that the weapons are tested before they leave the factory, such that there can be no defect.  Mot. 2.  This is not true.  During the crucial testing procedures at Century, the Class Weapons were not tested to determine if the gun will fire if the safety selector is raised above the dust cover.  *Id.* ¶ 129.  The instructions only say the following: "Test the safety selector lever by rotating it to the safe position and trying to pull the trigger. The hammer should not fall."  *Id.* ¶ 130.  The instructions do *not* require Century to test if the safety selector can rise above the dust cover, notwithstanding Century's testimony to the contrary.  *Id.* ¶ 131. Similarly, the instruction that advises Century's inspectors that "[s]afety should not go over dust cover as it will allow the gun to fire on safe"[14] does not say that the gun will fire if the safety goes over the dust cover; instead it suggests that a trigger pull when the safety is above the dust cover will fire the weapon.

Century places great weight on the number of what is calls "unverified claims" of an accidental discharge.  *See* Mot. 9.  Century is adamant that there has only been one, but the evidence it cites does not support this number at all.  It relies on an excerpt from Philip Burnor's testimony, and a declaration he submitted.  *See id.* (citing SOMF ¶ 35).  In the deposition, Philip Burnor testified that were only "two or three complaints" about the defect, but said nothing about accidental discharges.  *Id.* ¶ 132.  Notably, Philip Burnor later amended his estimate (perhaps based on problems with Century's complaint process, as identified below) to "less than 20" complaints about the defect.  *Id.* ¶ 133.  In any event, his declaration stated nothing at all about accidental discharges.  *Id.* ¶ 134.  Century is pulling this number out of thin air.

Century also claims that the relatively low number of complaints in Century's database shows there is no defect.  But Century's records about complaints are highly suspect.  Mr. Burnor testified that Century engaged in a wholesale document "purge[]" program at least "three

---

[14] *See id.* ¶ 201.

or four years ago," which included electronic files and paper files.  *Id.* ¶ 135.[15] This purge almost certainly wiped out many documents evincing customer complaints about the defect.[16]  Even Mr. Burnor admitted that he had "no way" of knowing how many complaints Century actually received.[17]

And for good reason, because Century does not even have the record of the complaint of one of the Plaintiffs.  Plaintiff Johnson called into Century to complain about the defect, but never received a call back, and there is no record of his call.[18]  Century's representative candidly admitted that this was important information for Century to have, and yet they have no record of it.[19]  It also does not logically follow that the number of complaints is an accurate proxy for the number of defective weapons.  Many—perhaps most—people who discover the defect will not register a complaint (or it might have been lost, like Plaintiff Johnson's).  The other plaintiffs knew about the defect, but did not contact Century.  PS ¶ 137 (Melton); ¶ 138 (Morris); ¶ 139 (Smith); ¶ 140 (Valdes).

At the very least, whether the number of complaints about the defect is material is clearly a question for the jury.  The jury may well conclude that people typically do not call in to complain about a defective product, gun owners in particular are more likely to try to fix the weapons for themselves, and Century's document "purge" and complaints process is so unreliable that its self-serving statements about the number of complaints should not be taken seriously.

Century also argues that there is no defect because "many gun enthusiasts and collectors" buy the class weapons because they are "authentic."  Mot. 1.  But there is no evidence of what

---

[15] Mr. Burnor originally testified that it was "three or four years ago," but then acknowledged "[i]t may have been longer than that[.]"  *Id.* ¶ 136.

[16] Century did claim that the database related to returns remained intact, but that only relates to cases in which the customers have demanded a refund or replacement. As demonstrated by the experience of Plaintiffs in this case, the returns database is a small subset of customers who have complained about the defect, and an even smaller subset of customers who know about the defect and did not formally advise Century of the defect. Plaintiff Johnson knew about the defect and contacted Century; the remaining plaintiffs knew about the defect but did not contact Century. *See* PS ¶ 137 (Melton); *id.* ¶ 138 (Morris); *id.* ¶ 139 (Smith); *id.* ¶ 140 (Valdes).

[17] *See id.* ¶ 141 ("Q. Do you know how many complaints the 1-800 number received that are not part of your [return authorization] system? . . . A. No, I would have no way to know that.").

[18] *See id.* ¶ 204.

[19] *See id.* ¶ 198.

motivated "many" customers, only anecdotal statements that it is conceivable that some would purchase the weapons as collectibles.  Not even Defendants' experts had any idea how many people bought the weapons as "collectibles"; they only offer their own opinions, and then found some people on the internet who agreed with them.  PS ¶ 142.

Nor is there any evidence that making the weapons more safe by using a different safety selector would have any impact whatsoever on the weapon's authenticity.  Authenticity, as Century describes it, is based primarily on how the weapon "looks."  *Id.* ¶ 143.  But Century offers no evidence that using a different safety selector would affect the look of the rifle.  And even Century's corporate representative agreed that warning customers about the defect would not make the weapons less authentic.  *Id.* ¶ 144.  Century asserts that the sale of authentic weapons is part of its "business model" (Mot. 2), but the evidence it cites does not support this proposition, and there has been no documents produced or testimony on what Century's "business model" is.

This argument also ignores Plaintiffs' own testimony.  All Plaintiffs here (except for Plaintiff Smith) are fairly described as gun enthusiasts.[20]  Indeed, as noted by Defendants, Plaintiff Morris "is an avid firearms collector and runs his own YouTube channel regarding firearms."  SOMF ¶ 47. But all joined this lawsuit because they wanted a safer weapon.[21]  Century is creating a false dilemma by arguing that making the weapons safer will render them less authentic.

## IV.     ARGUMENT

### A.     Legal standard

A party is entitled to summary judgment only when there is no "genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  The moving party bears the burden of showing that there are no genuine issues of material fact that should be decided at trial.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Blake v. Am. Airlines, Inc.*, 90 F. Supp. 2d 1265, 1265 (S.D. Fla. 2000) (Moreno, J.).  A factual dispute is genuine where the evidence is

---

[20] *See* SOMF ¶ 43 (Melton); ¶ 47 (Morris); ¶ 68 (Johnson); ¶ 61 (Valdes).

[21] *See* PS ¶ 149 (Johnson); ¶ 150 (Smith); ¶ 151 (Morris); ¶ 152 (Valdes); ¶ 153 (Melton).

such that a reasonable fact-finder could return a verdict for the non-moving party. *Patterson &
Wilder Constr. Co., Inc. v. United States*, 226 F.3d 1269, 1273 (11th Cir. 2000).

In deciding a motion for summary judgment, a court must view all evidence and
inferences in the light most favorable to the non-moving party. *Clark*, 929 F.2d at 606. As the
Eleventh Circuit has repeatedly explained:

> All reasonable doubts about the facts should be resolved in favor
> of the non-movant. If the record presents factual issues, the court
> must not decide them; it must deny the motion and proceed to trial.
> Summary judgment may be inappropriate even where the parties
> agree on the basic facts, but disagree about the inferences that
> should be drawn from these facts. If reasonable minds might differ
> on the inferences arising from undisputed facts, then the court
> should deny summary judgment.

*Patterson & Wilder Constr.*, 226 F.3d at 1273 (emphasis in original) (citations omitted). *See also
Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) ("[Plaintiff]'s evidence
must be taken at face value, and all justifiable inferences are to be drawn in his favor. Neither
we nor the district court are to undertake credibility determinations or weigh the evidence.").

Opinion evidence alone can be sufficient to preclude summary judgment, *Poe v. Sears,
Roebuck & Co., Inc.*, 1 F. Supp. 2d 1472, 1477 (N.D. Ga. 1998), and conflicting opinions may
preclude a finding that no genuine issues exist. *Wise v. Hartford Life & Accident Ins. Co.*, 360 F.
Supp. 2d 1310, 1324 (N.D. Ga. 2005). Courts "would 'rather wrongly submit a close question to
the jury than wrongly deny a litigant his or her day in court.'" *Kendall v. Cobb Cty.*, 14 F. Supp.
2d 1342, 1347 (N.D. Ga. 1998) (quoting *McKenzie v. Atl. Richfield Co.*, 906 F. Supp. 572, 576-
77 (D. Colo. 1995)); *see also Collins v. Beazer Homes USA, Inc.*, 334 F. Supp. 2d 1365, 1377
(N.D. Ga. 2004) (denying summary judgment in a "close case"). As described below, taking
Plaintiffs' evidence at "face value," summary judgment is inappropriate here.

**B.      Plaintiffs have standing to assert their claims.**

    **1.      Plaintiffs were injured at the point of sale by overpaying for their weapons.**

Defendants first contend that Plaintiffs lack standing to pursue their claims because there
was no defect, and hence no injury. *See* Mot. 9-10. Plaintiffs' Statement of Material Facts (*see
supra* Part III) demonstrates that there is clearly a defect, and at a minimum that there are
genuine issues of fact to resolve to determine whether there is a defect.

Defendants also contend that Plaintiffs were not injured by the defect.  But Plaintiffs have established that they overpaid for their weapons at the point of sale because of the defect.  This is sufficient to establish injury.  *See Melton v. Century Arms, Inc.*, 243 F. Supp. 3d 1290, 1299 (S.D. Fla. 2017) ("economic harm is a well-established injury-in-fact under federal standing jurisprudence" (citing *Adinolfe v. United Techs. Corp.*, 786 F.3d 1161, 1172 (11th Cir. 2014))).

Defendants next assert that Plaintiffs have failed to adequately provide a damages model.  Plaintiffs have proposed three separate damages models, depending on the specific claim being asserted.  And there is no doubt that the weapons are worth less because of the defect, and that Plaintiffs overpaid for their weapons.  And this defect—as even Defendants' own expert conceded—would have an across-the-board effect on the value of the Class Weapons.[22]  Another expert proffered by Defendants, Richard Vasquez, agreed that—all other things being equal—a safe weapon is worth more than a less safe weapon.  *Id.* ¶ 147.  This is the classic "benefit of the bargain" theory that confers standing.  *See Cole*, 484 F.3d at 723.  In any event, and as their proffered expert stated, all class members realize a drop in value of their weapons, regardless of the subjective reasons they purchased them.  PS ¶ 148.

Each Plaintiff has also described how the defect poses a real safety risk, to themselves and to others.  *Id.* ¶¶ 149 (Johnson); 150 (Smith); 151 (Morris); 152 (Valdes); 153 (Melton).  When Plaintiff Smith was asked why he was participating in the class action, he said "[b]ecause I think that this is a big safety issue, and it shouldn't be out there.  These products that do this shouldn't be out there on the market."  *Id.* ¶ 154.  When asked if he has attempted to resell his rifle, he responded, "I wouldn't feel very good about myself if I sold it to someone knowing that this was an issue.  I haven't attempted to sell the rifle."  *Id.* ¶ 155.  Plaintiff Melton testified that Century is "selling an unsafe product for profit.  They know it is unsafe. . . .  When parts interfere with one another to the point that a safety causes the gun to fire, you should know that there is a problem with the gun.  And then to profit on it, knowing that, is unfair and unjust."  *Id.* ¶ 156.  Plaintiffs Johnson, Smith, Valdes, and Melton testified that the weapon was "worthless" to them.  *Id.* ¶¶ 158, 160, 167, 170.  Plaintiffs Smith, Valdes testified that that would not have

---

[22] *Id.* ¶ 146 (McCormick Dep.) ("Q. If there was a factor that decreased the price of the firearms [and] allowing for other variables in terms of pricing, would the class members have common impact in the decrease of the price of the firearm? A. If all the class members suffered a price effect, I would say that there was common harm, yes.").

purchased the weapon if they had known about the defect (*id.* ¶ 161, 166), and Plaintiff Morris suggested that he wanted his money back. *Id.* ¶ 164.

The cost of repair is another appropriate measure of damages, based on the specific counts. Here, Defendants quibble with David Byron's methodology for calculating this repair (even though Defendants' purported expert, Mark McCormick, has no such quibble[23]). At least with respect to the negligence and strict liability claims, the cost of repair is a fair and adequate measure of damages.

## C.   Plaintiffs have proven their FDUTPA claim.

### 1.   Plaintiffs have proven "actual damages" under FDUTPA.

Defendants maintain that Plaintiffs have failed to prove damages cognizable under FDUTPA, which broadly is the difference in market value between the weapon as promised and the weapon as delivered. Mot. 12. Contrary to Defendants' claim, Plaintiffs are not insisting on the cost of repair as the source of FDUTPA damages. Mot. 13-14. Although cost of repair is included in Byron's report, that is primarily for calculating damages for other counts (which Defendants never address).

First, Defendants recognize that the "appropriate measure of actual damages" is the purchase price when the product is "rendered valueless as a result of the defect."[24] All five plaintiffs in this case testified that the weapon was worthless or that they wanted their money back. Each feared bodily injury or death—for themselves or others—if the defect is not fixed. PS ¶¶ 149-153. Plaintiffs have provided substantial evidence that the guns were worthless for them, which establishes injury under FDUTPA. *See Davis v. Main Street Family Pharmacy, LLC*, 2016 WL 9051172 (May 19, 2016) (plaintiff suffered damages under FDUTPA by receiving a worthless drug).

Plaintiffs also provide a common-sense model: the difference in market value is the price of the missing component. Although Plaintiffs were not allowed to obtain this information,[25] this

---

[23] PS ¶ 145.

[24] Mot. 12 (quoting *Rollins, Inc. v. Heller*, 454 So.2d 580, 585 (Fla. Dist. Ct. App. 1984) (citation omitted)).

[25] Plaintiffs served subpoenas on third party vendor Companion to produce documents related to its sales of various components to Century. Companion produced documents, but redacted pricing information. *See* Motion to Compel Unredacted Documents (D.E. 46). Plaintiffs' counsel learned that defense counsel had contacted Companion and asked Companion to redact the documents. Plaintiffs then moved to compel production of unredacted documents

is a viable model to measure the difference in value between what Plaintiffs paid, and what the market value was of the product at the point of sale.  Nowhere do Defendants dispute that this is a viable model, or even mention this model.

Defendants maintain that Plaintiffs have "put forth no evidence that the firearms at issue have dropped in value due to the alleged defective condition," Mot. 14, but this is plainly not true.  Plaintiffs' expert David Byron—who previously wrote pricing guides for firearms—stated in his report that gun owners pay a premium for a safe weapon.  As he explained, "[g]un owners—including experienced and sophisticated gun owners—would pay less for a gun that was not safe as compared to a gun that was safe."  PS ¶ 199.  As noted above, Defendants' own experts recognize that a safer weapon is more valuable than a less safe weapon, and a factor affecting prices (like the defect) would have an across-the-board effect.  *Id.* ¶¶ 146–147.

### 2.    Florida law applies to non-Florida residents.

Defendants initially assert that non-resident Plaintiffs Melton and Morris could not assert a claim under FDUTPA because of insufficient contacts with the state of Florida.  But, as Defendants recognize, this Court has already held that "Plaintiffs have alleged many facts connecting Florida to Century's alleged misconduct giving rise the claim. . . . that Century willfully, knowingly and/or recklessly committed acts in Florida for the purposes of concealing safety defects . . . and that Century misrepresented facts in its manuals and on its website, both in Florida."  Mot. 15 (citing *Melton*, 243 F. Supp. 3d 1290, 1305 (S.D. Fla. 2017)).[26]

To avoid certification of a nationwide class, Century focuses exclusively on the mechanical acts of importing, shipping, and distributing the weapons, while completely ignoring the above-quoted portions of the Court's order.  Rather remarkably, nowhere in Century's

---

from Companion, arguing in part that the interference in the production of documents by a third party was improper and sanctionable.  *See id.*  Magistrate Judge Turnoff denied that motion.  *See* Dkt No. 60.  Plaintiffs filed objections to this ruling with Judge Moreno, who overruled the objections.  *See* Dkt Nos. 66, 68.  Plaintiffs then filed a motion for clarification with respect to Judge Moreno's ruling, which was denied.  *See* Dkt No. 69, 75.

[26] To the extent that Defendants rely on cases at odds with this Court's prior decision on the extraterritorial application of Florida law, the Court's decision is law of the case and other conflicting decisions are entitled to no weight.  *See, e.g.*, Mot. 16 (quoting *Aaron Data Sys., Inc. v. GLD Int'l, Inc.*, 2018 WL 1973653, at *25 (S.D. Fla. Mar. 23, 2018)).  *Stein v. Marquis Yachts, LLC*, 2015 WL 1288146 (S.D. Fla. Mar. 20, 2015), is easily distinguishable because *Stein* did not involve any deceptive or fraudulent conduct in Florida.  *Id.* at *6.  Plaintiffs have now proven that the fraudulent conduct occurred in Florida.

summary judgment brief does it even acknowledge that the chief executives of Century (a) all are from the same family (the Suchers); (b) all work in Florida; (c) all live in Florida; and (d) all make important decisions for the company—*from Florida*.  To take one example, Century's own witness identified Howard Sucher as one of two people involved in making changes to the warning manual.  Howard Sucher lived and worked in Florida—establishing precisely the nexus to Florida that is required to apply FDUTPA to all gun purchasers.  John Burnor testified that, although he was not personally involved, the decision on the language most likely came in part from Howard Sucher, who worked *in Florida*.  PS ¶ 171.

Howard Sucher is the brother of Michael Sucher, who is the CEO and works at Century's Florida office.  *Id.* ¶ 172.  Brian Sucher is the Vice President of Century Arms, and he works in Florida as well.  *Id.* ¶ 173.  Although John Burnor works in Vermont, he and Brian Sucher work together on "doing a lot of the procurement from around the world. . . . He gives me the assignments[,] where to go, what to look at, people to talk to."  *Id.* ¶ 174.  John Burnor provided the following additional information about Century's presence in Florida:

- Brian Sucher is also involved in determining the purchase price of the weapons, and prepares the contracts for the purchase of the weapons.  *Id.* ¶ 175.

- When asked if Michael Sucher is "involved in the decision on which class weapons to purchased," John Burnor responded, "[y]es, I mean ultimately he's involved with most decisions with the company."  *Id.* ¶ 176.

- Michael Sucher is extensively involved in all aspects of the purchase of the class weapons.  With respect to the weapons, John Burnor said they discuss "what they are, what we can do with them.  Do we—is our plan to bring them in and sell them as kits, or is our plan to bring them in and reconfigure them to firearms that are saleable in the U.S."  *Id.* ¶ 177.

- When John Burnor prepares a report on the guns slated for purchase, he sends them to "upper management," which consists of Michael Sucher, Brian Sucher, and Phil Burnor.  Michael and Brian Sucher are involved in every purchase.  *Id.* ¶ 178.

- Michael Sucher is on the email chain "in most cases" when purchases have been approved.  In fact, Michael Sucher is on "most" work-related emails John Burnor sends.  They also talk on the phone two or three times a week.  *Id.* ¶ 179.

- They also discuss the transportation of the weapons, which containers to use to ship them, OSHA-related safety regulations, the use of safety googles, the labeling of the products, how many weapons will fit in a given container, whether to include the individual wooden cases during shipping, and a whole host other of minutiae related to the firearms.  *Id.* at ¶ 180.

- Michael Sucher is also involved in the evaluation of the weapons themselves, and whether the weapons are likely to sell.  *Id.* at ¶ 181.

Similarly, the testimony of Jason Karvois, Century's Director of Sales since late 2016,[27] confirms that the Florida Century executives are intimately involved with running all aspects of the company.  Michael Sucher works in the Florida office with a dedicated secretary.  *Id.* ¶ 183. According to Mr. Karvois, Michael Sucher is in the office when Mr. Karvois arrives at 8:00 a.m., and is still in the office when Mr. Karvois leaves at 5:00 p.m.  *Id.* ¶ 184.  Michael Sucher calls and emails Mr. Karvois after hours during the week, and on the weekends as well, multiple times a week.  *Id.* ¶ 185.  Although Mr. Karvois travels extensively for work, when he is in the office, he and Michael Sucher talk every day about how sales are doing, including individual sales.  *Id.* ¶ 186.

In sum, there is little doubt that all important decisions regarding the purchase of the weapons themselves originate from, and must be approved by, Florida executives.  The defect exists because Century purchased them in a defective condition.  The Florida executives not only were involved, but coordinated the entire operation.  Application of Florida law to non-residents is appropriate when the offending conduct occurred in Florida.  *Melton*, 243 F. Supp. 3d at 1305.

### 3.     Century fraudulently sold the weapons without disclosure of the defect.

Century asserts that Plaintiffs failed to prove that it engaged in any deceptive conduct, but Century is mistaken.  Mot. 16-17.  The "concept of 'unfair and deceptive' conduct [under the FDUTPA] is extremely broad*." TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC*, 945 F. Supp. 2d 1331, 1344 (M.D. Fla. 2013) (citing *Millennium Communs. & Fulfillment, Inc. v. Ofc. of Atty. Gen. Dep't of Legal Affairs*, 761 So.2d 1256, 1263 (Fla. Dist. Ct. App. 2000)). The deceptive practice must be one that is likely to mislead consumers. *Id.* (citing *Davis v. Powertel, Inc.*, 776 So.2d 971, 974 (Fla. Dist. Ct. App. 2000)).  To establish a FDUTPA violation plaintiff need only establish that defendant engaged in an unfair method of competition, *or* unconscionable acts or practices, *or* unfair *or* deceptive acts or practices.[28]

---

[27] PS ¶ 182.

[28] *See* FLA. STAT. § 501.203; § 501.204 ("'Violation of this part' means any violation of this act or the rules adopted under this act and may be based upon *any of the following* as of July 1, 2017") (emphasis added); *see also In re: Takata Airbag Prods. Liab. Litig.*, 2016 WL 6072406, at *11 (S.D. Fla. Oct. 14, 2016) (Moreno, J.) (FDUTPA claim has three elements: "(1) a deceptive act *or* unfair practice, (2) causation, and (3) actual damages.") (emphasis added).

- 14 -

Here, evidence shows that Century never warned its customers about the Class Defect, which affects over one million rifles. PS ¶ 187. Starting in 2008, Century began to change some of its manuals to include language about the safety selector, but this "warning," if anything, cleverly disguised the defect. The "warning" states as follows (*id.* ¶ 188):

> **WARNING!** The safety lever should not extend below the safety lever stop on the bottom of the receiver or rise past the receiver cover. If it does, put the lever in the safe position by rotating it either up or down into the safe position. If this occurs, have the rifle inspected by a competent gunsmith before further use.

This "warning" is misleading because it never warns consumers about the Class Defect; it says nothing about the fact that raising the safety selector above the dust cover will fire the weapon. *Id.* ¶ 189. A Century representative candidly admitted that this information is "important" for customers to know, but also admitted that Century never included that information. *Id.* ¶ 190. In fact, the "warnings" themselves were so weak that *no one* was on notice as to the defect. Even Century's representative and Century's expert agree. *See id; see also* ¶ 191 (Watkins). This failure to warn is particularly glaring when Century's manuals expressly warn that "[a]n accidental discharge will cause property damage, serious injury and/or death!" *Id.* ¶ 192.

The inadequacy of the warning is compounded by Century's refusal to publicize it. It did nothing to warn customers on its website, through YouTube, or any other social media (although it has done so before for other weapons). *Id.* ¶ 193. Century did not even update all of its manuals. Based on a review of the manuals produced in discovery, 18 of them do not include the update. *Id.* ¶ 194. A Century representative admitted that it could have updated many of the manuals that it did not publish by simply inserting a piece of paper into the manual itself, but chose not to do so.

Century maintains that Plaintiffs did not demonstrate any unfair practice by Century, because "Century's literature all clearly state that the products are imported and assembled from surplus and used parts." Mot. 17. First, it is ironic that Century would rely on its manuals, when it otherwise emphasizes that not all gun owners use or refer to the manual. *See* Mot. 5-6. In any event, this disclosure reveals more than it discloses. There is no reason to make the leap that, since these are "surplus and used parts," then the weapons are going to be unsafe. Indeed, Century fraudulently represents in its manual that the class weapons will remain same for the

- 15 -

foreseeable future.  On the very first page (the page customers are most likely to read), the manuals state that "[w]ith proper care and handling, it will give you long, reliable service."  PS ¶ 196.  This is plainly not true.

       **4.**      **Century's conduct misled a reasonable consumer.**

Finally, Century contends that Plaintiffs failed to establish proximate cause because they did not establish reliance on any of Century's materials.  This argument completely skips over the central allegation related to Century's fraudulent omission, which is that none of the Plaintiffs was warned about the defect.[29]  Each testified that knowing about the defect would have been important to their decision to purchase the gun, and most of them testified that they would not have purchased the weapon had they known about the defect.[30]  As Plaintiff Johnson testified, if Century were to warn customers (through social media, its website, or other means), he would have received that message.  PS ¶ 197 (Johnson).

But the focus on the individual plaintiff's individualized knowledge is misplaced, because the correct standard to apply is whether Century's omissions would deceive a reasonable consumer, and does not turn on a subjective inquiry of plaintiffs' knowledge.  Directly on point is *Davis v. Powertel, Inc.*, 776 So.2d 971 (Fla. Dist. Ct. App. 2000).  In *Davis*, plaintiffs sought to bring a class action lawsuit under FDUTPA based on Powertel's failure to disclose to consumers that the name brand phones it sold were pre-programmed to only work on Powertel's wireless communication service.  Powertel argued that the plaintiffs must establish individual reliance on these omissions, but the appellate court disagreed.  It held that "[a] party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue."  *Id.* at 973.  Instead, *Davis* adopted an objective standard, and evaluated whether a reasonable consumer would be misled by Powertel's omissions.  *Id.* at 974.  The court also concluded that the objective test is the same in class action cases as in other cases.  *Id.*; *see also Carriuolo v. Gen. Motors co.*, 823 F.3d 977, 984 (11th Cir. 2016) ("Under Florida law, an objective test is employed in determining whether the practice was likely to deceive a customer acting reasonably.").

---

[29] PS ¶ 157 (Johnson); ¶ 159.5 (Smith); ¶ 162 (Morris); 165 ¶ (Valdes); ¶ 168 (Melton).

[30] In particular, Plaintiffs Johnson, Smith, Valdes, and Melton testified that the weapon was "worthless" to them.  *Id.* ¶¶ 158; 160; 167; 170.  Plaintiffs Smith, Valdes testified that that would not have purchased the weapon if they had known about the defect (*id.* ¶ 161, 166), and Plaintiff Morris suggested that he wanted his money back.  *Id.* ¶ 164.

- 16 -

In this case, Plaintiffs do not need to prove that each Plaintiff was subjectively misled by Century's omissions (although factually this is mostly true). The only remaining question is whether Century's omissions would have misled a reasonable consumer. This is a fact-based inquiry that should be decided by a jury, and not by this Court on Century's motion for summary judgment. *See James D. Hinson Elec. Contracting Co., Inc. v. BellSouth Telecomm., Inc.*, 796 F. Supp. 2d 1341, 1353 (M.D. Fla. 2011) (denying plaintiffs' motion for summary when there was a material issue of fact as to whether defendant's phone bills were likely to mislead a reasonable consumer).

**D.    Plaintiffs are entitled to unjust enrichment restitution.**

      **1.    Plaintiffs can pursue unjust enrichment as an alternative.**

Defendants misstate the law when they contend that, "when a plaintiff's claim for unjust enrichment is based on the same operative facts that give rise to a consumer fraud claim, then an unjust enrichment claim is not legally viable." Mot. 17. The correct inquiry, as this Court and many others have recognized, is that Plaintiffs cannot *recover* under both theories, but they can pursue both theories up through trial and final judgment. Indeed, Defendants spent most of their brief arguing how Plaintiffs cannot possibly establish and collect damages, but then argue that unjust enrichment is not viable because Plaintiffs can collect damages. This makes no sense, and it is not the law. *See State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*, 427 F. App'x 714, 722 (11th Cir. 2011).[31]

      **2.    Plaintiffs agree that Smith and Morris cannot obtain unjust enrichment restitution.**

Defendants are correct that, as second-hand purchasers, Plaintiffs Smith and Morris are unable to obtain unjust enrichment relief.

      **3.    Plaintiffs established that Defendants received a benefit from remaining Plaintiffs.**

Defendants argue that Plaintiffs failed to demonstrate that Plaintiffs had conferred a benefit on them, but it is unclear why this is so, and Defendants do not cite to a single material fact in support. Defendants suggest that Plaintiffs did not "overpay" for an item, but that is not the issue under an unjust enrichment theory. Mot. 18. As this Court has already held, the

---

[31] *See also Licul v. Volkswagen Grp.*, 2013 WL 6328734, at *7 (S.D. Fla. Dec. 5, 2013); *Sports Imaging of Ariz., L.L.C. v. 1993 CKC Tr.*, 2008 WL 4448063 (Ariz. Ct. App. Sept. 30, 2008) (same, under Arizona law law).

elements of unjust enrichment are:  "(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying the value thereof."  *Melton*, 243 F. Supp. 3d at 1306.  Defendants also claim (without support) that Plaintiffs received "exactly what they sought," but this is plainly not so.[32] To believe this to be true, the Court would have to disbelieve every single Plaintiff's testimony on this point.

The benefit they conferred is straightforward:  Century sold the weapons that Plaintiffs purchased.  As this Court has already held, the fact that they were sold to Plaintiffs through a retail store makes no legal difference.[33]  Century cites no caselaw to support its contention, which is contrary to this Court's previous ruling.

### 4.     Defendants should not profit from their fraudulent conduct.

Next, Defendants maintain that Plaintiffs did not establish Century engaged in inequitable conduct in selling the firearms (but again fail to cite to any material facts in support). "Inequitable conduct" is a commonly used term in bankruptcy proceedings, and in that context it includes conduct that is "not limited to fraud," but includes "even lawful conduct that shocks one's good conscience,"[34] through conduct that is "unconscionable, unjust, unfair, close or double dealing or foul conduct."[35]  Knowingly selling a highly dangerous and defective weapons, and knowingly *not* fixing the weapon despite an easy means to do so, and knowingly misleading consumers about it through a "warning" that deliberately did not warn consumers about the defect, is the epitome of inequitable conduct.

The case Defendants cite in support is inapposite.  Mot. 19 (quoting *Moore v. GNC Holdings, Inc.*, 2014 WL 12644919 (S.D. Fla. Mar. 18, 2014)).  In *Moore*, defendant did not include a standard guidance to drink plenty of water to avoid side effect when taking the supplement creatine.  But this failure to disclose did not enrich defendant at all—or, put another way, disclosure of this guidance would not have led to lost sales.  2014 WL 12644919, at *4 ("the value of the consumer's product, as purchased without the hydration warning, was the same

---

[32] *See supra* note 28.

[33] *See Melton*, 243 F. Supp. 3d at 1307.

[34] *In re LightSquared Inc.*, 511 B.R. 253, 347 (Bankr. S.D.N.Y. 2014).

[35] *Id.* at 347-48 (citation omitted).

as the value of the same product untainted by Defendant's deception."). Here, however, Century benefited from not disclosing the defect—which is indisputably shown by the fact that it did not disclose the defect. Had it done so, it would have lost sales. This is precisely why unjust enrichment is appropriate here.

**E.    Plaintiff Melton's claims are timely.**

Defendants contend Plaintiff Melton's claims are untimely because he purchased his weapon on September 20, 2010, more than four years prior to the complaint's filing date of March 18, 2016. But Plaintiffs have established that Melton did not discover the defect until he read about it online, approximately one month before the complaint was filed. PS ¶ 202. The statute of limitations is accordingly tolled.[36]

**F.    Plaintiffs Smith and Morris did not believe they were purchasing a defective weapon.**

Defendants argue that Plaintiffs Smith and Morris "should not be permitted to maintain a lawsuit" because they knew about defect when they purchased the weapons. Mot. 20. This argument does not specify which claims are at issue, or why this fact is material. In any event, it is largely not true. Defendants rely on a portion of the transcript that simply says Smith saw a YouTube video that explained the defect, but it says nothing about when this occurred. *See* SOMF ¶ 55. For Plaintiff Morris, he did not believe that the class weapon he purchased had the defect because it contained a semi-auto safety selector. *See* PS ¶ 203.

**G.    Melton and Morris' fraud claims are valid.**

Next, Defendants repeat their argument that Plaintiffs Melton and Morris did not establish causation for their fraud claims. Mot. 20. They offer no new analysis on this score, and Plaintiffs accordingly incorporate by reference the prior discussion on these issues. *See supra* Part III.C.4.

Century also seems to suggest that the economic loss doctrine should preclude fraud claims, although its argument is unclear.[37] This Court has already held that this doctrine does not apply here, and indeed has already discussed the case upon which Defendants rely. *See Melton*,

---

[36] *See Anson v. Am. Motors Corp.*, 155 Ariz. 420, 426 (Ariz. Ct. App. 1987).

[37] *See* Mot. 20 ("while Arizona law does not automatically foreclose product liability and negligence causes of action when only economic loss is suffered, the Court must look to the fact of each individual case to determine whether tort principles or contract principles are applicable.").

243 F. Supp. 3d at 1302 (quoting *Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp.*, 694 P.2d 198, 210 (Ariz. 1984)).  The Court explained that the economic loss rule under Arizona law should not properly reach parties who are not in privity of contract (like Melton and Century) because the aggrieved party cannot pursue contractual remedies.  *Id.* at 1302-03.  For that reason, the Court held that, "[a]lthough the only harm alleged is economic loss, a defect in the safety selector that permits the rifle to fire without a trigger pull could be considered unreasonably dangerous as it may cause substantial risk of death or serious injury. The claims are further supported because of Plaintiffs' lack of privity with Century and the resulting unavailability of contractual remedies."  *Id.* at 1303.

**H.      Defendants do not move for summary judgment on three counts.**

Defendants' motion does not identify any facts in dispute with respect to Count 2 (negligence—Plaintiff Melton only); Count 3 (strict liability in tort—Plaintiff Melton only); and Count 7 (negligent failure to disclose—Plaintiffs Melton and Morris only).  Those counts will accordingly be decided by a jury.

## V.      CONCLUSION

Plaintiffs have cited to over one hundred material facts that support their claims and undermine Defendants' defenses.  The core questions of the nature of the defect, whether the warning gave adequate notice, the damages to Plaintiffs, and whether the firearms only exhibited the defect when they are "abused" are under sharp dispute.  These factual disputes are properly heard by a jury, and the Defendants' Motion for Summary Judgment should be denied.


Date: November 9, 2018                    Respectfully submitted,

                                          By: */s/ Angelo Marino, Jr.*
                                                 ANGELO MARINO, JR.
                                          Florida Bar # 151934
                                          645 SE 5th Terrace
                                          Fort Lauderdale, FL 33301-3160
                                          amjrpamail@aol.com


                                          Steve W. Berman (*Pro Hac Vice*)
                                          Jerrod C. Patterson (*Pro Hac Vice*)
                                          HAGENS BERMAN SOBOL SHAPIRO LLP
                                          1301 Second Avenue, Suite 2000
                                          Seattle, WA 98101

- 20 -

Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
jerrodp@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 9, 2018, a true and correct copy of the foregoing was filed using the CM/ECF system which will send a notice of electronic filing to all counsel or parties of record on the service list.

*/s/ Angelo Marino, Jr.*
ANGELO MARINO, JR.

CASE NO. 1:16-cv-21008-CIV-MORENO/LOUIS

## SERVICE LIST

**ANGELO MARINO, JR., P.A.**
Angelo "Tony" Marino, Jr. (Florida Bar
No. 151934)
645 SE 5th Terrace
Fort Lauderdale, FL 33301
(954) 765-0537 (telephone)
(954) 765-0545 (facsimile)
amjrpamail@aol.com
amjrpal@hotmail.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (*Pro Hac Vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292 (telephone)
(206) 623-0594 (facsimile)
steve@hbsslaw.com

*Attorneys for Plaintiffs*

**PISCIOTTI MALSCH**
Ryan L. Erdreich (Florida Bar No. 65712)
Anthony M. Pisciotti (*Pro Hac Vice*)
Danny C. Lallis (*Pro Hac Vice*)
Jeffrey M. Malsch (*Pro Hac Vice*)
30 Columbia Turnpike, Suite 205
Florham Park, NJ 07932
(973) 245-8100 (telephone)
(973) 245-8101 (facsimile)
rerdreich@pmlegalfirm.com
apisciotti@pmlegalfirm.com
dlallis@pmlegaLfirm.com
jmalsch@pmlegalfirrn.com

*Attorneys for Defendants*

- 23 -