# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 16-CV-21008-MORENO/LOUIS

JEFFREY MELTON, EZEKIEL MORRIS,
TOMMY JOHNSON, JUAN VALDES, and
MANVILLE SMITH,

        Plaintiffs,

v.

CENTURY ARMS, INC.; CENTURY
INTERNATIONAL ARMS CORP.;
CENTURY ARMS OF VERMONT, INC.; and
CENTURY INTERNATIONAL ARMS OF
VERMONT, INC.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** comes before the Court on Plaintiffs' Motion for Class Certification (ECF No. 81). The motion was referred to the undersigned United States Magistrate Judge by the Honorable Federico A. Moreno, United States District Judge, for a Report and Recommendation (ECF No. 100). An evidentiary hearing was held before the undersigned on November 7, 2018. Having reviewed the parties' submissions, the record, applicable case law, and considered the arguments advanced by counsel and their witnesses at the hearing, the undersigned recommends that Plaintiffs' Motion for Class Certification be **DENIED**.

## I.      BACKGROUND FACTS

Plaintiffs Jeffrey Melton, Ezekiel Morris, Tommy Johnson, Juan Valdes, and Manville Smith ("Plaintiffs") initiated this suit against Century Arms, Inc., Century International Arms Corporation, Century Arms of Vermont, Inc., and Century International Arms of Vermont, Inc.

(collectively, "Century" or "Defendants"). Century imports, manufactures, and sells AK-style semi-automatic rifles (ECF No. 81 at 3). Century imports the weapons it sells from manufacturers abroad. Plaintiffs allege that Century's AK-47 rifles share a common defect, and that Century has failed to disclose or correct that defect: its semi-automatic rifles are sold with components of the original, fully automatic rifle, which enable the weapon to accidentally fire when the safety selector is manipulated beyond the "safe" position.

Resolution of the present motion requires an understanding of how an AK-47 rifle operates.[1] A typical semi-automatic AK-47 rifle is equipped with a safety selector, which can be put in either the "safe" or "fire" position. Generally, for a semi-automatic rifle to discharge, the safety selector must be put in the "fire" position, and an individual must manually pull the trigger, which releases the hammer (a spring-like mechanism) and causes a single bullet to discharge. After the firearm discharges, a device called the disconnector catches the hammer to prevent the firearm from firing another round automatically. When the trigger is released, the disconnector snaps back and releases the hammer.

In a fully-automatic AK-47, a wider safety selector, known as a fully-automatic safety selector, prevents the disconnector from catching the hammer, and therefore allows the firearm to discharge several rounds of bullets automatically. A semi-automatic safety selector, by comparison, is narrower or "notched" and thus interacts differently with the disconnector. A typical AK-47 rifle also has a dust cover, a protective cover on top of the receiver (the body holding the trigger, safety, and bolt mechanisms) that prevents dust and debris from entering the receiver. The dust cover, which varies in shape and size depending on the model, may, in certain circumstances, serve to prevent the safety selector from over-rotating upward beyond the normal "safe" position.

---

[1] These facts are compiled from the exhibits to the motion and response in opposition, and are uncontested.

Federal laws require Century to modify the weapons before selling them in the United States. *See* 18 U.S.C. § 922(r). Compliance with these laws requires Century to disassemble and reconfigure the imported weapons (ECF No. 87-4 at 70-71).[2] Specifically, 18 U.S.C. § 922(r) limits the number of foreign parts that Century may use on its imported semi-automatic firearms. The reconfiguration process entails importing a group of foreign weapons, disassembling them, destroying the receiver and barrel, and then cataloging the remaining parts as firearm kits that can either be sold as part kits, or reassembled into new firearms using a combination of foreign and domestic parts (ECF No. 87-4 at 70-71). Typically, the hammer, trigger, sear, and gas tube are replaced in each firearm, but the original, foreign-made safety selector and dust cover are not (ECF No. 87-4 at 171-172). "Original" in this context means not the safety selector that was originally fitted in a particular weapon, but the safety selector originally manufactured abroad for that weapon model. Only a finite number of weapons can be assembled from each kit.

Firearms that are sold under the same model name, if derived from different kits originating in different countries, may contain different parts (ECF No. 193 at 165). For example, the WASR-10 is generally manufactured using new U.S. parts, or new Romanian parts from the Romanian factory, but the WASR-10/63 is "remanufactured into a WASR-10 configuration" using original parts from a 1963 machine gun (ECF No. 193 at 164-166).

At the hearing, Mr. Burnor and Century's quality manager, Mr. Andrew Chamberlin, both explained that even among same model weapons, the safety selectors and dust covers in each firearm will vary in the Class Weapons, depending on their country of origin (ECF No. 193 at 165, 109).[3] For example, some dust covers have ribs, bumps, or ledges, while others are flat;

---

[2] Century sells some firearms as "as-is" because they are classified as sporting rifles under U.S. regulations (ECF No. 81, FN. 6).

[3] Similarly, Century's interrogatory responses confirm that the safety selectors in the Class Weapons vary, and can be "original, surplus or manufactured by Defendant on a firearm by firearm basis." (ECF No. 87-18).

some safety selectors are fully automatic, while others are semi-automatic (ECF No. 193 at 108-109). Similarly, there is variance among the U.S. parts that Century uses to reconfigure each set of weapons (ECF No. 193 at 165). Which type of hammer, trigger, or sear is used in any given firearm batch depends on the vendor supplying these parts (ECF No. 193 at 141). The Class Weapons also have different types of disconnectors, such as flat-back disconnectors, tabbed disconnectors, and notched disconnectors (ECF No. 193 at 209-214). And the decision of which foreign parts to replace, and with which U.S. parts, is made on a "case-by-case" basis (ECF No. 87-4 at 171-172).

Plaintiffs allege that thirty-six different models of semi-automatic firearms sold by Century (the "Class Weapons") are defective because they contain foreign-made, fully-automatic safety selectors intended for fully-automatic, not semi-automatic, firearms. Plaintiffs contend that the fully automatic safety selectors on the Class Weapons are capable of accidentally firing the gun when the safety selector is raised above the "safe" position and rotated above the dust cover. Accordingly, Plaintiffs allege the existence of a common "Class Defect," defined as guns that "will fire if the safety selector is raised above the dust cover" (ECF No. 81 at 1).

Plaintiffs allege that Century has known about this defect since at least 2008, but has failed to warn the public of this defect, and has failed to recall the allegedly defective rifles, or make remedial changes to prevent the defect. Century's failure to disclose the defect, Plaintiffs allege, is a deceptive act that caused each putative class member to purchase a Class Weapon for more than that weapon is truly worth, to the detriment of the class member and to the unjust enrichment of Century.

Each named Plaintiff owns a different model Century AK-47 rifle, each of which exhibits the Class Defect. Of the thirty-six models Plaintiffs include in the class definition, only five of

those models are in fact owned by a named plaintiff—GP 1975 (owned by Plaintiff Melton), M70 OPAP (owned by Plaintiff Morris), N-PAP (owned by Plaintiff Johnson), M70AB2 (owned by Plaintiff Valdes), and M70 (owned by Plaintiff Smith).[4] No named plaintiff is alleged to have owned any of the other thirty-one models that Plaintiffs define within the Class Weapons.[5]

Plaintiffs' complaint alleges ten counts against Century for violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count 1); negligence (Count 2); strict liability (Count 3); breach of implied warranty or merchantability (Count 4); violations of the Magnuson-Moss Warranty Act (Count 5); fraudulent inducement and/or suppression (Count 6); negligent failure to disclose, failure to warn, concealment and misrepresentation (Count 7); fraudulent concealment and intentional failure to warn (Count 8); wrongful and/or unjust enrichment (Count 9); and declaratory relief (Count 10) (ECF No. 1). Defendants moved to dismiss Plaintiffs' complaint, and, on March 20, 2017, Judge Moreno entered an order granting the motion in part (ECF No. 20).

In deciding the Motion to Dismiss, the Court conducted a choice of law analysis to determine which state law applied to the claims of the respective Plaintiffs, three of whom live and reside in Florida (Johnson, Valdes, and Smith), one who resides in Illinois (Morris), and one who resides in Tennessee but purchased his rifle in Arizona (Melton). After determining that Plaintiffs' alleged injuries occurred at the point of purchase, the Court analyzed each Plaintiffs' state tort claims under the state law of the place of purchase: Florida, Illinois, and Arizona. With respect to Plaintiffs' FDUTPA claim, the Court concluded that sufficient allegations had been

---

[4] Only one named Plaintiff, Juan Valdes, reports that an accidental discharge has actually occurred; the other Plaintiffs claim only to be aware of the risk of accidental discharge.

[5] Though not alleged in the Complaint, Plaintiff Morris testified at deposition that he purchased another Century model rifle, an AES 10-B, after the Complaint was filed, in October 2016 (ECF No. 86-6 at 98). Because he purchased the rifle after the defined class period, it is not a Class Weapon as Plaintiffs defined that term and, indeed, Morris explained that his AES 10-B lacked the defining characteristic common to the Class Weapons: it was equipped with a notched safety selector, not the wide fully-automatic selector.

raised to overcome Defendants' motion to dismiss on the grounds that Plaintiffs Melton and Morris lacked standing to sue under FDUTPA. The Court observed that the analysis required factual findings that would be revisited at the class certification stage.

As a result of the Court's Order on the Motion to Dismiss, the surviving claims for which Plaintiffs seek certification are Plaintiffs' FDUTPA claim (Count 1), premised on Century's failure to disclose the defective safety lever; and Plaintiffs' unjust enrichment claim (Count 9), based on the profits Century derived from selling defective firearms at full price (ECF No. 20).[6] In the instant motion, Plaintiffs seek to certify a class on behalf of[7]:

> All individuals in the United States who, on or before March 18, 2016,[8] purchased a Century AK-47 model pattern firearm imported or manufactured by Century, limited to the following model platforms: WASR; M70AB2; RPK; DRAGUNOV; AMD65; C39v1 (excluding C39v2); M72; GP 1972; 1975 AK Bullpup; Golani; 2007 Champion Pistol; Galil; Draco Pistol; PLS54C; M70B1; M70B2; M76; AK74; Tantal; AES10B; 1960AK; AKMS; GP 1975; Saiga (excluding shotguns); PAPM85; PAPM92; M70; M74; N-PAP; GPAK 74; MAK- 22; PAPM90; MAADI; MAK-90; and AK63D.

> Alternatively, Plaintiffs seek to certify the following state classes under the consumer

protection laws for each respective state:

> All individuals in the jurisdictions of Arizona, Florida, and Illinois who, on or before March 18, 2016, purchased a Century AK-47 model pattern firearm imported or manufactured by Century, limited to the following model platforms: WASR; M70AB2; RPK; DRAGUNOV; AMD65; C39v1 (excluding C39v2); M72; GP 1972; 1975 AK Bullpup; Golani; 2007 Champion Pistol; Galil; Draco Pistol; PLS54C; M70B1; M70B2; M76; AK74; Tantal; AES10B; 1960AK; AKMS; GP 1975; Saiga (excluding shotguns); PAPM85; PAPM92; M70; M74; N-PAP; GPAK 74; MAK-22; PAPM90; MAADI; MAK-90; and AK63D.

Plaintiffs also seek to certify a nationwide class for their unjust enrichment claim, which they

define in the same manner as their proposed FDUTPA classes. At the hearing on this motion, the

---

[6] In addition, Plaintiffs Melton and Morris have surviving claims of fraudulent inducement (Count 6); negligent failure to disclose, failure to warn, concealment, and misrepresentation (Count 7); and fraudulent concealment and intentional failure to warn (Count 8). Further, Plaintiff Melton alone has claims for negligence (Count 2) and strict liability (Count 3), though these claims are not the subject of Plaintiffs' Motion for Class Certification.

[7] Plaintiffs' proposed class definitions were revised in Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion for Class Certification (ECF No. 102).

[8] The proposed date limiter relates to the date on which the Complaint was filed.

Court heard live testimony from Plaintiffs' expert, David Byron; Defendants' corporate representatives, Andrew Chamberlin and Philip Burnor; and Defendants' experts, Rick Vasquez and Derek Watkins.

## II.    LEGAL STANDARD

In order to state a claim that is appropriate for class treatment, the Federal Rules of Civil Procedure require that the suit meet four prerequisites, commonly referred to as numerosity, commonality, typicality, and adequacy of representation. *See Piazza v. EBSCO Industries, Inc.*, 273 F.3d 1341, 1345 (11th Cir. 2001). Specifically, the Rule states that:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

To be certified as a class action, the case must also meet one of three additional requirements of Rule 23(b). Here, Plaintiffs seek class certification pursuant to Rule 23(b)(3). Rule 23(b)(3) requires a plaintiff to prove that common questions predominate over any questions affecting only individual members; and that class resolution is superior to other available methods for the fair and efficient adjudication of the controversy. *See Harris v. Nortek Glob. HVAC LLC*, No. 14-CIV-21884, 2016 WL 4543108, at *3 (S.D. Fla. Jan. 29, 2016) (citing *Amchem Products, Inc. v. Windson*, 521 U.S. 591, 615 (1997)).

## III.    DISCUSSION

### A.  Class Definition

Before a court may grant a motion for class certification, "a plaintiff…must establish that the proposed class is adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*,

691 F.3d 1302, 1304 (11th Cir. 2012). "An identifiable class exists if its members can be ascertained by reference to objective criteria." *See Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014) (internal citations and quotations omitted). Many courts in our circuit require that the objective criteria be "administratively feasible," which means that the identification of class members is a "manageable process that does not require much, if any, individual inquiry." *See Bussey*, 562 F. App'x at 787; *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015).[9] Accordingly, "a court should deny class certification where the class definitions are overly broad, amorphous, and vague, or where the number of individualized determinations required to determine class membership becomes too administratively difficult." *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003).

Plaintiffs define the nationwide class as individuals who, on or before March 18, 2016, purchased a Class Weapon imported or manufactured by Century.[10] The proposed definition is over-inclusive, as the class would include purchasers of firearm models that are not actually owned by any named Plaintiffs. Plaintiffs contend that this problem is cured by their proof of uniformity of the Class Defect in all Class Weapons. Of the thirty-six models of weapons included in Plaintiffs' proposed definition, Plaintiffs collectively own only five of the thirty-six Class Weapon models. Plaintiffs' decision to include the additional thirty-one models was based on Century's answer to an interrogatory, which asked Century to identify which models had the "Alleged Defect" (ECF No. 87-18). Century responded to Plaintiffs' interrogatory by denying

---

[9] In the recent Eleventh Circuit opinion *Ocwen Loan Servicing, LLC v. Belcher*, No. 18-90011, 2018 WL 3198552, at *3 (11th Cir. June 29, 2018), the Court noted that the Eleventh Circuit has not yet addressed in a published opinion whether the plaintiff must demonstrate an "administratively feasible" method for determining class membership – which is the "highest standard among the various circuits" – in addition to the express requirements of Rule 23. *Id.* While this proposed class may exemplify administrative infeasibility, class certification fails even at the lower standard.

[10] Plaintiffs' alternative proposed definition, which would limit class members to purchasers "in" the states of Arizona, Florida and Illinois, suffers from the same infirmities as the proposed nationwide class and is accordingly not separately analyzed.

the existence of a defect, but noting that the "presumed configuration" identified by Plaintiffs "may" exist in a series of models listed by Century (ECF No. 87-18). Plaintiffs' class definition is thus based on this list of models on Plaintiffs' contention that all weapons across these platforms *in fact* uniformly exhibit the alleged defect, relying on their expert's opinion.

Plaintiffs' expert, David Byron, offered his opinion that the Class Weapons all exhibit a common defect. Included in the definition of Class Weapons are thirty-six different model rifles, with over 100 variants. Century constructed each rifle of surplus parts from rifles manufactured up to sixty years ago, imported from different countries, and at different time periods. In order to reach his conclusion, Mr. Byron inspected a total of seven[11] AK-style rifles, and opined that the alleged Class Defect exists in over 1,250,000 firearms. In his affidavit, Mr. Byron explains that in order to apply his findings with respect to the seven rifles he examined to the dozens of models of firearms that he did not examine, he relied on a review of discovery from Century, which included quality inspection instructions, component blueprints, and assembly worker instructions for the Class Weapons. Mr. Byron relied on these documents, and other blueprints he obtained from the internet, to reach the conclusion that each of the Class Weapons were identically configured in conformity with those instructions and blueprints.

At the hearing, however, Century presented credible evidence that undermines Mr. Byron's conclusion. Century's quality control manager, Andrew Chamberlin, testified that Century does not have blueprints for foreign parts, and that the blueprints it does have for certain

---

[11] Mr. Byron later inspected approximately 100 Century weapons following Defendants' disclosure of their expert, Mr. Watkins, who conducted an examination of stored weapons selected by Century's corporate representative and opined therefrom that approximately 34% of those he inspected were capable of firing in the manner alleged, but only by removing the dust cover. Mr. Byron reviewed the same weapons and reached different conclusions, including his opinion that many of the rifles examined by Mr. Watkins were "nonconforming" and appeared to have been manipulated in order to not exhibit the defect. Neither expert's inspection, or ensuing affidavit, aided the undersigned's analysis or form the basis of the findings in this order that the evidence fails to demonstrate uniformity in the alleged defects. Notwithstanding the same, the Court has considered and relied on the testimony presented by the respective experts at the hearing.

weapons are meant to be used as training aids for the assemblers, not as guidelines for operators to reject firearms for sale (ECF No. 193 at 115-117). Absent proof that Century in fact relies upon the blue prints or instructions in the manner Mr. Byron assumed for his opinion it does, there is no basis for finding the uniformity in configuration he urges across all Class Weapons.

Mr. Byron's opinion as to uniformity is further undermined by Century's evidence demonstrating the overwhelming variance in configurations among the Class Weapons. For example, Plaintiffs (through Mr. Byron) contend that it is the presence of a fully-automatic safety selector in the Class Weapon that causes the alleged Class Defect. Century's expert, Mr. Derek Watkins[12] testified and explained that whether any single firearm can be made to accidentally discharge will depend on the specific part configuration present in that particular weapon (ECF No. 193 at 176, 220). The shape of the safety selector is not dispositive: if a rifle is configured with a tabbed or notched disconnector, those components can move past each other and prevent the rifle from exhibiting the Class Defect even if it has a fully automatic safety selector. This combination of components is present in certain rifles within the class definition, which were identified at the hearing by Mr. Chamberlin. (ECF No. 193 at 209-214).

Even the rifles that do have the same parts may behave differently. Century's expert, Mr. Watkins, explained that tolerances, or minor variations between each weapon such as exact hole size and location, will affect the alignment of the components and exhibition of the alleged defect (ECF No. 193 at 199-204). As such, an individual examination of each firearm would be required to determine whether any individual firearm is capable of accidentally discharging, as

---

[12] Plaintiffs moved to strike the expert report and deposition testimony of Mr. Watkins (ECF No. 109), specifically challenging his opinions reached as a result of an examination of approximately 100 Century rifles. As more fully explained by separate order, Plaintiffs' motion is not well founded and no grounds are set forth therein for Mr. Watkins' exclusion. Similarly, the Court defers ruling on Plaintiffs' Motions to Strike Robert E. McCormick (ECF No. 107), Richard Vasquez (ECF No. 108), Stephen L. Young (ECF No. 110) because the Court's Report and Recommendation on Class Certification does not rely on any of these experts' opinions.

alleged by Plaintiffs. Indeed, at the hearing, Plaintiffs' expert, Mr. Byron, unequivocally acknowledged that in order to determine which parts were in each after-market rifle, one would need to look at individual weapons. (ECF No. 193 at 58-59).

In sum, the record evidence fails to support Plaintiffs' contention that the Class Weapons all exhibit the Class Defect. Recognizing this lack of uniformity, Plaintiffs' counsel proposed at the hearing that the class definition could be modified to be conditioned on the putative class members' ability to show that their firearm actually contain the alleged defect. This proposal is logistically unworkable. Plaintiffs' proposed class is not limited to current owners of the Class Weapons but to all purchasers. Requiring proof of the actual defect as a condition of class membership would defeat participation of purchasers who no longer own the rifle. Plaintiffs' counsel acknowledged this would impose a burden on certain putative class members (ECF No. 193 at 258). Plaintiffs' counsel similarly acknowledged the difficulty inherent in certifying a class of used weapon purchasers, who may have themselves replaced the safety selectors, or other parts, of their firearms and therefore would not be properly included as class members.

Finally, considering ascertainability, the undersigned finds that identifying the proposed class members would be uncertain and unmanageable. Century generally sells its firearms to federally licensed firearm distributors who resell their weapons to retailers for sale to individual consumers (ECF No. 87-18 at 13). Plaintiffs propose to identify class members by contacting the retailers through whom Century distributed 1,125,068 of the Class Weapons and requesting that retailers produce a list of the purchasers of these weapons. Plaintiffs note that retailers are required by law to retain contact information for customers who purchase weapons. Defendants respond that federally licensed firearm distributors are only required to retain records for twenty years, and that, in many cases, retailers who close or change their corporate structure are required

11

to return their records to the Bureau of Alcohol, Tobacco, Firearms and Explosive, making identification of these purchasers especially difficult.

Plaintiffs' proposal for ascertaining the class members suffers from multiple problems. First, Plaintiffs' reliance on Century's distributors to be able to identify customers who purchased Class Weapons is not substantiated. Plaintiffs have not shown that the customer lists that constitute the basis for their plan of class membership identification in fact exist, or what data has been maintained by the subject distributors, as is their burden. *See Luedke v. Delta Airlines, Inc.*, 155 B.R. 327, 332 (S.D.N.Y. 1993) (denying motion for class certification where plaintiffs did not show that the lists, which constitute the basis for their plan of identifying class members, existed in any reliable form). "A plaintiff cannot establish ascertainability simply by asserting that class members can be identified using the defendant's records; the plaintiff must also establish that the records are in fact useful for identification purposes, and that identification will be administratively feasible." *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 948 (11th Cir. 2015). In *Karhu*, the Eleventh Circuit affirmed the district court's finding that the plaintiffs did not meet the ascertainability requirement to certify a class of purchasers of a weight-loss supplement. There, the court determined that the plaintiff's proposal to use general "sales data" to identify class members was "incomplete," "bare," and lacked sufficient explanation as to how exactly the data would aide class-member identification. *Id*. at 949-50.  Similarly here, Plaintiffs' have not advanced evidence showing that the identified retailers have the data Plaintiffs seek.

Moreover, even if retailers had retained documents from which some class members may be identified, at best their records would only reach a fraction of putative class members under Plaintiffs' proposed definition, which includes everyone in the chain of ownership—not just the original purchasers. The class definition includes members who purchased weapons through

third parties in private transactions, including Plaintiff Smith who purchased his Class Weapon from his father (ECF No. 87-13 at 12). Determination of class membership would therefore require identification of secondary (and tertiary and beyond) market purchasers sufficient to determine who is entitled to notice of the suit and critically, who would be bound by any resulting judgment.

At the hearing, Plaintiffs proposed that the secondary market purchasers could be identified through social media by using blogging platforms frequented by gun aficionados. Plaintiffs' proposal goes to notice, not ascertainability: the undersigned does not doubt the potential to notify a broad group of potential class members through such websites, but doing so does not alleviate the problems that were likewise detrimental to the class certification in *Karhu* and *Perez*. In *Perez,* the Court determined that ascertainability could not be established when "the only evidence likely to be offered in many instances will be the putative class member's uncorroborated claim that he or she used the product." *Perez*, 218 F.R.D. at 269. The fact that Plaintiffs may be able to notify a large group of putative class members does not, alone, establish ascertainability. *See also LaBauve v. Olin Corp.*, 231 F.R.D. 632, 684 (S.D. Ala. 2005) (holding that the possibility of publication notice does not establish ascertainability because "publication notice may be both over inclusive and under inclusive in identifying class members.").

Plaintiffs' proposed class definitions suffer from a final infirmity: the class would include purchasers who suffered no damages. Plaintiffs' FDUTPA claim is premised on Defendants' failure to disclose the alleged defect, and the decreased "effectiveness and performance" and attendant value of the Class Weapons (ECF No. 1 at 22). Plaintiffs accordingly seek monetary damages for the diminished value of the Class Weapons. However, under the proposed definitions, the putative class would include individuals who purposefully purchased dated

firearms as collectibles, never intending to actually use them and thus never having been deceived or suffered any loss from their purchase.

Plaintiffs contend that the record is devoid of evidence of consumers who purchased firearms as collectibles, seeking firearms with original parts, even if defective. However, both Plaintiff Morris, who identifies as a gun collector, and Plaintiffs' expert, Mr. Byron, agreed that that gun collectors want as many original parts as possible in their firearms, and Mr. Byron noted that most of such firearms would never be used by consumers, but rather only displayed (ECF Nos. 87-6 at 17-18, 87-7 at 202). As such, the evidence demonstrates that Plaintiffs' proposed class definitions would include consumers who suffered no harm, and would have no viable FDUTPA claim. *See See Walewski v. ZeniMax Media, Inc.*, No. 6:11-CV-1178-ORL-28, 2012 WL 834125, at *4 (M.D. Fla. Jan. 30, 2012), *report and recommendation adopted*, No. 6:11-CV-1178-ORL-28, 2012 WL 847236 (M.D. Fla. Mar. 13, 2012), *aff'd*, 502 F. App'x 857 (11th Cir. 2012) (affirming denial of class certification where, in relevant part, plaintiff failed to set forth a workable method for identifying which members were injured and thus should be included as part of the class). Similarly, with respect to Plaintiffs' unjust enrichment claim, at the hearing, Plaintiffs' counsel candidly acknowledged that their unjust enrichment claim would not extend to secondary purchasers who conferred no benefit on Century.

For the reasons set forth above, the undersigned finds that the proposed class is neither adequately defined nor ascertainable for class certification purposes.

### B.  Certification Under Rule 23

Despite the absence of an adequately defined and ascertainable class, and recognizing that class definition could be modified, the Court also addresses the Rule 23 criteria.

#### a.  Rule 23(a)(1)-Numerosity

The numerosity requirement of Rule 23 requires a district court to determine "whether 'the class is so numerous that joinder of all members is impracticable.'" *Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256, 1266-67 (11th Cir. 2009) (quoting Fed. R. Civ. P. 23(a)(1)). Generally, "a group of more than 40 satisfies numerosity, a group of fewer than 21 does not, and the numbers in between are subject to judgment based on additional factors." *Kelecseny v. Chevron, U.S.A., Inc.*, 262 F.R.D. 660, 668 (S.D. Fla. 2009). The Eleventh Circuit has explained that "[a]lthough mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff need not show the precise number of members in a class." *Vega*, 564 F.3d at 1266-67 (internal citations and quotations omitted). Nonetheless, a plaintiff seeking to certify a class must make a showing with factual support that the numerosity requirement will be satisfied.

Plaintiffs claim, and Defendants do not dispute, that the numerosity requirement is satisfied by the "over one million Class Weapons" sold and identified as belonging to the Nationwide class. In support of their proposition, Plaintiffs cite to the deposition testimony of Century's corporate representative, Mr. Burnor, who estimates that about one million of the Class Weapons have been sold (ECF No. 87-4 at 54). In light of this evidence, and in the absence of evidence to rebut the same, the Court agrees that Plaintiffs have made a showing that the number of actual members in the nationwide class will be so high that "joinder of all members is impracticable." Fed R. Civ. P. 23 (a)(1).

With respect to Plaintiffs' proposed classes composed of citizens of the states of Florida, Illinois, and Arizona to pursue the state consumer laws of those respective states, no evidence has been advanced to demonstrate the number of putative class members for any of those classes. Even where numerosity is not contested, the Court must evaluate the record evidence of class membership to satisfy itself that this element is met. The Court may not surmise from the

15

evidence of total Class Weapons sold that the number sold in the three representative state would be so numerous as to make joinder impractical. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012) (reversing class certification and finding district court erred by relying on the evidence of nationwide presence of defendant's service to satisfy the numerosity requirement without state-specific evidence). For this additional reason, the undersigned does not recommend certification of Plaintiffs' proposed alternative class, defined as persons "in" Florida, Illinois, or Arizona.

### b. Rule 23(a)(3)-Typicality

Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[T]he typicality requirement is permissive: representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 674 (S.D. Fla. 2011) (citing *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 605 (S.D. Fla. 2003)). Accordingly, a plaintiff must generally establish that a "sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (internal citations and quotations omitted). Said differently, a plaintiff must show that the claims of the named representatives share "the same essential characteristics as the claims of the class at large." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279, n.14 (11th Cir. 2000) (internal citations and quotations omitted). As such, "a strong similarity of legal theories will satisfy the typical requirement despite substantial factual differences." *Id.*

Century raises several arguments in opposition to a finding of typicality. Century first argues that the named representatives' claims are not typical of the class because Plaintiffs Melton and Morris have individual causes of actions, which are different than the FDUTPA and unjust enrichment claims that the Plaintiffs seek to certify. However, Mr. Melton's and Mr. Morris's individual causes of actions are not the subject of this instant motion for class certification, and the nature of those claims are irrelevant to deciding whether or not their FDUTPA and unjust enrichment claims are typical of the putative class members. Similarly, Century contends that Plaintiff Johnson continued to use his firearms after learning of the defect, but offers no explanation how this impacts his claim that Century deceived him by failing to disclose a known defect before he bought the gun. Century additionally argues that these claims do not advance the interests of purchasers who seek original parts and want the rifles as collectables, but again, offers no analysis of how either of those interests departs from those advanced by the named Plaintiffs, who seek damages based on a theory that the value of the rifle was less than perceived as a result of Century's alleged deceptive acts.  The undersigned disagrees that any of these factual differences precludes a finding of typicality.

Century further challenges Plaintiffs Morris and Smith as atypical because, Century contends, each purchased their Class Weapons after learning of the defect. Century does not develop this argument further or offer any legal analysis of the impact of the Plaintiffs' alleged knowledge on a finding of typicality. Plaintiffs similarly dispute the fact of their knowledge of the defect but undertake no analysis of its impact on typicality.

With respect to Mr. Morris, the evidence on which Defendants rely does not demonstrate his knowledge of the defect before buying the Class Weapon that forms the basis for his allegations. Century relies on his purchase of the AES-10 in October 2016. That is not the

firearm on which Mr. Morris bases his claim. Mr. Morris's inclusion as a class representative appears to relate to his purchase of a different firearm, the O-PAP (ECF No. 1 at ¶ 38). Moreover, Mr. Morris testified that he did not know this firearm was defective at the time of purchase (ECF No. 87-6 at 99).

Plaintiff Smith presents a different scenario. Mr. Smith obtained his rifle on his eighteenth birthday, February 21, 2016, from his father. Century advanced evidence that Mr. Smith sent an email to Century weeks before, on February 4, 2016, complaining about a defect in his rifle. Century presented the email to Mr. Smith's father at deposition and he confirmed that on the date the email was sent, he still owned the weapon, and that he did not send the email. Century argues that this communication proves that Plaintiff Smith had knowledge of the Class Defect before he purchased his weapon, and bought it notwithstanding.

In response, Plaintiffs attached to their Reply a declaration executed by Plaintiff Smith after his deposition, in which he offers an explanation for denying at his deposition that he ever contacted Century with a complaint regarding the Class Defect (ECF No. 104-10). Plaintiff Smith explained in his declaration that the defect described in his February 4, 2016 email was not the alleged Class Defect but rather a second defect he identified in the weapon: the safety may be installed in a manner that allows the gun to fire in the safe position, and not fire in the "fire" position. The declaration is most notable, however, for what it does not say: it does not deny Century's specific charge that Mr. Smith knew about the alleged Class Defect before he bought his firearm. Mr. Smith's deposition testimony similarly does not state that he bought the rifle before learning of the alleged defect. Mr. Smith testified that he learned about the defect from an article he viewed on Facebook, but he did not specify whether that occurred before or after he purchased the weapon (acknowledging only that it occurred after the related Erickson

18

suit was filed in January 2016). Indeed, the only record evidence from which it could be inferred that Mr. Smith bought the rifle without knowledge of the defect comes in his response to his own counsel's question: would he have bought the gun if he had known? He answered in the negative (ECF No. 82-7 at 53).

The competent record evidence is, at best, conflicted on this point. The Court does not need to decide this factual dispute in order to resolve the present motion. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV, 2018 WL 3145807, at *7 (S.D. Fla. June 26, 2018), *reconsideration denied*, No. 16-24077-CIV, 2018 WL 5004864 (S.D. Fla. Oct. 15, 2018) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). The Court cannot resolve factual disputes, on which Plaintiffs bear the burden of proof, in Plaintiffs' favor. Faced with a direct challenge to Mr. Smith's claims as atypical on the basis that he had knowledge of the defect and bought the gun with this knowledge, Plaintiffs failed to adduce competent evidence showing that he did not. If he knew, it could break the causal link between Defendants' deceptive acts and his damages. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 598–99 (3d Cir. 2012). In *Marcus*, the court found no error in determining typicality satisfied despite defendant's challenge to the named plaintiff's relative ignorance about the deal before entering, observing that if the opposite were true—that the plaintiff did indeed know about the alleged defect in the product before acquiring it—that would create a typicality problem.

The complaint herein alleges that "Plaintiffs and Class Members would not know of the defect, and by the exercise of reasonable diligence, Plaintiffs and class members could not have known of the defect" (ECF No. 1 at ¶ 13). Plaintiffs moreover identify in their motion questions

common to the class that assume ignorance of the defect at the time of purchase.[13] Plaintiffs have

failed to show, by a preponderance of the evidence, that Plaintiff Smith is typical in this respect,

specifically, that he did not know about the alleged Class Defect at the time he purchased the

firearm. *See Hutson v. Rexall Sundown, Inc.*, 837 So. 2d 1090, 1093 (Fla. 4th DCA 2003)

(affirming trial court's finding that plaintiffs with knowledge of the alleged deceptive act failed

to satisfy typicality requirement for FDUTPA claim). Accordingly, he cannot serve as a class

representative.

### b.  Rule 23(a)(4)-Adequacy of Representation

Rule 23(a)(4) requires a showing that "the representative parties will fairly and

adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The analysis "encompasses

two separate inquiries: (1) whether any substantial conflicts of interest exist between the

representatives and the class; and (2) whether the representatives will adequately prosecute the

action." *Valley Drug Co. v. Geneva Pharms., Inc.,* 350 F.3d 1181, 1189 (11th Cir. 2003) (citation

omitted). This prong also requires a determination that plaintiff's counsel is "qualified,

experienced and generally able to conduct the proposed litigation." *Bowe v. Pub. Storage*, 318

F.R.D. 160, 172 (S.D. Fla. 2015).

While Century did not challenge Plaintiffs' counsel's adequacy of representation in their

briefing, at the hearing, defense counsel suggested that factual variations among plaintiffs, like

their knowledge of the defect at the time of purchase, preclude a finding of adequacy of

representation. Except for Plaintiff Smith as explained above, these variances do not rise to the

level of a substantial conflict of interest exists between the representatives and the class.

Moreover, the undersigned finds that Plaintiffs and their counsel are actively participating in this

---

[13] Two such examples are whether the average customer was likely to be misled by Century's omissions about the Class Defect; and whether Century's omissions would have caused Plaintiffs and the class to alter their behavior, including by not purchasing the Class Weapons.

litigation and adequately representing the interests of potential class members. As for Plaintiffs'
counsel, they are well-qualified to pursue this action on behalf of their clients and have
demonstrated skill in pursuing this litigation. Plaintiffs have, therefore, satisfied the adequacy of
prong of Rule 23(a).

### C.  Rule 23(a)(2) and 23(b)(3)—Commonality & Predominance

Rule 23(a)(2)'s commonality requirement demands "questions of law or fact common to
the class." Fed. R. Civ. P. 23(a)(2). As with numerosity, the Eleventh Circuit has described the
commonality requirement as a "low hurdle" or a "light burden," as commonality "does not
require that all questions of law and fact raised be common." *Williams v. Mohawk Indus., Inc.*,
568 F.3d 1350, 1356 (11th Cir. 2009); *Vega*, 564 F.3d at 1268. The Supreme Court has found
that the commonality inquiry requires the plaintiff to demonstrate that the class members "have
suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541,
2551, 180 L. Ed. 2d 374 (2011) (internal citation omitted). Additionally, the court must take into
account whether certification of the class will "generate common answers to drive the resolution
of the litigation." *Id.* Even "a single common question" will suffice. *Id.* at 359. Though
Defendants challenge commonality on the grounds that no uniform defect exists, Plaintiffs have
raised multiple issues common to the class, including whether Century was aware of the alleged
defect, whether the disclosures made by Century were likely to deceive an average consumer.
This is a low hurdle, and Plaintiffs have met it here.

Predominance, while similar to the commonality requirement under Rule 23(a)(2), is "far
more demanding." *Vega*, 564 F.3d at 1270 (11th Cir. 2009) (internal citation omitted). Common
issues of fact and law predominate if they have a direct impact on every class member's effort to
establish liability that is more substantial than the impact of any individualized issues in

resolving the claims of each class member. *See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010). However, common issues will not predominate over individual questions if "as a practical matter, the resolution of [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009). The court's inquiry is typically focused on "whether there are common liability issues which may be resolved efficiently on a class-wide basis." *Brown v. SCI Funeral Servs. of Fla.*, 212 F.R.D. 602, 606 (S.D. Fla. 2003). To conduct this inquiry, the Court must consider the cause of action and "what value the resolution of the class-wide issue will have in each member's underlying cause of action." *Rutstein v. Avis Rent–A–Car Sys., Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000).

Plaintiffs argue that common issues predominate because this action arises from a common course of conduct, and Plaintiffs' claims do not depend on any individualized issues. However, as explained below, Plaintiffs' claims include elements in which individual issues predominate.

### a. FDUTPA

#### 1. Choice of Law

The parties disagree over whether there are sufficient contacts with Florida to justify the application of Florida substantive law to a nationwide class and whether FDUTPA applies to all class members' claims, so that there is a predominance of common legal issues. *Renaissance Cruises, Inc. v. Glassman*, 738 So. 2d 436 (Fla. 4th DCA 1999). If not, common issues of law do not predominate, because the claims of non-resident consumers would require the application of consumer protection laws from each of the states where the deceptive trade practice occurred.

Century argues that Plaintiffs Melton and Morris cannot bring their claims under FDUTPA because neither one purchased their rifles in Florida, nor lives in Florida. Plaintiff Melton, a resident of Tennessee, purchased his rifle in Arizona; and Plaintiff Morris resides in and purchased his rifle in Illinois. Focusing on the place of purchase as the site of injury, Century contends that a certified class would require the Court to apply the respective consumer protection laws for each state in which a Class Weapon was purchased. Plaintiffs focus on Century's acts committed in Florida, and contend that Florida has a strong interest in deciding this case. Plaintiffs alternatively seek certification of classes based on the state consumer laws of Florida, Arizona, and Illinois, the states in which the named Plaintiffs purchased their Class Weapons and thus, the place where their respective injury occurred.

Prior to engaging in a choice of law analysis, the Court must first determine whether a true conflict of law exists. *Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198, 1219 (S.D. Fla. 2008), aff'd, 329 F. App'x 257 (11th Cir. 2009). A true conflict exists when "two or more states have legitimate interests in a particular set of facts in litigation, and the laws of those states differ or would produce different results in the case." *Walker v. Paradise Grand Hotel, Ltd.*, No. 01-3564-CIV, 2003 WL 21361662, at *2 (S.D. Fla. Apr. 25, 2003), *aff'd,* 107 F. App'x 894 (11th Cir. 2004). In this case, Florida's and Illinois's consumer protection laws are similar, and neither require a showing of reliance, accordingly there is no conflict of law between Florida and Illinois. *See Mednick v. Precor, Inc.*, 320 F.R.D. 140, 150 (N.D. Ill. 2017). Arizona's consumer protection law, however, does require a consumer to show reliance on the deceptive act. *See Kuehn v. Stanley*, 208 Ariz. 124, 129, 91 P.3d 346, 351 (Ct. App. 2004). Thus, a plaintiff that may have a cognizable claim under Florida law, may not have a claim under Arizona law, if the plaintiff cannot show reliance on the deceptive act. Because both Florida and

Arizona law have a legitimate interest in Plaintiffs' unfair trade practice claim and the laws of these states differ, a true conflict exists.

Having determined that a true conflict exists, the Court applies Florida's conflict of laws rules to determine whether Florida law would apply to the unfair trade practice claims of every putative class member. In a diversity action, a federal court applies the conflict of laws rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). Florida utilizes the "most significant relationship" test of the Restatement (Second) of Conflict of Laws § 145 (1971) to determine which state's laws apply to tort claims, including FDUTPA. *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 225 (S.D. Fla. 2002). Courts consider four types of contacts to determine which states have an interest in the matter: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered. *See* Restatement (Second) of Conflict of Laws § 145 (1971).

Because the injury alleged arises from the sale of a defective product and Defendants' alleged omissions about that alleged defect, place of injury is not as significant as it would be in a personal injury dispute. *See Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 626 (S.D. Fla. 2008). Plaintiffs' injuries occurred when, and where, each member purchased his or her Class Weapon: for Plaintiff Melton, in Arizona; Morris, in Illinois; and Plaintiffs Smith, Johnson and Valdes each purchased their rifles in Florida. Thus the injury occurred in Florida, Arizona, and Illinois.

"When the injury occurred in two or more states . . . the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the

applicable law." Restatement (Second) of Conflict of Laws § 145 cmt e (1971). Plaintiffs argue that Century's conduct occurred in Florida, advancing the following facts in support: Century's corporate headquarter and customer service representatives are located in Florida, which include at least twenty-five employees (ECF No. 82-1); Century's registered agent and CEO, Michael Sucher, works in Florida, as do two other company officers (ECF No. 82-10); and for thirty years Century had an entity called Century Arms Inc. of Florida registered to do business in Florida (ECF No. 82-11). Moreover, three of the five named Plaintiffs bought their rifles in Florida, evidencing that Century avails itself of this market. Century does not refute these facts but advances evidence that it imports, manufacture, inspects, and ships its rifles from its factories in Vermont, and the contested manuals that Plaintiffs' allege fail to disclose the defect originate from Vermont. The conduct causing the alleged injury occurred in Florida and Vermont.

Where one of the parties is domiciled or does business in a given state will usually carry little weight. Restatement (Second) of Conflict of Laws § 145 cmt. e (1971). Defendant Century Arms, Inc. is registered to do business in Florida and has a Florida mailing address, though it is domiciled in Vermont (ECF Nos. 82-1, 82-10, 87-4). Century International Arms, Corp. is located in Vermont. Century Arms of Vermont, Inc. is a d/b/a for Century Arms, Inc., and was created to do business in Florida. Plaintiffs are residents of Florida, Tennessee, and Illinois. Plaintiffs' proposed alternative class definition would include "[a]ll individuals in the jurisdiction of Arizona, Florida, and Illinois" who purchased a Class Weapon before the class date. Because Arizona is not the state of any Plaintiffs' residence but the place in which Plaintiff Melton purchased his rifle, presumably the proposed class would include class members residing in any and all states, who purchased their weapons in any one of the three delineated states. This assumption is consistent with Plaintiffs' primary class definition, which includes all individuals

in the United States. Accordingly putative class members are residents of all 50 states and the District of Columbia. This contact is neutral.

The final contact, the place of the parties' relationship, is similarly neutral. Neither party presented evidence with respect to this contact. However, none of the Plaintiffs purchased directly from Century, nor is any other contractual or other relationship alleged.

Having identified the possible states with interests in this dispute, the Court is guided by Section 6 of the Restatement (Second) of Conflict of Laws to determine which sovereign has the most significant contact. *Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1569 (11th Cir. 1990). Defendants generally contest Plaintiffs Melton's and Morris's standing to bring their FDUTPA claims, but offer no analysis to demonstrate which of the other potential sovereigns have a greater interest.

Under the facts developed to date, Florida has the most significant interest in having its laws applied to this dispute. First, three of the five Plaintiffs reside in and purchased their Class Weapons here; it is undisputed that the alleged injury to those three Plaintiffs occurred here in Florida. Defendants raise no challenge to the application of Florida law to those Plaintiffs. Similarly, it is still uncontested that Defendants conduct significant and related business activity in Florida, including having the presence of its CEO and its customer service team in Florida. And while Defendants aver that their more significant business conduct occurs in Vermont, not Florida, the nature of the alleged misconduct (deception by omission) makes it difficult to say that such conduct occurred in Vermont *to the exclusion* of Florida. Finally, and importantly, the Court notes that Florida law will be applied to these claims: it is undisputed that three of the five Plaintiffs can maintain their FDUTPA claims against Defendants herein, and that those claims will be adjudicated by this Court.

26

In sum, no state has a greater interest than Florida does in the application of its laws to decide Defendants' liability for the deceptive acts alleged. Accordingly, the undersigned rejects Defendants' challenge to predominance predicated on the grounds that the Court would have to apply multiple state consumer laws, and proceeds to analyze predominance under the elements of a single state law: FDUTPA.

### 2.   Applying FDUTPA, Common Issues Do Not Predominate

A plaintiff asserting a claim under FDUTPA must establish: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Harris v. Nortek Glob. HVAC LLC*, No. 14-CIV-21884, 2016 WL 4543108, at *12 (S.D. Fla. Jan. 29, 2016) (internal citations omitted). To satisfy the predominance requirement, a plaintiff must therefore demonstrate that "the individual injury resulting from the alleged FDUTPA violation was capable of proof at trial through evidence that [was] common to the class rather than individual to its members." *Id.* (internal citations and quotations omitted). Accordingly, this inquiry requires that the alleged damages from the injury be "measurable on a class-wide basis through use of a common methodology." *Id.* (internal citations and quotations omitted).

### i.   *Deceptive Act or Unfair Practice*

Plaintiffs' FDUTPA claims are premised on Century's alleged failure to disclose the alleged defect in the firearms. The Complaint alleges that "century violated FDUTPA by failing to disclose to and concealing from Plaintiffs, Class Members, prospective purchasers, and the public the Safety Device defect in the Class Rifles and Pistols." (ECF No. 1 ¶ 60). Defendants argue that Plaintiffs cannot prove a class-wide deceptive act because the putative class members were not uniformly exposed to the alleged deception. Specifically, Defendants contend that in 2008, they revised their manuals to disclose the condition that may cause the rifle to fire: that the

safety was capable of rotating above the dust cover. The putative class members would include those who were exposed to the manuals before and after that revision (and subsequent revisions). Defendants further observe that the named Plaintiffs have had varied experiences with the manuals: some have read it, but others have not, making it impossible to prove that, uniformly, the alleged deficiency in the manual constitutes deceptive act with respect to the varying class members.

A "deception" occurs when there is a "representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (internal citations and quotations omitted). Defendants' arguments here fail to appreciate the nature of the deception alleged, which is a complete failure to disclose a defective condition that resulted in a less-valuable product than the purchaser expected. Plaintiffs allege that none of the manuals meaningfully disclosed the defect because none specified that the rifle could fire when the safety was rotated beyond the "safe" position. To the extent there was a defect about which Defendants knew but failed to disclose to the purchasing public, that deceptive act is susceptible to class-wide proof. Common issues predominate with respect to the first FDUTPA element.

### ii.   Causation

In order for a party to be entitled to any relief under FDUTPA, the party "must not only plead and prove that the conduct complained of was unfair and deceptive but the consumer must also plead and prove that he or she was aggrieved by the unfair and deceptive act." *Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 644 (S.D. Fla. 2008) (internal citations and quotations omitted). FDUTPA "does not require a plaintiff to prove actual reliance on the alleged conduct." *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009).

Instead, a plaintiff must prove that "the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances." *Id.* (internal citations and quotations omitted).

Plaintiffs contend that Century's failure to disclose the alleged defect in "their distribution, sale, marketing, and/or advertisement of the Class Rifles and Pistols, including information in Century's Manual[s]," caused consumers to purchase firearms that have diminished value (ECF No. 1 ¶ 58). To satisfy predominance, Plaintiffs must show that their claims are susceptible to class-wide proof of causation. Plaintiffs rely on their premise that a uniform defect exists in all Class Weapons, and Century's uniform failure to disclose same. Defendants argue that Plaintiffs cannot show class-wide evidence of causation because they cannot prove the existence of a uniform defect; nor can Plaintiffs prove uniformly that the failure to disclose caused the injuries alleged.

Because Plaintiffs' FDUTPA claim is premised on Century's failure to notify the class of the alleged defect, an essential question to answer at trial will be whether the Class Weapons are in fact defective and capable of accidentally discharging. If Plaintiffs cannot prove that all Class Weapons have the fully automatic safety selector, which Plaintiffs allege causes the firearms to accidentally discharge, Plaintiffs cannot successfully show that Century's allegedly deceptive practice caused the putative class members any harm. *See Harris v. Nortek Glob. HVAC LLC*, No. 14-CIV-21884, 2016 WL 4543108, at *13 (S.D. Fla. Jan. 29, 2016) (denying motion for class certification where evidence failed to demonstrate uniformity of defect alleged and not disclosed).

As this Court has already noted, the evidence in the record demonstrates that the Class Weapons do not all have the fully-automatic safety selectors about which Plaintiffs complain. Mr. Burnor testified at the hearing that the safety selectors in Century's imported firearms are

usually not replaced, and that safety selectors vary, depending on manufacture and possibly country of origin (ECF No. 193 at 165). Plaintiffs' expert, Mr. Byron, conceded these variances at the hearing (ECF No. 193 at 58-59). Because the allegedly defective safety selector does not exist uniformly in the Class Weapons, for each of the "over one million" potential class members in Plaintiffs' proposed class definition this Court would need to determine whether the Plaintiff at issue actually suffered a harm from Century's allegedly deceptive practice. For each plaintiff, the Court would need to know whether the firearm at issue contained a fully-automatic safety selector at the time of purchase, resulting in a diminished value to the plaintiff. Determining whether or not any given plaintiff actually suffered a harm from Century's allegedly deceptive practice would require individualized proof pertaining to each individual plaintiff (ECF No. 87-4 at 172-173). *See Harris*, 2016 WL 4543108, at *13; *City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 652 (S.D. Fla. 2010).

Defendants additionally challenge Plaintiffs' ability to prove causation with common proof on the grounds that "many" purchasers *are* aware that their rifle is configured with the original, fully automatic safety selector; citing *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 611 (3d Cir. 2012), Defendants contend that this individualized knowledge of the defect would predominate and defeat class certification. Plaintiffs distinguish *Marcus* on the grounds that the defendants there presented significant evidence that the allegedly omitted information was available to class members from various sources, averring that there is no such evidence here. While there is record evidence of availability of the information regarding the alleged defect, including Plaintiff Smith's testimony that he read an article about the defect on Facebook, which linked to a video on YouTube, the evidence of availability of the information on social media is

not sufficient to determine whether a significant number of potential class members knew about the defect before purchasing their weapons.

### iii.    *Damages*

Because the allegedly defective safety selector does not exist uniformly in the Class Weapons, for each of the "over one million" potential class members in Plaintiffs' proposed class definition, this Court would need to determine whether the plaintiff at issue purchased a firearm that actually exhibited the defect has a suffered a harm from Century's allegedly deceptive practice. Determining whether or not any given plaintiff actually suffered a harm from Century's allegedly deceptive practice would require individualized proof pertaining to each individual plaintiff, for the reasons explained above. *See Harris v. Nortek Glob. HVAC LLC*, No. 14-CIV-21884, 2016 WL 4543108, at *13 (S.D. Fla. Jan. 29, 2016); *City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 652 (S.D. Fla. 2010). Accordingly, individual issues of fact predominate over the common issues in demonstrating whether the class members were actually aggrieved by Defendants' alleged deceptive practice.

Predominance also requires that damages resulting from the injury be measurable on a class-wide basis through use of a "common methodology." *Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013) (internal citations and quotations omitted). Actual damages for a claim brought under FDUTPA are "the difference in the market value of the product or service in the condition which it was delivered and its market value in the condition in which it should have been delivered…" *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006) (internal citations and quotations omitted); *see also Harris*, No. 14-CIV-21884, 2016 WL 4543108, at *15. Although the Eleventh Circuit has held that individualized damages issues will seldom upset a case otherwise suited for class certification, "[w]here there are significant individualized

31

questions going to liability…the need for individualized assessments of damages is enough to preclude 23(b)(3) certification." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Landstar Sys., Inc.*, 622 F.3d 1307, 1326 (11th Cir. 2010) (internal citations and quotations omitted).

Plaintiffs propose class-wide damages that are measured by either diminution in value of the firearms as a result of the alleged defect, or the value of Defendant's unjust enrichment. Plaintiffs claim that proper damages calculation is the cost of replacing the Class Weapons with properly functioning safety selectors (ECF No. 102 at 13). The damages model presented by Plaintiffs' expert, Mr. Byron, would require individualized assessment. Mr. Byron suggests that replacing each allegedly defective safety lever would cost between $143.44 and $365.74 "depending on safety selected, installation difficulty and shipping" (ECF No. 83 at 35). Plaintiffs provide a chart a generalized chart of shipping charges across the United States, and suggest that safeties can range from $19.99 to $58.99 (ECF No. 83 at 33-34). Variations in the cost of safety levers and the corresponding installation difficulties are presumably based on the individualized nature of the firearms at issue. Thus, individualized proof of which safety lever is required for which firearm, and how difficult substitution of the same would be for each firearm would be necessary. Plaintiffs do not offer how such determinations would be rendered on a class-wide basis for over "one million weapons." Thus, while the issue of damages is not alone determinative, the proposed individualized damages calculations contribute to a lack of predominance in this case. *See City of St. Petersburg*, 265 F.R.D. at 642 (holding that the individualized nature of the class members' damages contributes to a finding that individual issues predominate in the case); *Harris*, No. 14-CIV-21884, 2016 WL 4543108, at *15 (finding that the proposed individualized damages calculation weighed against a finding that common issues predominate).

Because individual issues predominate as to the question of common design defect, in conjunction with the proposed damages model that require individual proof and calculation, class certification of Plaintiffs' FDUTPA claim is inappropriate pursuant to Rule 23(b)(3).

### b. Unjust Enrichment Claim

Plaintiffs' unjust enrichment claim similarly fails to satisfy predominance. The essential elements of unjust enrichment in Florida are: "(1) a benefit conferred upon defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Vega*, 564 F.3d at 1274 (11th Cir. 2009) (internal citations and quotations omitted). Before a court can grant relief on an unjust enrichment claim, a court "must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist." *Id.* This necessitates inquiry into the "individualized equities attendant to each class member," and as such, "courts, including ours, have found unjust enrichment claims inappropriate for class treatment." *Id.*

In this case, Plaintiffs argue that a nationwide class for Plaintiffs' unjust enrichment claim is appropriate because Defendants uniformly deceived customers by "not disclosing the defect and not fixing the defect." (ECF No. 81 at 15). Plaintiffs rely on *In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 676 (S.D. Fla. 2015) for the proposition that a nationwide should be certified under the instant circumstances. However, in that case, the district court specifically found that class-wide proof was available to show the defendant deceived its customers "through uniform misrepresentations and concealment" of important information and that substantial evidence existed to demonstrate that defendant's actions were uniformly concealed from consumers. No such evidence of uniformity exists here. As explained above,

material differences exist between the firearms at issue that would necessitate individualized inquiries to determine the extent to which individual inequities exists as to class members. *See Harris*, No. 14-CIV-21884, 2016 WL 4543108, at *15; *see also Kunzelmann v. Wells Fargo Bank, N.A.*, No. 9:11-CV-81373-DMM, 2013 WL 139913, at *10 (S.D. Fla. Jan. 10, 2013). In sum, Plaintiffs have failed to demonstrate that common issues of law and fact predominate as to their unjust enrichment claims.

Because the Court finds that Plaintiffs have failed to meet the predominance requirement for certification pursuant to Rule 23(b)(3) as to both their FDUTPA and unjust enrichment claims, it does not reach the question of a superior means of adjudication. *See Vega*, 564 F.3d at 1278; *see Harris*, No. 14-CIV-21884, 2016 WL 4543108, at *15.

## IV.     RECOMMENDATION

For the foregoing reasons, the undersigned **REPORTS AND RECOMMENDS** that Plaintiff's Motion for Class Certification (ECF No. 81) should be **DENIED.**

Pursuant to Local Magistrate Rule 4(b), the Parties have fourteen (14) days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to timely file objections shall bar the Parties from de novo determination by the District Judge of any factual or legal issue covered in the Report and shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. *See* 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *Patton v. Rowell*, 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security*, 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**RESPECTFULLY SUBMITTED** this 28th day of November, 2018.

LAUREN LOUIS
UNITED STATES MAGISTRATE JUDGE